**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, *and* Rebecca Rieckhoff, *individually, and on behalf of all others similarly situated,*<br><br>                                  Plaintiffs,<br><br>        v.<br><br>United States Postal Service, Louis DeJoy*, as Postmaster General of the United States Postal Service*; and Donald J. Trump, *as President of the United States,*<br><br>                              Defendants. |

Docket No. 20-cv-6516-VM

---

### PLAINTIFFS' MEMORANDUM OF LAW
### IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

---

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016

*Attorneys for Plaintiffs*

September 2, 2020

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL HISTORY ..............................................................................................................2

    A.    Postmaster DeJoy's Testimony. ............................................................................3

    B.    Other Testimony and Facts. ..................................................................................4

ARGUMENT ............................................................................................................................8

    I.    A Mandatory, National Injunction is the Appropriate Remedy. ...................................8

    A.    Plaintiffs must (and do) show a clear or substantial likelihood of success on the merits. .8

    B.    Nationwide relief is appropriate in the circumstances here, and any other remedy would be constitutionally problematic. .........................................................................................9

    II.    First Amendment Scrutiny Applies to Acts of USPS Like Any Other Part of the Government, If Not More So. ...................................................................................................11

    III.    Plaintiffs Have A Clear Likelihood of Success on the Merits. ...................................13

    A.    The restrictions here require strict scrutiny. ........................................................14

    i.    Many voters face the most severe burden possible:  total disenfranchisement. ...............14

    ii.    The burden on all voters is severe. ......................................................................16

    iii.    The burden falls differently on different voters, presenting equal protection and one-person, one-vote problems. ..........................................................................................18

    iv.  Because USPS has changed its policies, service standards, and capacity to handle election mail in the middle of an election cycle, the changes should be scrutinized more closely. .......21

B.     If not strict scrutiny, the burden here requires analysis on the high end of *Anderson-Burdick*'s sliding scale. ...................................................................................................................23

C.     Under any level of scrutiny, the restrictions are not supported by any cognizable justification..............................................................................................................................25

    i.  Defendants have no legitimate government interest at stake. .............................................25

    ii.  Because there is no legitimate government interest to balance it, the burden Defendants have placed on the right to vote is unconstitutional. ...................................................27

IV.   The Balance of the Equities Favors Injunctive Relief and Irreparable Harm Is Presumed.28

CONCLUSION.......................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*725 Eatery Corp. v. City of New York,*
408 F. Supp. 3d 424 (SDNY 2019) .......................................................................................2, 5

*Al-Amin v. Smith,*
511 F.3d 1317 (11th Cir. 2008), *en banc rehearing denied* 277 Fed. Appx. 977 (2008),
*cert. denied*, 555 U.S. 820 (2008) ......................................................................................... 12

*Anderson v. Celebrezze,*
460 U.S. 780, 789 (1983) ................................................................................................ 24, 25

*Associated Students for Univ. of California v. Attorney Gen. of United States,*
368 F. Supp. 11 (CD Ca. 1973) ...........................................................................................11

*Atl. Coast Demolition & Recycling v. Bd. of Chosen Freeholders,*
112 F.3d 652 (3d Cir. 1997) ................................................................................................26

*Ayers-Schaffner v. Distefano,*
37 F.3d 726 (1st Cir. 1994) ..................................................................................................22

*Blount v. Rizzi,*
400 U.S. 410 (1971) .........................................................................................................1, 11

*Briscoe v. Kusper,*
435 F.2d 1046 (7th Cir. 1970) .............................................................................................22

*Brown v. Plata,*
563 U.S. 493 (2011) .............................................................................................................26

*Burdick v. Takushi,*
504 U.S. 428, 434 (1992) .....................................................................................................13

*Bush v. Gore,*
531 U.S. 98 (2000) ...............................................................................................................19

*Califano v. Goldfarb,*
430 U.S. 199 (1977) .............................................................................................................26

*Constitution Party of Va. v. Va. State Bd. of Elections,*
No. 3:20-cv-349, 2020 U.S. Dist. LEXIS 125589 (E.D. Va. July 15, 2020) ....................23

*Credico v. N.Y. State Bd. of Elections,*
751 F. Supp. 2d 417 (EDNY 2010) ............................................................................... 24, 29

*Credico v. New York State Bd. Of Elections,*
    2013 US Dist. LEXIS 109737 (EDNY 2013), 10-cv-4555-(RJD)-(CLP) ................................ 24, 27

*Culp v. Raoul,*
    921 F.3d 646 (7th Cir. 2019) ................................................................................................26

*Daunt v. Benson,*
    956 F.3d 396 (6th Cir. 2020) (Readler, J., concurring) ................................................................18

*Democratic Nat'l Comm. v. Reagan,*
    904 F.3d 686 (9th Cir. 2018) (Thomas, J., dissenting) ................................................................17

*Doe v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) ................................................................................... 10, 15

*Doe v. Walker,*
    746 F. Supp. 2d 667 (D Md. 2010) ................................................................................14, 15, 16

*Dudum v. Arntz,*
    640 F.3d 1098 (9th Cir. 2011) ................................................................................................17

*Esshaki v. Whitmer,*
    No. 2:20-CV-10831-TGB, 2020 U.S. Dist. LEXIS 68254 (ED Mich. Apr. 20,
    2020), *stay granted in part,* No. 20-1336, 2020 U.S. App. LEXIS 14376 (6th Cir.
    May 5, 2020) ................................................................................................23

*Flores v. Town of Islip,*
    2019 U.S. Dist. LEXIS 60319 (EDNY 2019) ................................................................................5

*Flynt Distrib. Co. v. Harvey,*
    734 F.2d 1389, 1394 (9th Cir. 1984) ................................................................................................2

*Free Libertarian Party, Inc. v. Spano,*
    314 F. Supp. 3d 444 (EDNY 2018) ................................................................................................24

*Gallagher v. N.Y. State Bd. of Elections,*
    2020 U.S. Dist. LEXIS 138219 (SDNY 2020) ................................................................*passim*

*Garbett v. Herbert,*
    2:20-cv-245-RJS, 2020 U.S. Dist. LEXIS 75853 (D Utah Apr. 29, 2020) ................................23

*Gray v. Sanders,*
    372 U.S. 368 (1963) ................................................................................................20

*Green Party v. N.Y. State Bd. of Elections,*
    389 F.3d 411 (2d Cir. 2004) ................................................................................................*passim*

*Green Party v Weiner,*
    216 F. Supp. 2d 176 (SDNY 2002) ................................................................................................20

*Greenberg v. Bolger,*
    497 F. Supp. 756 (EDNY 1980) ..................................................................11

*Hadley v. Junior Coll. Dist. of Metro. Kan. City,*
    397 U.S. 50 (1970)....................................................................................19

*Hannegan v. Esquire, Inc.,*
    327 U.S. 146 (1946)..................................................................................12

*Harman v. Forssenius,*
    380 U.S. 528 (1965)....................................................................................9

*Hiett v. United States,*
    415 F.2d 664 (5th Cir. 1969).................................................................9, 11

*Hirschfeld v. Bd. of Elections,*
    799 F. Supp. 394 (SDNY 1992) ...............................................................27

*Hudler v. Austin,*
    419 F. Supp. 1002 (ED Mich. 1976), *aff'd sub. nom., Allen v. Austin,* 430 U.S. 924
    (1977) ........................................................................................................22

*Kermani v. N.Y. State Bd. of Elections,*
    487 F. Supp. 2d 101 (NDNY 2006) ..........................................................29

*Lamont v. Postmaster General,*
    381 U.S. 301 (1965)..................................................................................11

*Lerman v. Bd. Of Elections,*
    232 F3d 135 (2d Cir. 2000)........................................................................25

*Libertarian Party of Ohio v. Husted,*
    2014 U.S. Dist. LEXIS 187771 (SD Ohio, 2014).......................................22

*Lynch v. City of New York,*
    589 F.3d 94 (2d Cir. 2009) ..........................................................................8

*Mastrovincenzo v. City of New York,*
    435 F.3d 78 (2d Cir. 2006) ..........................................................................8

*Medina v. City of Osawatomie,*
    992 F Supp 1269 (D Kan 1998)..................................................................13

*United States ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson,*
    255 U.S. 407 (1921) (Holmes, J., dissenting)..........................................1, 11

*Mullins v. City of New York,*
    626 F.3d 47 (2d Cir. 2010) ...........................................................................2

*Ne. Ohio Coal. v. Husted,*
　696 F.3d 580 (6th Cir. 2012) ............................................................................22

*New York v. U.S. Dep't of Homeland Sec.,*
　2020 U.S. App. LEXIS 24492 (2d Cir. Aug. 4, 2020) ..............................9, 10

*Norman v. Reed,*
　502 U.S. 279 (1992) ...........................................................................................17

*O'Brien v. Skinner,*
　414 U.S. 524 (1974) ...........................................................................................15

*Obama for Am. v. Husted,*
　697 F.3d 423 (6th Cir. 2012) ............................................................................28

*Obama for Am. v. Husted,*
　697 F3d 423 (6th Cir. 2012) .............................................................................13

*Original Cosmetics Prods. v. Strachan,*
　603 F.2d 214 (2d Cir. 1979) *cert. denied,* 444 U.S. 915 (1979) ......................11

*Pitts v. Black,*
　608 F. Supp. 696 (SDNY 1984) .......................................................................29

*Poindexter v. Strach,*
　324 F. Supp. 3d 625 (EDNC 2018) ..................................................................22

*Price v. N.Y. State Bd. of Elections,*
　540 F.3d 101 (2d Cir. 2008) ................................................................13, 24, 25

*Purcell v. Gonzalez,*
　549 U.S. 1 (2006) ..........................................................................................18, 21

*Reynolds v. Sims,*
　377 U.S. 533 (1964) .............................................................................................1

*Rossito-Canty v. Cuomo,*
　86 F. Supp. 3d 175 (EDNY 2015) ......................................................................8

*Rutan v. Republican Party,*
　497 U.S. 62 (1990) ........................................................................................20, 26

*Schulz v. Williams,*
　44 F.3d 48, 60 (2d Cir. 1994) ...........................................................................28

*Stanley v. Illinois,*
　405 U.S. 645 (1972) ...........................................................................................26

*Storer v. Brown,*
    415 U.S. 724 (1974)................................................................................................................24

*Taylor v. Sterrett,*
    532 F.2d 462 (5th Cir. 1976)..............................................................................................12

*Tollett v. United States,*
    485 F.2d 1087 (8th Cir. 1973) ...........................................................................................12

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994)............................................................................................................25

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,*
    453 U.S. 114 (1981)........................................................................................................1, 11

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981)..............................................................................................................2

*Vanasco v. Schwartz,*
    401 F. Supp. 87 (SDNY 1975), *aff'd,* 1976 U.S. LEXIS 921 (1976)................................29

*Veasey v. Perry,*
    574 U.S. 951 (2014)............................................................................................................21

*Velesaca v. Decker,*
    2020 U.S. Dist. LEXIS 78470 (SDNY 2020).......................................................................5

*Vote Forward v. DeJoy,*
    20-cv-2405-EGS (D.D.C.) ....................................................................................................6

*Watson v. City of Memphis,*
    373 U.S. 526 (1963)............................................................................................................26

*Wengler v. Druggists Mut. Ins. Co.,*
    446 U.S. 142 (1980)............................................................................................................26

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) .................................................................................................................1

*Williams v. Salerno,*
    792 F.2d 323 (2d Cir. 1986) ...................................................................................9, 28, 29

*Yang v. Kellner,*
    __ F. Supp. 3d __, 2020 US Dist. LEXIS 79331 (SDNY May 5, 2020)........................2, 8, 9, 23

*Yang v. Kosinski,*
    960 F.3d 119 (2d Cir. 2020) ........................................................................................*passim*

*Yick Wo v. Hopkins,*
  118 U.S. 356 (1886) .............................................................................................................. 1

*Ex parte Young,*
  209 U.S. 123 (1908) ............................................................................................................ 12

**Other Authorities**

Anita Kumar, Trump Aides Exploring Executive Actions to Curb Voting By Mail,
  POLITICO (Aug. 8, 2020) ....................................................................................................... 7

Fed. R. Civ. P. 26(f) .................................................................................................................. 2

Fed. R. Evid. 702 ...................................................................................................................... 5

Francis Ford Coppola, THE GODFATHER PART II (1974) ........................................................... 7

Herodotus, THE PERSIAN WARS, Bk. 8, ¶ 98 (trans. A. D. Godley, 1924) ................................. 1

Louis DeJoy, Postmaster General Statement on Operational Excellence and
  Financial Stability, USPS (July 27, 2020) ............................................................................ 25

Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) .......................................... 9

Newberg on Class Actions § 24:83 (4th ed. 2002) ..................................................................... 9

U.S. Const., amend. I ........................................................................................................... *passim*

U.S. Const., amend. XIV ................................................................................................... 18, 20

## PRELIMINARY STATEMENT

As the Supreme Court has long recognized, the right to vote is *the* "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).[1] This jurisprudential and political touchpoint has become so well accepted that the qualification that preceded the declaration in *Yick Wo* – that voting is a "privilege merely conceded by society according to its will, under certain conditions" – sounds unfathomably foreign. *Id. Compare, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."). In short: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

It is also unquestionable, at this hour in our history, that "use of the mails is almost as much a part of free speech as the right to use our tongues." *United States ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson,* 255 U.S. 407, 437 (1921) (Holmes, J., dissenting), *dissenting view adopted in, inter alii, Blount v. Rizzi,* 400 U.S. 410, 416 (1971). Thus, the postal power "may not[,] of course[,] be exercised … in a manner that abridges the freedom of speech or of the press protected by the First Amendment." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 126 (1981).

Yet here, Defendants would – whether by design or by neglect – do just that. USPS has long promised that "[n]either snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds." Inscription Above New York City Post Office, *quoting* Herodotus, THE PERSIAN WARS, Bk. 8, ¶ 98 (trans. A. D. Godley, 1924). Defendants should not be allowed to add "but perhaps political gain or cost savings might" to that longstanding promise.

---

[1] Though, perhaps the statement in *Yick Wo* has a certain irony, given the broad, then-existing denials of the franchise

## FACTUAL HISTORY

Plaintiffs incorporate by reference the facts set out in Complaint[2] (citations to "Comp. ¶ __") as well as the terms defined there in the interest of space the limited time available to brief this case.  Briefly, shortly after taking office, Postmaster General Louis DeJoy began a "transformative initiative" that "had unintended consequences that impacted [USPS's] overall service levels."  Comp. ¶¶ 62-63; 66.  *See also* Green Ex. 1 ("House Tr.") at 181-82.  Whether as part of the same "initiative" or not (House Tr. at 181-82), USPS has faced many dramatic changes in recent months, including a requirement that trucks leave even if they were not yet loaded with the mail for the day (¶ 66), dramatic limits – if not outright bans – on overtime (¶ 66), bans on "extra trips" meant to ensure all mail for a day would be delivered (¶ 68), and a "pilot program" that prohibited morning sorting of mail by letter carriers (¶ 70).[3]  There were also dramatic mechanical capacity changes:  official plans set a goal  of disposing of 969 sorting machines by the end of the financial year (¶ 84-84; Comp. Ex. 3), and machinery already removed under this directive has reduced nation-wide sorting capacity by more than 21.4 million mailpieces per hour.  ¶¶ 83-95.  *See also*, Green Ex. 7 at 5 (American Postal

---

[2] The Complaint cites many media reports (*see, for example,* Comp. ¶ 77, quoting a New York postal employee saying there is currently a two-day delay because of the new policies), all directly quoting sources with first-hand knowledge.  While there is a layer of hearsay in these statements, "[i]n the Second Circuit, courts routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief."  *725 Eatery Corp. v. City of New York,* 408 F. Supp. 3d 424 (SDNY 2019) (quotation marks omitted), *quoting Mullins v. City of New York,* 626 F.3d 47 (2d Cir. 2010) ("conclud[ing] that hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction" and collecting cases), *in turn citing, inter alii, Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981) and *Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction … makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may even give inadmissible evidence some weight").  *See also, Yang,* 2020 U.S. Dist. LEXIS 79331 (granting preliminary injunction in *Anderson-Burdick* case on documentary record and declarations of parties).  The media sources (and the first-hand testimony they use) in the Complaint are intended to be incorporated in any citation to a particular paragraph.

If the Court believes the *weight* of this evidence is insufficient to show any necessary fact, Plaintiffs request that the Court hold a hearing where they can use subpoena power to obtain testimony from any necessary, first-hand witnesses.  *See Mullins,* 626 F.3d at 52 ("admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage").  To that end, Plaintiffs note that in most contexts (including here) testimony from employees of a defendant is virtually impossible to obtain voluntarily, particularly where there are (1) fears of retaliation and (2) both union and USPS rules making any comment on processing and delivery thorny for an individual witness.  Also relevant, for the moment, the parties have not yet held a Fed. R. Civ. P. 26(f), and subpoena power is therefore unavailable to Plaintiffs.

[3] That program, the "Expedited to Street/Afternoon Sortation," has since been suspended as part of a union grievance process.

Workers Union grievance letter noting that removal of machines violated collective bargaining agreement requiring notices of mechanization changes, since no notice was given, and also concluding "[t]he unilateral removal of automation equipment (machines) has contributed to delayed mail).

> ### A.        Postmaster DeJoy's Testimony.

Since Plaintiffs filed the Complaint, Postmaster DeJoy has testified to both chambers of Congress and submitted a supplemental letter to Congress with an exhibit (Green Ex. 3). In his testimony, Postmaster DeJoy stated that some of the policies in the complaint were "not a directive from [him]," but also stated, "I have purposely not tried to find out who" had "jumped ahead of [him]" and issued the guidance. House Tr. at 30-31. Even so, Postmaster DeJoy has not yet issued any official guidance clarifying that there should have been no changes to overtime policies. *Id.* at 31. Asked about his initiative to have trucks "leave on time," Postmaster DeJoy was genuinely puzzled as to how that policy might have led to mail being delayed. *See, for example*, House Tr. at 60-61. And when asked whether USPS has conducted any analysis of the policy's impact, Postmaster DeJoy seemed to suggest none had been conducted, saying simply, "the intention was to put the mail on the trucks and have the trucks leave on time. That should not have impacted anybody."[4] *Id.*

As to the other changes, Postmaster DeJoy testified he didn't know who ordered them. House Tr. at 214. Yet, despite not knowing who had ordered changes or what studies had been conducted about them, he refused to commit to reversing all of them. *Id.* at 214-15. Postmaster DeJoy even acknowledged that there may be problems with election mail in November, though he believed those problems would be limited to "situations where … the ballots come in on the same

---

[4] There is a tension the Congressional questioning did not explore: it is hard to see how the initiatives could have been "transformative" on one hand, and amounted to no more than just saying, "run the trucks on time" on the other. While there is much that could be said on this, most importantly: Postmaster DeJoy's testimony that he was surprised that his initiative(s) created delays makes his prediction that there will be no delays of election mail in November significantly less credible (particularly in the face of contrary predictions from USPS workers with decades of experience). *Cf. also*, House Tr. at 211 (Postmaster DeJoy does not know the cost of mailing a postcard).

day the turnaround time is so slow that we need to really scour and look amongst all of the other

450 million pieces of mail to find [ballots] and make sure they--they get delivered and postmarked."

House Tr. at 205-6.  In raising that concern, he seemingly agreed that USPS has historically engaged

in the kinds of herculean efforts described in the Complaint.  *See* Comp. ¶¶ 58-61.

       B.        <u>Other Testimony and Facts.</u>

According to a processing clerk with 33 years of USPS experience, at the San Antonio USPS

plant, management has made significant efforts to hide the extent of problems, even as a backlog of

mail continues to build.  Barrios Dec. ¶¶ 3-6 ("I would estimate we are, on average, 2-3 days behind

our usual service standard, with some mail far more behind").  When Representative Joaquin Castro

toured the facility, management decided to send 30,000 to 54,000 backed up mail pieces to a plant in

Austin, knowing "[t]he only possible purpose of that transportation would have been to physically

hide these massive piles of late mail from Rep. Castro," since the mail would ultimately simply

return to San Antonio.  *Id.* ¶¶ 7-10.  Beyond hiding late mail, plant management also instructed a

maintenance mechanic to "make [destroyed] machines look good" and "(falsely) told the

Representative that they would be putting [the machines] back into service."  *Id.* ¶¶ 13-14.  There

"was no way the machines would ever be usable again."  *Id.* ¶¶ 15; 19.  And management not only

dressed the machines up, they "told Rep. Castro that the machines were already back in place and

were running" and even "staged mail containers next to the machine[s], which would serve no

purposes besides giving the implicit impression that the machine would, at some point, be used to

process that mail."  *Id.* ¶¶ 17-18.

Across the country, apparently other USPS officials similarly gave members of Congress

misleading information to the same effect.  *See, e.g.*, House Tr. at 134 (describing USPS briefings and

updates to Congress that omitted any mention of taking sorting machines offline until the stories

broke in the press); and at 22-23 (Postmaster DeJoy did not produce August 12 report showing

8.1% drop in USPS "On-Time Score" in response to August 14 request from Congress).  And despite the impression the San Antonio plant intended to give Rep. Castro, an August 18 email from the USPS Director of Maintenance Operations to local managers commands, "Please message out to your respective maintenance managers tonight.  They are **not to reconnect/reinstall machines** that had been previously been disconnected without approval from headquarters maintenance, **no matter what direction they are getting from the plant manager**."  House Tr. at 135 (emphasis added, corrected to match document); Green Ex. 4 (the August 18 email).  Similarly suggestive of bad faith, as described by the American Postal Workers Union, the destruction of machines involved the "Postal Service … relying on low mail volume during a period of the COVID-19 pandemic, without considering the return of any mail volume.  In many instances the Union was informed that the machines would only be tarped in anticipation of a possible return of mail volume, only in the end for the machines to be trashed."  Green Ex. 7 at 4.  And as the APWU concluded, "[t]he elimination of machines has a direct negative impact on reduced service standards."  *Id.*

Plaintiffs' expert on USPS,[5] Mark Jamison, concludes that, based on the Postmaster's public comments and USPS history, Postmaster DeJoy has "chosen to sacrifice performance in favor of cost cutting."  Jamison Decl. ¶ 15.  Importantly, "[t]here are many ways to achieve a deterioration of service without ordering it outright, and these are things that are happening under DeJoy's leadership": "If carriers are told to leave for their delivery route before the truck arrives, this causes

---

[5] Mr. Jamison, on Post Office operations, is an "expert by knowledge, skill, experience [and] training," whose "technical, or other specialized knowledge will help the  trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; Jamison Dec. ¶¶ 4-6 (describing a long career, beginning at the bottom of USPS and ending in a local postmaster role for 14 years).  *See also,* Fed. R. Evid. 702 Advisory Committee's Note (2000) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony").  Expert testimony at the preliminary injunction stage – whether by declaration or at a hearing, if one takes place – is evaluated regardless of any technical flaws, which go only to weight.  *Velesaca v. Decker,* 2020 U.S. Dist. LEXIS 78470 at *9 (SDNY 2020) (relying on "several expert declarations tending to support the position that the COVID-19 pandemic, poses particular danger for the putative class and subclass in light of ICE's subpar healthcare abilities" ); *Flores v. Town of Islip,* 2019 U.S. Dist. LEXIS 60319 at *9 (EDNY 2019) (considering expert testimony despite "alleged improprieties" because "the Court may consider inadmissible evidence when deciding whether to issue a preliminary injunction"); *725 Eatery Corp. v. City of New York,* 408 F. Supp. 3d 424, 457 (SDNY 2019) (same).

a day's delay in mail delivery.  Similarly, if the trucks at the distribution center are told to leave before the mail is fully processed and machine cycles are completed this will slow the mail delivery by a day each day it happens.  The effects of continually doing this will inevitably compound and increase delays further."  *Id.* ¶ 21.  And Postmaster DeJoy has made clear he will not roll back the policies that force exactly these problems.  *See, for example,* House Tr. at 215 (Q:  "will you commit to reversing these changes"; A:  "No.").  Moreover, as Mr. Jamison explains, "[a] simple lack of institutional attention could noticeably slow down mail."  *Id.* ¶ 31.  A "lack of institutional attention" is perhaps the best way to describe Postmaster DeJoy's approach to running USPS, given his Congressional testimony.  And in a context where USPS has historically taken extraordinary lengths to ensure election mail – above all other mail – is delivered on time (*see, e.g.,* Comp. ¶¶ 58-61; 119-121; Barrios Dec. ¶ 22; House Tr. at 206), all it would take is a handful of seemingly innocuous directions to have the effect of slowing down election mail to the point of crippling it.  Or, perhaps, a series of confusing and contradictory official and unofficial directions that point in many different directions, and for which the Postmaster himself ultimately disclaims knowledge and responsibility.

Mr. Jamison also confirms that the letters from USPS's general counsel to 46 states reflect that there *is* a meaningful change in processing standards for election mail.  *See, for example,* Comp. Ex. 5 at 1 (suggesting that election mail sent "[u]sing Marketing Mail will result in slower delivery times").  Mr. Jamison explains:  "the letter[s] from Marshall – to someone who knows historical USPS standards [under which all election mail has been treated as First Class Mail] – all but expressly warn[ States,] 'we will no longer automatically treat your ballots as First Class Mail.'  That is a profound and disturbing change."  Jamison Dec. ¶ 28.  *See also,* Green Ex. 6 (chart prepared by plaintiffs in *Vote Forward v. DeJoy*, 20-cv-2405-EGS (D.D.C.), compiling and summarizing the content of the warnings to each state)

Whatever the ultimate cause, according to an official report dated August 12, 2020, USPS's

"On-Time Score" for First Class mail declined by 8.1% just after Postmaster DeJoy began his "transformative" initiatives, with virtually all of that decline coming from issues in processing. Green Ex. 2 at 2; *see also* House Tr. at 20-21 ("[Postmaster's] office already confirmed to [the House] that this document is authentic").  Confirming that the policy changes at issue *did* cause mail to slow down, on Monday this week, Postmaster DeJoy submitted a supplemental letter to Congress showing that after some of the dramatic changes to USPS policy were rolled back, delivery standards for First Class Mail are now only 5.6% below the historical baseline (at about 88% on-time).  Most importantly, however, there is no question that "there are delays presently."  House Tr. at 182-84 (Postmaster also noting that there are "2 week delays" and "excessive delays [in some places] throughout the country").  And if those delays are left unaddressed, they will lead in turn to delays and problems in processing election mail.

Ultimately then, while the scale of disenfranchisement at stake here is unclear, there is no doubt it will be meaningful.[6]  And it may remain a mystery whether there was a direct order to slow down the mail,[7] or whether – hearing cues from their Postmaster and President – others at USPS read between the lines and decided to rid the President and Postmaster of their "meddlesome priest."  In either event, however, the Constitution demands better:  countless Americans will vote

---

[6] In this regard, it is also worth noting that the President has signaled that he views ballots that arrive after Election Day, even where permitted by state law, as illegitimate – and is reportedly being briefed on "possible executive actions … stopping local officials from counting [ballots] after Election Day."  Anita Kumar, Trump Aides Exploring Executive Actions to Curb Voting By Mail, POLITICO (Aug. 8, 2020), *and see, for examples,* Donald J. Trump (@realDonaldTrump), TWITTER (7:51 AM, Jul. 10, 2020) ("No more big election night answers … Ridiculous! Just a formula for RIGGING an Election"), *available at* https://twitter.com/realdonaldtrump/status/1281556745211523072; (7:44 AM, Nov. 12, 2018) ("The Florida Election should be called in favor of Rick Scott and Ron DeSantis in that large numbers of new ballots showed up out of nowhere, and many ballots are missing or forged. An honest vote count is no longer possible-ballots massively infected. Must go with Election Night!"), *available at* https://twitter.com/realdonaldtrump/status/106196286937654072.  Thus, the harms from mail delay do not just include instances in which a voter would be disenfranchised by state law, but also where it puts a voter at risk for being targeted by executive action – or having their vote arbitrarily declared "[dis]honest" or "RIGG[ED]" by the President of the United States.

[7] *See* Francis Ford Coppola, THE GODFATHER PART II (1974) ("No one knows who gave the order. … when he turned up dead, I let it go.  And I said to myself, this is the business we've chosen.  I didn't ask who gave the order, because it had nothing to do with business."), *and compare*, House Tr. at  30-31 ("I have purposely not tried to find out who that was.")

by mail in November, and those voters deserve assurance that the aggressive steps to hobble mail delivery will be fully reversed before then.

## ARGUMENT

### I.     A Mandatory, National Injunction is the Appropriate Remedy.

#### A.     Plaintiffs must (and do) show a clear or substantial likelihood of success on the merits.

"In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus [(3)] a balance of the hardships tipping decidedly in favor of the moving party." *Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted). Where, as here, the injunction sought would essentially "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant must show a "'clear' or 'substantial' likelihood of success on the merits." *Yang v. Kellner*, __ F. Supp. 3d __, 2020 US Dist. LEXIS 79331, at *18 (SDNY May 5, 2020), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020), *quoting People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). Thus, a "district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Mastrovincenzo v. City of New York,* 435 F.3d 78, 89 (2d Cir. 2006), *citing No Spray Coal., Inc. v. City of New York,* 252 F.3d 148, 150 (2d Cir. 2001).

This case meets those exacting criteria. As explained in Point III below, the substantive legal theories here are meritorious and the challenged actions and policies are unconstitutional. "No right is more precious in a free country than that of having a voice in the election of those who make the laws … The right to vote remains, at bottom, a federally protected right." *Rossito-Canty v. Cuomo,* 86

F. Supp. 3d 175, 180-1 (EDNY 2015) (quotation marks and citations omitted).  "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."  *Harman v. Forssenius,* 380 U.S. 528, 537 (1965).  And of course, "the use of the mails is not a privilege to which the Congress or the Post Office [or the President] can attach any condition it chooses.  When a postal law affects expression, the exercise of the postal power must be tested against the first amendment [with the accompanying level of scrutiny]."  *Hiett v. United States*, 415 F.2d 664, 669 (5th Cir. 1969).  For the third prong (as addressed below in Point IV), in right-to-vote cases the injunction test largely collapses into a single question of whether the alleged act is unconstitutional:  Irreparable harm and a favorable balance of the equities automatically flow from a clear likelihood of success on the constitutional claim.  *See, e.g.*, *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

B.     Nationwide relief is appropriate in the circumstances here, and any other remedy would be constitutionally problematic.

As to the relief sought,[8] a nationwide injunction on as to the policies and practices at issue – and the harm that has already been done – is likely the only way to address the problems at issue.  Providing relief that applies in one part of the country but not another "would risk running afoul of the Constitution's guarantee of equal treatment."  *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219 *71-2 (SDNY 2020), *citing Bush v. Gore*, 531 U.S. 98, 109 (2000).  As the Second Circuit recently observed, there is "no doubt that the law, as it stands today, permits district courts to enter nationwide injunction."  *New York v. U.S. Dep't of Homeland Sec.*, 2020 U.S. App. LEXIS 24492, at *94 (2d Cir. Aug. 4, 2020) (modifying injunction because of other litigation and Supreme

---

[8] The claims here are styled as on behalf of all voters nationally, and "[t]he Court need not formally certify a class in order to issue the requested preliminary relief."  *Yang*, 2020 U.S. Dist. LEXIS 79331 at *42 n. 5, *citing* Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief.") *and* Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit.").  *See also*, *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *37-38; *38 n. 2 (S.D.N.Y. Aug. 3, 2020) (same conclusion as *Yang*).

Court stay).  And "absent injunctive relief, [Plaintiffs'] First Amendment rights likely would be forever extinguished."  *Yang v. Kosinski*, 960 F.3d 119, 136 (2d Cir. 2020).

Further, even when there is a problem with a nationwide remedy, the moment to address the problem is not when it remains hypothetical, but when it arises.  As the Second Circuit has explained, at *that* point, the parties – or the Court itself – can seek or enter appropriate modifications.  *Id.* at *93-5.  Here, this Court will likely be the first to speak on these questions, and there is every chance that "multiple courts [will ultimately speak] unanimously on the issue" – a "circumstance[]" where a uniform nationwide injunction is "an appropriate remedy," and not a problem at all.  *Id.* 95.  *See also Doe v. Trump*, 957 F.3d 1050, 1070 (9th Cir. 2020) ("because the certified class is nationwide in scope and promotes uniformity in administering federal immigration law, the district court did not abuse its discretion in entering a nationwide injunction"); note 8, above.

More broadly, there is some question of whether, in the context of an *Anderson-Burdick* or one person, one vote claim, a District Court could enter anything *but* a nationwide injunction with a nationwide defendant (particularly where the action must be treated, before certification, as a class action – *see* note 8).  The problem is this:  Assume an injunction was limited to just New York State.  That injunction would lead to New Yorkers' absentee votes being statistically more likely to be counted than other voters across the country.  As a result, the *Court* would be affirmatively ordering exactly the scenario found constitutionally impermissible in *Gallagher*:

> "whether the votes of … two voters [in different places]—who cast their votes in precisely the same manner [and on the same date]—are counted depends entirely on the speed at which their local post office delivered their votes.  And it demonstrates that Defendants have created a voting process where arbitrary factors lead [the state to valuing one person's vote over that of another—the kind of process specifically prohibited by the Supreme Court."

*Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *61-62 (SDNY Aug. 3, 2020), *citing Bush*, 531 U.S. at 104-105.  As the *Gallagher* decision explains, the solution to this

problem is simply to fit the remedy to both the scale and nature of the problem:  a statewide problem calls for statewide relief, a nationwide problem calls for nationwide relief, and the equal protection clause requires any remedy to treat all similarly situated voters alike, period.  *Id.* at *68-72.

## II.   First Amendment Scrutiny Applies to Acts of USPS Like Any Other Part of the Government, If Not More So.

Justice Holmes' "frequently quoted admonition" (*Blount v. Rizzi,* 400 U.S. 410, 416 (1971)) that "the use of the mails is almost as much a part of free speech as the right to use our tongues" is now comfortably the mainstream view.  *United States ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson,* 255 U.S. 407, 437 (1921); *see, e.g., Associated Students for Univ. of California v. Attorney Gen. of United States*, 368 F. Supp. 11, 21 (CD Ca. 1973) ("Justice Holmes' now-famous dissent has been adopted by the Court as the correct rule of law"), *citing Blount; Lamont v. Postmaster General*, 381 U.S. 301, 305 (1965).

Little surprise, then, that it is now similarly well-settled that "the use of the mails is not a privilege to which the Congress or the Post Office" – or the President for that matter – "can attach any condition it chooses."  *Hiett v. United States*, 415 F.2d 664, 669 (5th Cir. 1969).  Rather, "[w]hen a postal law affects expression, the exercise of the postal power must be tested against the first amendment [with the accompanying level of scrutiny]."  *Id.  See also*, *U.S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 126 (1981) ("[the postal power] may not of course be exercised . . . in a manner that abridges the freedom of speech or of the press protected by the First Amendment"); *Original Cosmetics Prods. v. Strachan,* 603 F.2d 214 (2d Cir. 1979) *cert. denied,* 444 U.S. 915 (1979)  ("[it] is entirely fitting that governmental action which has consequences as drastic as those which flow from a Post Office stop order and which could potentially impinge upon First Amendment rights be subject to careful scrutiny"); *and Greenberg v. Bolger*, 497 F. Supp. 756, 778 (EDNY 1980) (USPS's "monopolistic nature requires that any restriction and especially a restriction that at best touches, and at worst obstructs, the expression of political ideas must be viewed with

great suspicion.").[9]  Here, the relevant level of scrutiny is either (1) triggered by the level of "burden" under *Anderson-Burdick* or (2) triggered by the one person/one vote and equal protection disparities at work.  In either event, either strict scrutiny or some intermediate form of scrutiny applies.

While Postmaster DeJoy asserted to Congress that he had no awareness of many of the measures implemented under his watch (*see, for example,* House Tr. at 60-61), a(n implausible) lack of *ex ante* awareness is neither relevant nor significant for an *Ex parte Young* suit over the right to vote.  As Judge Torres put it recently in a case also addressing USPS errors in the election process, "the Constitution is not so toothless."  *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *53.  Defendants "cannot ignore a later discovered, systemic problem that [will likely] arbitrarily render[ significant numbers of] ballots invalid.  *Id.*, *citing Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005).  There is no question that, even having rolled back *some* of the changes to USPS practices, USPS delivery standards remain substantially below the benchmark, even when the pandemic means USPS has had far less mail than it would historically at this point of the year.  *See also,* Green Ex. 7 at 4 (USPS "is relying on low mail volume during a period of the COVID-19 pandemic").  That bodes poorly for the unprecedented volume of election mail on the horizon.  And there is similarly no question that there have been issues with delivering and sorting ballots in the past that have led to votes being discarded.  With those facts fully within Defendants' knowledge, Defendants "cannot ignore [the] later discovered, systemic problem."  2020 U.S. Dist. LEXIS 138219, at *53.  The only remaining question is whether, under *Ex parte Young*, Defendants have the authority to implement relief.  There should be no dispute – they do.

---

[9] *For more, see Hannegan v. Esquire, Inc.*, 327 U.S. 146, 156 (1946) ("grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever"); *Al-Amin v. Smith,* 511 F.3d 1317 (11th Cir. 2008), *en banc rehearing denied* 277 Fed. Appx. 977 (2008), *cert. denied*, 555 U.S. 820 (2008) ("Mail is one medium of free speech, and the right to send and receive mail exists under the First Amendment"); *Taylor v. Sterrett*, 532 F.2d 462, 480 (5th Cir. 1976) ("federal statutes affecting communications sent by mail are constitutional only if narrowly drawn so as not to interfere with protected speech"); *and Tollett v. United States*, 485 F.2d 1087, 1091 (8th Cir. 1973) ("[restrictions on mail] must be construed in the light of the First Amendment rather than in the light of any regulatory power granted to the Postal Service.").

### III.   Plaintiffs Have A Clear Likelihood of Success on the Merits.

When a case "call[s] upon" the Court "to consider the constitutionality of [an election restriction] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of constitutionality. *Yang v. Kosinski*, 960 F.3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983). Rather, the Court "conduct[s] a two-step inquiry that applies to election-related restrictions." *Id.* "First, [the Court] ascertain[s] the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake[:] The restriction could qualify as 'reasonable [and] nondiscriminatory' or as 'severe.'" *Id.*, *quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Second, the Court applies scrutiny: a restriction is subject to the "*Anderson-Burdick* balancing test"[10] if the restriction is reasonable and nondiscriminatory and to "the more familiar test of 'strict scrutiny'" if the restriction is severe. *Id. See also*, *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) ("[t]he standards for review are clear[:] If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. If the burden is minor, but non-trivial, *Burdick's* balancing test is applied."); *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004).[11]

Under either level of review, Defendants' actions are unconstitutional. And the Court may effectively skip the first stage of analysis (determining the burden/level of scrutiny) given the lack of cognizable government interest. *Yang*, 960 F.3d at 129 ("in these circumstances, we need not decide

---

[10] The *Anderson-Burdick* test, discussed below, provides that the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment under this more flexible standard, [the Court] must determine both the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights." *Yang*, 960 F.3d at 129 (alterations adopted).

[11] Some courts (outside this Circuit) have theorized that neither strict scrutiny nor rational basis exists in *Anderson-Burdick* jurisprudence, but that the flexible *Anderson-Burdick* balancing test may bend to "approximat[e]" both standards. *See, e.g.*, *Medina v. City of Osawatomie*, 992 F Supp 1269, 1275 (D Kan 1998). *See also*, *Obama for Am. v. Husted*, 697 F3d 423, 440 (6th Cir. 2012) (White, J., concurring in part, dissenting in part) ("*Anderson-Burdick* balancing test … is flexible enough to *approximate* the rational-basis test when appropriate, i.e., where the burden is slight, the required showing by the state is correspondingly light.") (emphasis added). The Second Circuit, however, seems to have foreclosed this alternative approach with some finality in *Yang*.

whether the strict-scrutiny test applies here, since Plaintiffs … are clearly or substantially likely to prevail on the merits of their claim even under the more flexible and less exacting standard").

        A.        <u>The restrictions here require strict scrutiny.</u>

The burden stage of *Anderson-Burdick* asks whether restrictions are reasonable and nondiscriminatory on one hand, or severe on the other.  The burden here is both severe on its face, as well as problematically random and potentially discriminatory in its impact.  The severity of the burden is also further amplified – and arguably *automatically* severe – because Defendants' actions amount to changing the rules of the election at the eleventh hour.  Each of these qualities alone is enough to require strict scrutiny.  Together, they demand it.

        *i.  Many voters face the most severe burden possible:  total disenfranchisement.*

Certain voters – among them international, immunocompromised, and disabled voters – face an unacceptable risk of disenfranchisement in the absence of an injunction.  Statistically speaking, because of the inevitable and significant increase in the time it will take for international mail to reach the United States caused by the current global pandemic, further delays caused by changes in USPS policy, practice, and capability will disenfranchise some voters.

"By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote."  *Doe v. Walker*, 746 F. Supp. 2d 667, 679-80 (D Md. 2010).  *See also*, *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at \*47; and \*54 (S.D.N.Y. Aug. 3, 2020) (finding an "exceptionally severe" burden where the challenged restriction would cause ballots mailed in the last possible days permitted for mailing being thrown out for lack of a postmark).  The same principle that applies to states when they do not provide adequate time for overseas voters and servicemembers to return their ballot also applies to USPS:  where USPS delays will lead to insufficient time for voters to "receive, fill out, and return

their absentee ballots," USPS likewise "imposes a severe burden." *Doe*, 746 F. Supp. 2d at 679-80.

Just as the voters in *O'Brien* were "denied any alternative means of casting their vote" beyond the absentee ballots that the Supreme Court found they were constitutionally entitled to, international voters – this year in particular – do not have the ordinary, reliable means they usually use to return their ballots. *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974). As Plaintiff Kathy Rothschild – a voter in Costa Rica – explains, normal mail service is not even available, and her understanding is that even special delivery service, "because of the recent slowdown in [mail] service in the U.S.," is now taking "two to several weeks to arrive." Rothschild Decl. ¶¶ 6-8. Similar problems exist for use of an Embassy pouch: pouches from Costa Rica currently take 2-8 weeks to deliver to the states, which may lead to a ballot not counting on its own (international ballots reach voters 45 days before the election, 8 weeks is 56 days). *Id.* ¶¶ 9-10. When compounded with USPS delays, this makes it significantly more likely that ballots will not arrive on time even when placed in the mail stream at the earliest possible moment. *Id.* FedEx and UPS, the only other alternative, are expensive and in some states, may not even result in a necessary postmark (and in other states, reduce the time permitted for the ballot to be delivered). *Id.* ¶¶ 10-11. And UPS and FedEx themselves have warned against using their services for ballots. *Id.*

In this context, each additional day of USPS delay creates a certainty that some number of voters will be left without a vote. Even placing a ballot in a diplomatic sack *the day* international ballots arrive places a voter at a significant risk that USPS delays will lead to their vote being discarded. Under *O'Brien* and *Doe*, for at least some voters, this amounts to "a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots": a severe burden on the right to vote that triggers strict scrutiny. *Doe*, 746 F. Supp. 2d at 679-80.

The burden is similar for voters with no in-person voting option. Plaintiff Mary Winton

Green is a 97-year-old woman who has worked as a poll watcher in 40's and 50's in Chicago (and has the "frightening" stories to go with that experience), has voted her whole life, and is the child of suffragettes.  Green Dec. ¶¶ 5-8.  She has "specifically [been] instructed to stay home and not go to public places such as polling places" by her doctor, because COVID-19 "would be fatal."  *Id.* Similarly, Plaintiff Carol Sussman, a Presidential voter ever since she cast her ballot for Adlai Stevenson in 1956, "cannot walk without help," and "cannot vote unless [she] vote[s] by absentee." Sussman Dec. ¶¶ 5-6.  There are many other reasons one might need to vote by mail as well. Plaintiff Rebecca Rieckhoff is a law student in Chicago, but registered to vote in Wisconsin – and if her ballot is not delivered timely, her vote will not be counted.  Rieckhoff Dec. ¶¶ 2-5.  *See also*, Matthew Wallach Dec. ¶¶ 2-3 ("I also travel the globe working on feature films for months on end … I have voted by mail for local and national elections for my entire adult life due to the uncertainty of my location around elections year in and year out").  Just like international voters, those who are immunocompromised, elderly, disabled, awaiting trial in prison or jail, or just working or studying out of state face unacceptable risks that, with delays factored in, there is "a deadline which does not allow sufficient time … to receive, fill out, and return … absentee ballots."  *Doe,* 746 F. Supp. 2d at 679-80.  Once again, that triggers strict scrutiny.

> ii.   *The burden on all voters is severe.*

If a policy – or even a good-faith error – means that "[a] large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control," the "burden [on the right to vote] is exceptionally severe."  *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *47 (SDNY Aug. 3, 2020) (finding an unconstitutional burden where New York law forbid the boards of elections from counting thousands of ballots

missing postmarks because of "human or mechanical errors" at USPS).[12]  This is so, even where

voters have a choice on whether to vote in person.  Comp. ¶ 130 (New York's argument, rejected in

*Gallagher*, that "Voters['] … ignorance of the law is no excuse" for a ballot lacking a timely

postmark).

There is a statistical certainty that because of the slowdown of mail involved here, thousands

if not millions of ballots – cast in compliance with the law by voters – will not be counted.  As

described by the USPS itself, even if USPS had not shifted their policies and eliminated mail

processing capacity, in more than 40 states, there is a "significant risk" that "ballots may be

requested in a manner that is consistent with [state law] and returned promptly, and yet not returned

in time to be counted."  Comp. Ex. 5 at 2 (and in all other letters).  Any *additional* slowdown will

simply shift that already "significant risk" into a certainty.  And there is a meaningful slowdown.

Green Exs. 2 and 3.  Thus, if left unaddressed, the current slowdown (*see, for examples,* Barrios Dec. ¶

6; Comp. ¶¶ 77, 78, and 79) will result in *at least* two to three days' worth of ballots being invalidated.

As Mr. Jamison explains, a continued, "simple lack of institutional attention could noticeably slow

down mail" and Postmaster DeJoy is currently (whether by neglect or intentionally) "creating delays

in mail delivery that will almost certainly impact the ability for ballots to reach their destination on

time."  Jamison Dec. ¶¶ 32, 37.

Beyond that predictable effect, the *change* in policies and capacity will inevitably introduce

---

[12] *See also, Norman v. Reed*, 502 U.S. 279, 288-89 (1992) (denial of access to the ballot through insufficiently tailored signature measures – where signature measures are independently a *non*-burden – constitutes a severe burden and any law therefore "must be narrowly drawn to advance a state interest of compelling importance"); *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 422 (2d Cir. 2004) (removing a party's "line" on the ballot for failure to obtain enough votes in one election cycle is a severe burden, triggering strict scrutiny).  Even in cases with split decisions, there is broad agreement that not counting duly cast votes – at least where the relevant "burden" cannot be recast as simply requiring *the voter* to avoid making an error – is a severe burden.  *See Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 742 (9th Cir. 2018) (Thomas, J., dissenting) (arguing that the "burden imposed by Arizona's refusal to count [votes incorrectly cast in the wrong precinct] is severe," even where voter error was involved—the *voter* error being the point of disagreement with the majority).  *Cf. also, Dudum v. Arntz*, 640 F.3d 1098, 1113 (9th Cir. 2011) (finding no severe burden for a multi-stage vote counting system because the "appearance that some votes are not 'counted' is just a product of how the algorithm operates for efficiency's sake" — implying that if votes *actually* were not counted, the burden would be severe).

*un*predictable human error into the process.  Judge Torres' decision in *Gallagher* – where New York

used Business Reply Mail (which does not require stamps) for the first time for ballots (something

successfully accomplished in other states for years) – highlights how that might happen:

> Yet, despite the postal service's best efforts, there is uncontroverted evidence that thousands of absentee ballots for the June 23 Primary were not postmarked. This could be due to a number of human or mechanical errors. For example, some return envelopes may lack postmarks because, contrary to policy, the envelopes were not routed to the Morgan Facility, or were misdirected and did not pass through the automatic cancellation machinery.

*Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *14-16 (SDNY Aug. 3, 2020)

(cleaned up).  *See also*, House Tr. at 205-6; Jamison Dec. ¶ 21 (concluding that "[t]he effects of

continually [insisting that mail carriers run "on time" even when their cargo is has not arrived or

been sorted] will inevitably compound and increase delays further").  Indeed, part of the reason that

the *Purcell* principle requires the government *not* to interfere with election rules at the last minute is

because of the potential for such cascade effects.  Further, amid a pandemic, all voters have an

important interest in keeping themselves, their families, loved ones, coworkers, and friends safe.  *See*

Rosen Dec. ¶¶ 5-9; Matthew Wallach Dec. ¶¶ 4-5; Mac Wallach Dec. ¶ 4; Marsie Wallach Dec. ¶¶ 6-

7.  Forcing voters to choose between a statistically significant risk that their vote won't count and a

risk that voting places their loved one's lives at risk is not constitutionally permissible.

　　In short, once it has been involved and relied on as part of election machinery by states and

voters, if the USPS takes actions that will lead to voters being disenfranchised with no misstep of

their own, it imposes a severe burden on the right to vote.  To enact such policies or take such

actions, then, the government must satisfy strict scrutiny.

> ### iii.   *The burden falls differently on different voters, presenting equal protection and one-person, one-vote problems.*

　　The *Anderson-Burdick* test, by including the distinction that it only applies its intermediate

scrutiny to "nondiscriminatory" restrictions, suggests that "in the Equal Protection setting, we

would be wise to forego *Anderson-Burdick*."  *Daunt v. Benson*, 956 F.3d 396, 423 (6th Cir. 2020) (noting

"[t]he temptation to overindulge in the *Anderson-Burdick* test has not gone unnoticed" and "we recently questioned 'whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims,' as the Supreme Court has 'only applied the framework in the context of generally applicable laws.'") (Readler, J., concurring), *quoting Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020).  In a 2004 case, the Second Circuit seemed to treat instances of unequal treatment as an independent strict scrutiny trigger *within* the *Anderson-Burdick* framework, reasoning that an unequal treatment made a minor political party's "situation even more difficult" and therefore made the "burden" a "severe" one.  *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419-22 (2d Cir. 2004).

Whatever the mode of conceptualizing equal protection issues, where "USPS locations in [one place] handle[] absentee ballots differently from the postal service locations in … other[s]," there are equal protection "issues indistinguishable from those in *Bush v. Gore*."  2020 U.S. Dist. LEXIS 138219, at *57-9, *citing Bush v. Gore*, 531 U.S. 98 (2000).  The central principle at work in *Bush* is that one-person, one-vote jurisprudence always seeks to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's."  *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970).

Hence, just as *Bush* demanded that the infamous "hanging" and "dimpled chads" be treated similarly across Florida, here the same "minimum requirements for the nonarbitrary treatment of voters" require that ballots mailed on the same day be treated identically.  531 U.S. at 105-7 ("Palm Beach County, for example, began the process with a 1990 guideline which precluded counting completely attached chads, switched to a rule that considered a vote to be legal if any light could be seen through a chad, changed back to the 1990 rule, and then abandoned any pretense of a per se rule, only to have a court order that the county consider dimpled chads legal.  This is not a process with sufficient guarantees of equal treatment"); 134.  *See also*, *id.* at 107 ("An early case in our one

person, one vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties. The Court found a constitutional violation."), *describing Gray v. Sanders*, 372 U.S. 368 (1963).  Historically, all absentee ballots have been treated – automatically – as First Class, or in necessary cases, as Express Mail.  Yet, even months before the election, there are certain places where mail delays are reaching weeks – and even months – while mail continues to flow with minimal delays in others.  This differential treatment requires a remedy because "whether the votes of … two voters—who cast their votes in precisely the same manner [in the days just before Election Day]—are counted [will] depend[] entirely on the speed at which their local post office delivered their votes," and that "demonstrates that Defendants have created a voting process where arbitrary factors lead the state to valuing one person's vote over that of another—the kind of process specifically prohibited by the Supreme Court."  *Gallagher*, 2020 US Dist LEXIS 138219, at *61-62, *citing Bush*, 531 U.S. at 104-105.

Additionally, the distribution of sorting capacity reductions raises serious equal protection concerns on its own.  Sorting capacity was reduced much more dramatically in (1) locations in States where the General Election will likely be close or (2) major cities, likely to skew Democratic, that will impact the national popular vote tally.  Comp. ¶ 93.  *See also*, Green Ex. 5 (image overlaying the reduction in sorting capacity with the 2016 Election results).  "An otherwise permissible law might still violate the Equal Protection Clause if there is evidence of an intentional or purposeful deprivation of the right to vote."  *Green Party v Weiner*, 216 F. Supp. 2d 176, 188 (SDNY 2002), *citing Rogers v. Lodge*, 458 U.S. 613, 621 (1982).  Beginning from the touchpoint that the government "may not enact a regulation providing that no Republican … shall be appointed to federal office" and "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly," a intentional attempt to discard Democratic-leaning votes is facially unconstitutional.  *Rutan v. Republican Party*, 497 U.S. 62, 77-78

(1990), *quoting Pub. Workers v. Mitchell*, 330 U.S. 75, 100 (1947).

There is significant, circumstantial evidence that political motivation is driving – at the least – the President's views of mail-in voting: it is a "threat to his election" and USPS is "not going to get the $3.5 billion [and t]herefore, they can't do the universal mail-in vote. It's very simple." *See* Comp. ¶¶ 106-110. And there is significant evidence that local managers have taken that kind of "will no one rid me of this meddlesome priest?" to heart. *See, e.g.*, Barrios Dec. ¶¶ 8-19 (detailing an elaborate deception of Rep. Castro by San Antonio USPS sorting plant management); House Tr. at 30-31 (Postmaster DeJoy describing managers who blocked overtime altogether and took other dramatic, apparently unapproved steps as having "jumped ahead of [him]"[13]). This evidence requires the Court to evaluate the reductions in capacity, as well as the "jump[ing] ahead" by local managers, with strict scrutiny.

> iv. *Because USPS has changed its policies, service standards, and capacity to handle election mail in the middle of an election cycle, the changes should be scrutinized more closely.*

It is a well-established principle of constitutional election cases that because "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls" and "[a]s an election draws closer, that risk will increase," courts should be cautious the closer they are to an election. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (emphasis added). *See also, Veasey v. Perry*, 574 U.S. 951, 952 (2014). This principle also extends to the other branches of government: the closer an act touching an election is to an election, the more likely it is that it creates "voter confusion and consequent incentive to remain away from the polls." 549 U.S. at 4-5. *Cf. Veasey*, 574 U.S. at 953 ("any voter confusion or lack of public confidence in Texas' electoral processes is in this case largely attributable to the State itself").

---

[13] The Postmaster's choice of words here is telling: he did not say the managers did something he (DeJoy) did not want, or disagreed with – only that they jumped *ahead* of him. Indeed, the word "ahead" even suggests that Postmaster DeJoy *ultimately* wants to block overtime for postal workers and take the other steps that ultimately caused a decline in service standards.

Thus, courts have generally found that changes in election rules, "enacted during an election cycle," receive heightened scrutiny. *Poindexter v. Strach*, 324 F. Supp. 3d 625, 632 (EDNC 2018). As the Second Circuit recently recognized in *Yang*, "application of [a mid-election-cycle change in rules] in 2024 may raise different issues that are not implicated in the circumstances presented" when it is challenged in that initial election cycle: a law that poses a trivial burden when on the books four years in advance can still pose a severe burden when passed in and applied to an ongoing election. 960 F.3d at 129. *See also, Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *67-68 (where a USPS mistake in failing to apply a postmark led to ballots not counting, it would not change the rules and "to the contrary, [would be] in line with the expectations of voters and candidates alike" to order ballots without a postmark to be counted).

In other words, when there is a mid-cycle change in the rules that touch on voter's expectations for how to vote, "[t]he long line of cases upholding ballot access requirements are patently inapplicable, as limiting candidates through reasonable advance requirements provides no justification for the retroactive restriction of the right to vote" and that is harm of an "obviously severe nature." *Ayers-Schaffner v. Distefano,* 37 F.3d 726, 730 (1st Cir. 1994). *See also, Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *67-68; *Poindexter v. Strach*, 324 F. Supp. 3d 625, 632 (EDNC 2018) ("the court [is not] aware, of any legislation that has been found constitutionally sound when enacted <u>during an election cycle</u> that disqualifies previously qualifying candidates from appearing on a ballot") (emphasis in original); *Libertarian Party of Ohio v. Husted,* 2014 U.S. Dist. LEXIS 187771 (SD Ohio, 2014); *Hudler v. Austin,* 419 F. Supp. 1002 (ED Mich. 1976), *aff'd sub. nom., Allen v. Austin,* 430 U.S. 924 (1977); *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970). *Cf. Ne. Ohio Coal. v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) ("substantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in significant disenfranchisement and vote dilution'"), *quoting Griffin v. Burns,* 570 F.2d 1065, 1074 (1st Cir. 1978).

These cases, particularly when read through the Second Circuit's decision in *Yang*, seem to add up to a rule: any change in the way elections are administered, if applied in the middle of an election cycle, poses a "severe" burden (requiring strict scrutiny) when applied to that same election cycle. As a policy matter, this rule makes sense. While changes in delivery policies and standards might not pose a significant burden should voters, candidates, and states have time to adapt their behavior, without that time it is a "different issue[]" entirely. *Yang*, 960 F.3d at 129. And that is to say nothing of the pandemic – which increases the burden the changes place on voters, particularly as it relates to voting by mail.[14]

In other words, imagine USPS going through the ordinary process for policy and machinery changes, with an eye towards changing policy in 2021. Rather than – as Postmaster DeJoy conceded he was – being surprised that mail slowed down when he implemented changes, the Postmaster might have had time to conduct appropriate studies and account for the problems inherent in sudden cost-cutting measures. Similarly, with advance knowledge of USPS slowdown and service issues, States might more appropriately adjust their laws (which – as the letters to States suggest – should not be changed just before an election).[15] But here, the only warnings provided do not measure up. *See generally*, Compl. Ex. 5; *Yang*, 960 F.3d at 129. The burden of that timing is severe.

> **B.**    If not strict scrutiny, the burden here requires analysis on the high end of
> *Anderson-Burdick*'s sliding scale.

When it comes to non-severe burdens on the right to vote, the Second Circuit and the Supreme Court alike have cautioned that there "is no litmus-paper test for separating those

---

[14] *See, e.g.*, *Constitution Party of Va. v. Va. State Bd. of Elections*, No. 3:20-cv-349, 2020 U.S. Dist. LEXIS 125589, at *17 (E.D. Va. July 15, 2020) (concluding "other courts faced with challenges to signature requirements during COVID-19 have likewise concluded that such requirements impose a severe burden on plaintiffs" and collecting examples), *citing, inter alii, Garbett v. Herbert*, 2:20-cv-245-RJS, 2020 U.S. Dist. LEXIS 75853 (D Utah Apr. 29, 2020); *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 U.S. Dist. LEXIS 68254 (ED Mich. Apr. 20, 2020), *stay granted in part*, No. 20-1336, 2020 U.S. App. LEXIS 14376 (6th Cir. May 5, 2020).

[15] Notably on that point, faced with serious problems in USPS delivery times and postmarking practices in the June Primary Election, New York adjusted its absentee ballot window to allow ballots without postmarks, delivered on the day *after* Election Day to be counted. *See* N.Y. S8799A (signed into law by Governor Cuomo on Aug. 21, 2020).

restrictions that are valid from those that are invidious" and the "rule is not self-executing and [it] is no substitute for the hard judgments that must be made." *Storer v. Brown*, 415 U.S. 724, 730 (1974). *See also, Yang*, 960 F.3d at 129, *quoting Anderson*, 460 U.S. at 789.  And, of course, the "results of this evaluation [cannot] be automatic." *Anderson*, 460 U.S. at 789.

If a burden is not necessarily "severe," but still is a "weighty imposition on Plaintiffs' … right[s]," *Anderson-Burdick*'s sliding scale requires much more than rational basis review.  *Yang*, 960 F.3d at 130.  As Chief Judge Dearie explained in *Credico*:

> "That the plaintiffs' associational rights will not be severely burdened, however, does not end my inquiry. As the Second Circuit recently instructed in *Price*, while 'review in such circumstances will be quite deferential,' I must actually 'weigh the burdens imposed on the plaintiff against the *precise* interests put forward by the State' and 'take into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights,' *Price* directs me to conduct more than just a rational basis review, and I am not to give much weight to 'flimsy' or 'extraordinarily weak' justifications proffered by the State."

*Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422 (EDNY 2010) (citations omitted, emphasis added in *Credico*), *quoting Price*, 540 F.3d at 108-11 (under the "flexible standard" in *Anderson-Burdick,* as contrasted with rational basis, "the court must **actually** weigh the burdens imposed on the plaintiff against the precise interests put forward by the State") (emphasis added). *See also, Free Libertarian Party, Inc. v. Spano*, 314 F. Supp. 3d 444, 456 (EDNY 2018) ("The degree to which these burdens and effects are constitutionally tolerable is indirectly proportional to their severity," "judged on a sliding scale.").

As explained above, even assuming the burden is not exceptionally severe (it is), the statistical certainty that some significant number of voters who follow all of their state's rules and will not have their ballots counted because of newly introduced USPS delays constitutes – at a minimum – a "weighty imposition."  *Yang*, 960 F.3d at 130.  *Anderson-Burdick* requires such an imposition to be balanced by real and precise justifications.

C.      Under any level of scrutiny, the restrictions are not supported by any cognizable justification.

Once a plaintiff shows a burden on the right of access to the ballot – even if that "burden … is not large" – it becomes the government's responsibility to justify that burden. *Price*, 540 F.3d at 112. The Court should weigh "the precise interests *put forward by the [government] as justifications* for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (emphasis added). *See also, Green Party v. NY State Bd. of Elections*, 389 F3d 411, 421 (2d Cir. 2004), *Lerman v. Bd. of Elections*, 232 F3d 135, 149 (2d Cir. 2000), *and Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). Moreover, even where "defendants' asserted interests are 'important in the abstract'" it does not follow that the "chosen means of regulation 'will in fact advance those interests.'" *Green Party* at 421, *quoting Lerman* at 149-50 ("we cannot uphold a statutory provision that substantially burdens political speech and association … without insisting that the defendants do more than simply posit the existence of the disease sought to be cured.") (cleaned up). In analyzing the justification, the Court should "examine each justification in turn and consider whether they make it necessary to burden the constitutional rights of Plaintiffs." *Yang*, 960 F.3d at 134 (cleaned up), *citing Anderson*, 460 U.S. at 789. Under any level of scrutiny, Defendants' actions fail spectacularly to "in fact advance [their proffered] interests." *Id.*

*i. Defendants have no legitimate government interest at stake.*

Defendants have asserted two interests, neither with any constitutional weight at all: (1) cost-cutting[16] and (2) the President's "fear that vote by mail [i]s a threat to his election." Comp. ¶¶ 106-11.

The first interest can never balance a constitutional harm. While eliminating government

---

[16] *See* Louis DeJoy, Postmaster General Statement on Operational Excellence and Financial Stability, USPS (July 27, 2020) ("The Postal Service is in a financially unsustainable position, stemming from substantial declines in mail volume, and a broken business model. We are currently unable to balance our costs with available funding sources to fulfill both our universal service mission and other legal obligations."), House Tr. 114-15 (Postmaster DeJoy unable to identify any harm to restoring processing machines beyond the cost).

waste is, of course, *good*, "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis,* 373 U.S. 526, 537 (1963). *See also Califano v. Goldfarb*, 430 U.S. 199, 217 (1977); *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 152 (1980); and for a more recent opinion where this kind of reasoning flows throughout, *see Brown v. Plata*, 563 U.S. 493 (2011). That is, as the Supreme Court has explained, "the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general … that [it was] designed to protect the fragile values of a vulnerable citizenry from the **overbearing concern for efficiency and efficacy** that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972) (emphasis added). *See also Culp v. Raoul*, 921 F.3d 646, 661 (7th Cir. 2019) ("simply avoiding cost and administrative burden does not justify denying constitutional rights"); *Atl. Coast Demolition & Recycling v. Bd. of Chosen Freeholders*, 112 F.3d 652, 671 (3d Cir. 1997) ("defendants' financial problems could not constitute the 'compelling reason' for delaying a remedy").

In short, the "design[]" of the Bill of Rights begins with the fact that it is virtually always more expensive to accommodate a right than deny it. Perhaps just as relevant, any cost associated with adequately serving State election systems is one that USPS "chose to bear … when it assumed the responsibility" of providing vote-by-mail services – and induced state and voter reliance on those services. *Yang*, 960 F.3d at 136. To put it simply: cost cutting can't cut it.

The second "interest" is no government interest at all. As the Supreme Court has long cautioned: "the government 'may not enact a regulation providing that no Republican … shall be appointed to federal office'" and "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Republican Party*, 497 U.S. 62, 77-78 (1990), *quoting Pub. Workers v. Mitchell*, 330 U.S. 75, 100 (1947).

26

Even if the President is right that he will do worse on mail-in ballots than in-person voting, he still may not constitutionally target mail-in voters with measures that assure their votes are statistically worth less.

       ii. *Because there is no legitimate government interest to balance it, the burden Defendants have placed on the right to vote is unconstitutional.*

Where courts have faced this kind of non-justification – or justifications not tailored at all to the burdens imposed – they have uniformly rejected them. Even assuming there *were* a cognizable government interest at stake here, it is not advanced meaningfully by the measures employed. Framing any necessary analysis, recently in *Yang*, the Second Circuit took a hard look at what all parties conceded was a state interest of the highest order (at least, in the abstract): "protecting the public from the health risks posed by COVID-19." 960 F.3d at 134. Despite the obvious abstract importance of that interest, the Second Circuit took a fine comb to whether the measure employed – canceling a primary election to reduce in-person voting – advanced the interest asserted and found the justification was "overstated for at least two reasons": in-person voting was likely to be significantly lower than in past years and the reduction of in-person voting largely occurred in places with less (but not *no*) risk of COVID-19. *Id.* at 135-6. *See also, Credico v. New York State Bd. Of Elections*, 2013 US Dist. LEXIS 109737 at *71-72 (EDNY 2013), 10-cv-4555-(RJD)-(CLP) (state's anti-confusion "justification carries no weight in the context of this case, because the application of Section 7-104(4)(e) did not reduce clutter on the 2010 ballot and, if anything, enforcement of the Statute increased voter confusion."); *and cf. Hirschfeld v. Bd. of Elections*, 799 F. Supp. 394 (SDNY 1992) (finding it "seem[ed] unnecessary to examine the various statutory provisions claimed here to be relevant" because "if it is the Board's contention that on the facts above outlined the statutes of the state of New York give it the right to reject plaintiff's certificate of acceptance, it is equally clear that the statutes as so applied are unconstitutional.").

So too here. Even if Defendants manage to identify an important state interest in their

opposition, that interest will not suffice because Defendants cannot explain (1) why USPS did not implement the same measures and policies *sooner*, giving states sufficient time to adopt election rules that accounted for reduced USPS delivery standards and delays; (2) why USPS could not have waited until *after* the election to implement the same measures and policies; and (3) what, beyond costs, would be the harm in forcing USPS to meet delivery and performance targets set by the Court.

## IV.    The Balance of the Equities Favors Injunctive Relief and Irreparable Harm Is Presumed.

In ordinary cases, the grant or denial of an injunction may turn on factors beyond likelihood of victory on the merits.  In constitutional cases, however, a demonstration of the required likelihood of success entitles a party to a presumption that the equities balance in their favor. So, while an injunction technically requires a showing of "(a) irreparable harm and (b) likelihood of success on the merits," voters "would certainly suffer irreparable harm if their right to vote were impinged upon." *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).  Hence, an "injunction [is] properly issued [in a voting rights case] if the district court" finds a probability of success on the constitutional question.  *Id.*

Put even more simply:  a clear likelihood of success on the merits *requires* "[t]he typical remedy" of an injunction.  *Schulz v. Williams*, 44 F.3d 48, 60 (2d Cir. 1994) ("permanent injunction was not an abuse of discretion, as it represented appropriate relief" for an unconstitutional restriction of access to the ballot).  *See also, Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) (balance of equities is all but automatically tipped in favor of an injunction by "'strong interest in exercising the fundamental political right to vote'" and fact that "[t]he public interest … favors permitting as many qualified voters to vote as possible."), *quoting Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006);

This rule holds particular weight in the election context:  because of the nature of elections, "absent injunctive relief, [Plaintiffs'] First Amendment rights likely would be forever

extinguished." *Yang*, 960 F.3d at 136 (2d Cir. 2020) (holding that extinguishing voting rights is "surely a 'significant' hardship that the Board has not adequately justified" and any costs to the State are a "cost that the State of New York chose to bear when it assumed the responsibility of regulating and holding the Democratic Party's primary election.") (alterations adopted); *see also Kermani v. N.Y. State Bd. of Elections,* 487 F. Supp. 2d 101 (NDNY 2006) (injunction granted against enforcement of Election Law section restricting outside expenditures in primary elections, observing "[i]n matters involving allegations or claims of First Amendment violations, irreparable harm may be presumed.").

Thus, injunctions issue in virtually every case where a restriction is unconstitutional under *Anderson-Burdick* (or its predecessors). *See, e.g., Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411 (2d Cir. 2004) (injunction granted against Election Law section canceling status of previously enrolled parties which fail to get 50,000 votes in gubernatorial election); *Williams v. Salerno,* 792 F.2d 323 (2d Cir. 1986) (injunction granted against Board of Elections determination that college dorm could not constitute "residence" for voter registration purposes); *Pitts v. Black,* 608 F. Supp. 696 (SDNY 1984) (injunction against refusal to register homeless voters); *Vanasco v. Schwartz,* 401 F. Supp. 87 (SDNY 1975), *aff'd,* 1976 U.S. LEXIS 921 (1976) (enjoining BOE rules which censored content of campaign materials); *Credico v. New York State Bd. of Elections,* 751 F. Supp. 2d 417 (EDNY 2010) ("Because violations of First Amendment rights are commonly considered irreparable injuries, I have no trouble concluding that plaintiffs have established that, in the event the injunction is not granted, they will suffer an irreparable injury") (cleaned up).

Even if more balancing were required, as detailed throughout Point III above, the government has offered no cognizable justification for the risk to the right to vote posed by the undisputed slowing of the mail. The remaining – and harder – question is "what remedy fits?" Plaintiffs have proposed several measures, all aimed at accomplishing a return to the status quo – before much sorting capacity was destroyed. As explained by Mr. Jamison, even a "simple lack of institutional attention could

noticeably slow down mail." Jamison Dec. ¶ 32.  Here, there have been dramatic measures that, according to the Postmaster, were not authorized at all.  Beyond that, the Postmaster has suggested he is largely unaware of management decisions made beneath him.  And managers – to say nothing of the Postmaster himself – have even tried to *hide* the effects and facts of those policies from Congress and the public.  *See* Barrios Dec. ¶¶ 8-19; House Tr. at 22-24.  Thus, the best remedy is one that sets targets and metrics aimed to measure potential slowdowns and keep the restoration of service on track.  The proposed measures do just that.

## <u>CONCLUSION</u>

For the reasons above, the Plaintiffs respectfully request the Court grant their motion for injunctive relief.

Respectfully submitted,

/s/
_____

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com