UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MONDAIRE JONES, *et al.*,

                              Plaintiffs,

     - against -

UNITED STATES POSTAL SERVICE, *et al.*,

                              Defendants.

No. 20 Civ. 6516 (VM)

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street, Third Floor
New York, New York 10007
Tel:     (212) 637-2774/2715
*Attorney for Defendants*

Rebecca S. Tinio
Steven J. Kochevar
*Assistant United States Attorneys*
          – Of Counsel –

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................II

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ...........................................................................................................2

    I.      THE UNITED STATES POSTAL SERVICE ......................................................2

    II.     USPS'S ESTABLISHED AND CONTINUING COMMITMENT TO
            ELECTION MAIL.................................................................................................2

        A.     State, Local, and Individual Responsibility for Election Mail................................4

        B.     USPS's Expanded Efforts to Ensure Timely Delivery of 2020 Election
            Mail    6

            1.     USPS Outreach and Recommendations to Election Officials ....................6

            2.     USPS's Long-Standing Special Handling Measures for Election
                  Mail.................................................................................................................9

            3.     USPS's Increased Efforts in the 2020 Election Season ............................11

    III.    USPS'S YEARS-LONG MANDATE TO IMPROVE EFFICIENCY AND
            CONTROL EXPENSES ......................................................................................12

        A.     Periodic, Data-Based Reduction in Redundant Processing Equipment and
            Collection Boxes................................................................................................13

        B.     USPS's Renewed Focus on Adhering to Existing Transportation
            Schedules ..........................................................................................................16

        C.     USPS Personnel Issues: Consistent Overtime Practices, and Staffing
            Shortages Caused by the Covid-19 Pandemic ......................................................18

        D.     Other Routine Efficiency-Promoting Measures....................................................20

ARGUMENT.................................................................................................................21

    I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CLAIMS ...........21

        A.     This Court Lacks Jurisdiction to Grant the Relief Sought ....................................21

            1.     Plaintiffs Lack Standing...........................................................................21

                  a.     Plaintiffs have failed to show injury-in-fact. ...............................22

       b.      Plaintiffs have failed to show traceability or redressability...........26

   2.      Plaintiffs' Claims Are Moot.......................................................................27

B.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.......................28

   1.      Plaintiffs' § 1983 claims fail against federal defendants. ..........................28

   2.      The Court should not apply the *Anderson-Burdick* line of cases, but if it does, USPS's actions are constitutional under that framework. .................................................................................................29

       a.      The *Anderson-Burdick* line of cases does not apply here. .............29

       b.      Even if the Court found that USPS's operational choices constituted "election laws," this case would be controlled by the *McDonald* framework .........................................................32

       c.      USPS's actions are constitutional under the *Anderson-Burdick* framework, were the Court to apply it. ...........................33

       d.      USPS's actions would survive strict scrutiny, were the Court to apply it. ...................................................................36

   3.      Plaintiffs are unlikely to prevail on their first claim, construed as a standalone First Amendment claim. .........................................................36

   4.      Plaintiffs are unlikely to prevail on their second claim, construed as a Fifth Amendment equal protection claim. .........................................37

II.     PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM .........................39

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST ARE IN THE GOVERNMENT'S FAVOR ..................................................................39

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)...................................................................................... 32, 33

*Arcara v. Cloud Books, Inc.*,
   478 U.S. 697 (1986)........................................................................................... 39

*Bolling v. Sharpe*,
   347 U.S. 497 (1954)........................................................................................... 30

*Burdick v. Takushi*,
   504 U.S. 428 (1992)................................................................................ 33, 35, 36

*Cacchillo v. Insmed, Inc.*,
   638 F.3d 401 (2d Cir. 2011)......................................................................... 24, 27

*Campbell v. Louisiana*,
   523 U.S. 392 (1998)........................................................................................... 25

*Church of Am. Knights of the Ku Klux Klan v. Kerik*,
   356 F.3d 197 (2d Cir. 2004).............................................................................. 39

*City of L. A. v. Lyons*,
   461 U.S. 95 (1983)............................................................................................. 24

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013)..................................................................................... 24, 26

*Council of Greenburgh Civic,
   Assocs.*, 453 U.S. 114 (1981)............................................................................ 33

*Daunt v. Benson*,
   956 F.3d 396 (6th Cir. 2020) ............................................................................ 31

*Ethyl Corp. v. EPA*,
   541 F.2d 1 (D.C. Cir. 1976) ....................................................................... passim

*Franklin v. Mass.*,
   505 U.S. 788 (1992)........................................................................................... 27

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005).............................................................................. 41

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*,
   528 U.S. 167 (2000)..................................................................................... 24, 29

*Futch v. Fine*,
   No. 09 04020, 2009 WL 565616 (D.D.C. March 5, 2009).................................... 28

*Gallagher v. N. Y. State Bd. of Elections*,
   --- F. Supp. 3d ---, 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020) ..................... 31

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018)....................................................................................... 26

*Gray v. Sanders*,
   372 U.S. 368 (1963)........................................................................................... 32

*Hutchins v. D.C.*,
   188 F.3d 531 (D.C. Cir. 1999) .......................................................................... 39

*Johnson v. Mississippi*,
    71 U.S. 475 (1866)....................................................................................................... 27

*Kingsley v. Bureau of Prisons*,
    937 F.2d 26 (2d Cir. 1991)..................................................................................... 30, 38

*Knight First Amendment Institute at Columbia University v. Trump*,
    302 F. Supp. 3d 541 (S.D.N.Y. 2018)...................................................................... 27

*Laird v. Tatum*,
    408 U.S. 1 (1972)........................................................................................................ 26

*Lamar Advert. of Penn, LLC v. Town of Orchard Park, N.Y.*,
    356 F.3d 365 (2d Cir. 2004)....................................................................................... 29

*Lau v. Meddaugh*,
    229 F.3d 121 (2d Cir. 2000)....................................................................................... 28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................................................................... 24

*Marcavage v. City of New York*,
    689 F.3d 98 (2d Cir. 2012)................................................................................... 24, 27

*Martin-Trigona v. Shiff*,
    702 F.2d 380 (2d Cir. 1983)....................................................................................... 29

*McDonald v. Board of Election Com'rs of Chi.*,
    394 U.S. 802 (1969).................................................................................................... 34

*Munaf v. Geren*,
    553 U.S. 674 (2008).................................................................................................... 23

*PEN American v. Trump*,
    --- F. Supp. 3d --- 2020 WL 1434573 (S.D.N.Y. March 24, 2020) ........................ 27

*Phillips v. Girdich*,
    408 F.3d 124 (2d Cir. 2005).......................................................................... 31, 39, 40

*Raines v. Byrd*,
    521 U.S. 811 (1997).................................................................................................... 24

*Reynolds v. Sims*,
    377 U.S. 533 (1964).................................................................................................... 32

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)......................................................................................... 28

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir 2020) ...................................................................................... 34

*United States v. Sanchez-Gomez*,
    138 S. Ct. 1532 (2018)............................................................................................... 29

*Whitmore v. Ark.*,
    495 U.S. 149 (1990).................................................................................................... 24

*Wright v. City of St. Petersburg*,
    833 F.3d 1291 (11th Cir. 2016) ................................................................................. 39

*Yang v. Kosinki*,
    960 F.3d 119 (2d Cir. 2020)................................................................................ passim

*Zherka v. Ryan*,
    52 F. Supp. 3d 571 (S.D.N.Y. 2014)......................................................................... 39

Statutes

28 U.S.C. § 1983 ..................................................................................................................... 30

N.Y. Election Law § 8-412(1) ............................................................................................... 26

Rules

Federal Rule of Civil Procedure 65(d)(1)(B)-(C) ....................................................... 28

## PRELIMINARY STATEMENT

The United States Postal Service ("USPS") is undertaking extraordinary efforts to ensure it will timely deliver ballots and other mail related to the upcoming election. It is relying on steps it has taken in earlier election cycles—as well as new expanded measures—to ensure that it can handle an anticipated surge of mail related to the election. The USPS has both the capacity and the commitment to fulfill its role in the election.

Plaintiffs' challenges to USPS operations lack a basis in fact or law. As a factual matter, most of the operational measures challenged by plaintiffs have been suspended until after Election Day—and all of them were implemented to help the USPS provide good service, not to disrupt the election or delay mail delivery. Indeed, many of the challenged actions—such as the removal of underused or obsolete machinery or collection boxes—are part of longstanding, regular USPS operations that contribute to its ability to survive as a self-funded public institution. None of the actions Plaintiffs challenge will impair the USPS's ability to timely and efficiently deliver election mail.

As a jurisdictional matter, Plaintiffs lack standing to bring this suit, including because their asserted injuries—that their ballots might not be delivered on time—are speculative.  If plaintiffs mail in their ballots at a reasonable time before the election, it is very likely their ballots will be timely delivered, and widespread delivery issues are unlikely, particularly in light of the USPS's established policies and practices that ensure timely delivery of election mail. In addition, plaintiffs' asserted speculative injuries do not support the overbroad and impractical relief plaintiffs seek. Plaintiffs' motion also suffers from mootness because many of the challenged operational measures have already been suspended.

Plaintiffs' claims also fail on the merits. Plaintiffs improperly rely on precedents reviewing state election laws (known as the *Anderson-Burdick* line of cases) that do not apply to

federal executive agency action that does not directly regulate an election, such as the routine operational measures employed by the USPS. And even if *Anderson-Burdick* standards applied, the USPS's actions pass constitutional muster: they are reasonable, non-discriminatory, and designed to accomplish the efficient and timely delivery of the nation's mail. There also is no equal protection claim here because plaintiffs have not established any purposeful or intentional discrimination. And "one person, one vote" principles do not apply to how USPS delivers mail.

Put simply, the Constitution does not require USPS to deliver mail within a specific timeframe. Nor does it permit this Court to micro-manage USPS, even in connection with the election.  And USPS is ready and able to deliver the mail, including and especially election mail.

The Court should deny plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I.  The United States Postal Service

In addition to being a self-supporting, independent federal agency, the USPS is one of the nation's largest and most complex business operations. To fulfill its universal service obligation, the USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and, on a *single* typical day, processes and delivers more than 450 million mailpieces to nearly 160 million delivery points. *See* Declaration of Rebecca S. Tinio ("Tinio Dec.") ¶ 3 & Ex. 1 (United States Postal Service FY2019 Annual Report to Congress) at 2, 7.

### II.  USPS's Established and Continuing Commitment to Election Mail

Among its service obligations, the USPS recognizes the special importance of Election Mail. "Election Mail" is any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Declaration of Robert Justin Glass ("Glass Dec.") ¶ 3. This includes mail sent by election officials to voters (*e.g.*, voter registration

2

materials, absentee or mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots).[1] *Id.*

The USPS is fully capable—financially and operationally—of handling a surge of Election Mail in connection with the November 2020 election (the "2020 Election"). To put the anticipated volume of Election Mail into perspective, even if every registered voter in the United States[2] used a mail-in ballot in the 2020 Election, those ballots would represent only a fraction of the total mailpieces that the USPS processes each day, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail volume that the USPS handles every winter holiday season. *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23.[3] Indeed, the USPS projects (even accounting for an increased use of mail-in ballots) that only 2-5 percent of the total volume of mail in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. As detailed below and in the USPS's declarations and public statements, the USPS has been planning for the 2020 Election for many months, and has the funds, processing

---

[1] Election Mail is distinct from "Political Mail" sent by political candidates, political action committees, and similar organizations in order to engage in advocacy. Glass Dec. ¶ 3.

[2] Publicly available data generally indicate that there are approximately 150 million registered voters in the United States. *See, e.g.*, *Number of Voters and Voter Registration as a Share of the Voter Population*, https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%2 2:%22asc%22%7D (last visited Sept. 8, 2020).

[3] *See also, e.g.*, *Can the Post Office Handle Election Mail? Why the Recession Could Actually Help* (Tinio Dec. ¶ 4 & Ex. 2) (charts showing annual seasonal spikes in winter holiday mail volume, as well as overall declines in First-Class and Marketing Mail).

capacity, and personnel to ensure that Election Mail is timely delivered. Glass Dec. ¶¶ 42-44.[4]

Beyond these financial and operational resources, the USPS will continue to employ longstanding special Election Mail measures, including offering dedicated markings that help improve the visibility and handling of Election Mail, extensive educational outreach to election officials and voters, and, as USPS's declarations further detail, taking various extraordinary actions to ensure the timely delivery of Election Mail. *See* Glass Dec. ¶¶ 3-41.  The USPS has in no way diminished—and in fact has *enhanced*—its efforts to facilitate and expedite the timely delivery of Election Mail this year.

### A.    State, Local, and Individual Responsibility for Election Mail

Crucially, the USPS can control only its own product lines and handling of Election Mail once it enters the USPS's processing and delivery network. The USPS has no authority over the many important decisions that are committed by law to states and localities in determining their own Election Mail procedures. *Id.* ¶ 4. Every election year (including this one), the USPS provides a substantial amount of information, via publications and written and verbal outreach, to election officials regarding options and best practices for using the USPS's services for Election Mail. *Id.* ¶¶ 5-9.

As a threshold matter, in most circumstances, each state decides whether, and to what extent, to allow mail-in voting of any kind. This is not a decision in which the Postal Service is involved. Once a state decides to use the mail as part of its election process, generally speaking,

---

[4] *See also Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Aug. 7 Meeting* (Tinio Dec. ¶ 5 & Ex. 3) at 4 ("[T]he Postal Service has ample capacity to deliver all election mail securely and on-time in accordance with our delivery standards, and we will do so."); Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections (Tinio Dec. ¶ 7 & Ex. 5) at 54 ("[W]e have plenty of cash to operate for the election.").

election officials must choose whether to send Election Mail to voters via either First-Class Mail, which typically takes 2 to 5 days for delivery, or lower-cost Marketing Mail, which typically takes 3 to 10 days. *Id.* ¶ 4; *see also Processing Readiness of Election and Political Mail During the 2020 General Elections* (Tinio Dec. ¶ 6 & Ex. 4) at 1. Because of the nature of the mailpiece, all completed ballots (representing votes) that individuals return back to election officials are sent via First-Class Mail, unless individual voters choose to, for example, hand-deliver ballots or send them as Priority Mail or Priority Express Mail, which are faster services than First-Class Mail. OIG 2020 Election Mail Report at 1; Glass Dec. ¶ 4. The USPS has not altered, nor will it alter, any of its existing postal services, service standards, or rates used for the delivery of Election Mail in advance of the 2020 Election. *See, e.g.*, Tinio Dec. ¶ 7 & Ex. 5 at 18 ("[W]e are not going to change any rates."); *id.* ¶ 5 & Ex. 3 at 4 ("We have delivery standards that have been in place for many years. These standards have not changed").

Election officials also solely determine: (1) the design of Election Mail (its dimensions and the graphic and textual elements that will be displayed); (2) whether they will mark Election Mail with the USPS's official Election Mail logo, identify ballots being sent out to voters with the USPS's Green Tag 191, or otherwise identify outgoing mailpieces as Election Mail on postage statement forms (all of which help the USPS identify and expedite Election Mail within USPS facilities); (3) entry times (meaning the dates on which election officials will enter Election Mail into the USPS system for delivery to voters, and the deadlines for voters to request ballots and return them to election officials); (4) whether Election Mail will be trackable (for example, using USPS's Intelligent Mail barcode system, for which USPS does not charge additional fees); and (5) whether to pre-pay postage for ballots that voters return to election officials (versus requiring voters to affix their own postage). Glass Dec. ¶ 4. Individual voters are

responsible for, among other things, providing current addresses to election officials and the USPS; understanding vote-by-mail procedures in their state and locality; and timely requesting ballots from, and returning those ballots to, local election officials.

The USPS's two most significant operational concerns with respect to the 2020 Election are: (1) election officials' decisions regarding Election Mail and ballot design (which, as discussed below, can significantly affect the USPS's ability to recognize and expedite Election Mail), and (2) Election Mail timeframes set by state and local officials. *Id.*. ¶ 45. Indeed, in a recent review of the USPS's servicing capacity for the 2020 Election conducted by the USPS Office of Inspector General ("OIG"), each of the five "potential concerns" that OIG identified under "Findings" are controlled by election officials and voters, not by the USPS (ballots mailed without tracking technology, ballot mailpiece design, Election Mail sent to voters too close to the election, varying state postmark requirements for ballots, and out-of-date voter addresses).[5]

### B.   USPS's Expanded Efforts to Ensure Timely Delivery of 2020 Election Mail

In preparation for the 2020 Election, the USPS has undertaken extensive and expanded efforts to educate election officials and voters, strongly recommend best practices, and prepare to process and deliver a high volume of Election Mail through the completion of the 2020 Election.

### 1.   USPS Outreach and Recommendations to Election Officials

The USPS has already had approximately 42,000 individual contacts with election officials

---

[5] The OIG Report was based on an audit conducted during special and primary elections held in May and June 2020, and did not review issues recently highlighted in the media and Plaintiffs' Complaint. *See* Tinio Dec. ¶ 6 & Ex. 4 at 1. The Report concluded that the USPS had improved several of its practices and procedures since OIG's prior relevant audits, and that "the Postal Service has altered its normal processes to accommodate for the timely processing of Election and Political Mail and help meet the needs of elections." *Id.* at 3, 12. While the Report identified some best practices and made recommendations (not all directed at the USPS), *id.* at 3-4, it also found that USPS management was "responsive to the [Report's] recommendations" and that planned "corrective actions should resolve the issues identified . . . ." *Id.* at 19.

in order to advise and consult with them about best practices and recommendations regarding Election Mail, and this outreach is ongoing. Glass Dec. ¶¶ 5-9. In addition, since February 2020, the USPS has sent out approximately 11,500 copies of "Kit 600," an official Election Mail guide, to election officials; offered the services of mailpiece design experts; designated election coordinators in each locality; and published extensive election-related information online. *Id.* ¶ 6; *see also* Tinio Dec. ¶ 8 & Ex. 6 ("Kit 600"). This outreach strategy to election officials in the run-up to the 2020 Election is consistent with the USPS's approach in past years, but the volume and frequency of the USPS's communications has increased, largely because of the need to address challenges stemming from the COVID-19 pandemic. Glass Dec. ¶ 32.

In May and July 2020, the USPS General Counsel's office sent letters to election officials following up on the transmission of Kit 600 and "highlight[ing] some key aspects of the Postal Service's delivery processes, to allow you to take those processes into account when educating the public on . . . using the mail to vote." Glass Dec. ¶ 7 & Ex. 1 ("May 29, 2020 USPS Letter"). The July 2020 letters were tailored to each state, reciting key provisions from each state's election laws and procedures and identifying particular issues to keep in mind when using the USPS to send Election Mail (and educating voters). *See generally* ECF No. 1-5. For example, in its letter to Arkansas election officials, the USPS identified certain state election law provisions that "are incongruous with [USPS] delivery standards" and "create[] a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted." *Id.* at 1. In each letter, the USPS asked "that election officials keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of election mail to voters, and when informing voters how to successfully participate in an election" by mail. *Id.* at 2. None of these letters stated that the USPS intended to slow delivery of

Election Mail, or that the USPS was otherwise altering its service standards for Election Mail. Rather, these letters aimed to ensure that election officials are fully informed, well in advance of the 2020 Election, of the USPS's delivery standards, the extensive resources that the USPS offers to assist election officials, and the potential risks that certain state law provisions may pose to voters' full participation by mail in the 2020 Election. *See* May 29, 2020 USPS Letter; *see generally* ECF No. 1-5. Moreover, these letters were consistent with the USPS's outreach to election officials during past election cycles. *See, e.g.*, Glass Dec. ¶ 8 & Ex. 2 (2016 letter sent to state election officials advising them, for example, to consult with USPS Election Mail Coordinators; urge voters to return ballots early in order to ensure timely delivery; use the official USPS Election Mail logo and Green Tag 191; and send Election Mail by First-Class mail).

In all of these communications and others, the USPS has strongly and repeatedly recommended the following best practices, among others, for 2020 Election Mail[6]:

- Consult with USPS Election Mail design coordinators and election coordinators. *See, e.g.*, May 29, 2020 USPS Letter at 2; ECF No. 1-5 at 2; Tinio Dec. ¶ 8 & Ex. 6 at 5; *see also* Glass Dec. ¶ 6.

- Use First-Class Mail to transmit Election Mail (including blank ballots) to voters, and allow sufficient time for delivery to and from voters. *See, e.g.*, May 29, 2020 USPS Letter at 2; ECF No. 1-5 at 1; Tinio Dec. ¶ 9 & Ex. 7 at 10 (USPS Publication 632, explaining the USPS's different delivery standards and "recommend[ing] the use of First-Class Mail service to obtain timely delivery"); *see also* Glass Dec. ¶ 18.

- Identify Election Mail using the USPS's official Election Mail logo, Green Tag 191 (which can be applied only to ballots being sent out to voters), or by other means. *See, e.g.*, May 29, 2020 USPS Letter at 2; Tinio Dec. ¶ 8 & Ex. 6 at 4, 5, 13, 23; Tinio Dec. ¶ 10 & Ex. 8 (USPS Publication 631, providing guidelines for using the official USPS Election Mail logo); *see also* Glass Dec. ¶¶ 11-14.

---

[6] *See* Glass Dec. ¶ 32; *see also* Tinio Dec. ¶ 6 & Ex. 4 at 2 ("[t]he Postal Service has frequently communicated to state election officials the importance of" following best practices).

- Use tracking technology, for example the USPS's Intelligent Mail Barcode, on Election Mail. *See, e.g.*, May 29, 2020 USPS Letter at 2; Tinio Dec. ¶ 8 & Ex. 6 at 7.

- Keep USPS delivery standards in mind when informing voters how to participate in an election using the mail, and when establishing deadlines and the means used to send Election mail to voters. *See, e.g.*, May 29, 2020 USPS Letter at 2; ECF No. 1-5 at 1.

Lastly, the USPS has consistently urged voters to return their completed ballots early. *See, e.g.*, May 29, 2020 USPS Letter at 2; Glass Dec. ¶ 42 ("[T]o mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively voters and election officials to act early"); Tinio Dec. ¶ 11 & Ex. 9 at 1 (statement by Postmaster General DeJoy "encourag[ing] all Americans who choose to vote by mail to request their ballots early and to vote early, as a common sense best practice.").

### 2. USPS's Long-Standing Special Handling Measures for Election Mail

Once Election Mail enters the USPS's processing and delivery network, the USPS has long deployed a number of special handling measures—which the USPS has only *increased* in anticipation of the 2020 Election—to ensure that all Election Mail, whether being sent by election officials to voters or vice versa, is timely delivered.

First, USPS personnel have long made special efforts to physically identify and track[7] the progress of Election Mail through USPS facilities, to ensure that all Election Mail keeps moving through the network. These efforts are significantly more effective when election officials choose to use the official USPS Election Logo, affix Green Tag 191 to containers of mail (*e.g.*, ballots being sent out to voters), or check the "Election Mail" box on the postage statement form that is filled out when containers of Election Mail are entered into the USPS system. *See* Glass.

---

[7] As mentioned above, the USPS also encourages the use of Intelligent Mail barcoding on outgoing Election Mail, which gives election officials tracking capability. *See* Glass Dec. ¶ 4.

Dec. ¶¶ 11-14. When a container of mail identifiable as Election Mail enters the system, USPS personnel log that container at every step, so that it can be easily located if necessary. *Id.* ¶ 19. USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out, or at the front of the line for delivery the next day). *Id.*

The USPS has long engaged in several practices that expedite processing and delivery of Election Mail, particularly ballots (whether election officials have chosen to use Marketing or First-Class Mail for delivery of materials to voters). *Id.* ¶ 20. The USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail (in other words, when capacity permits, the USPS will "advance" Marketing Mail that it can identify as Election Mail ahead of other Marketing Mail). *Id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *Id.* The USPS also prioritizes placing identifiable Election Mail on outgoing trucks, a step that is particularly effective when election officials designate ballot mailing containers using Green Tag 191. *Id.* ¶ 22.

The USPS also has a long-standing practice of cancelling (applying a postmark to) all mailpieces that it can identify as ballots being returned by voters to election officials, even if there is no reason to do so for the USPS's own purposes. *Id.* ¶ 34. A postmark is a USPS imprint applied to a mailpiece indicating the location and date that the USPS accepted custody of the mailpiece, in order to cancel affixed postage (*e.g.*, a stamp) so that it may not be reused (thereby providing revenue assurance for the USPS). *Id.* ¶ 33. Many mailpieces do not need to be cancelled, because they bear indicia of postage that is not at risk of being reused (*e.g.*, metered or permitted mail, or mail bearing a pre-cancelled stamp). *Id.* And as discussed above, election

officials have the authority to determine whether they will prepay the postage on blank ballots that they expect voters to return to them (using methods, like metering, that would not normally trigger cancellation by the USPS), or whether they will require voters to affix their own postage. *See supra* Part II.A; Glass Dec. ¶ 4.

In recognition of the importance that many states place on a ballot's postmark in validating that ballot as timely under the state's election laws, the USPS endeavors to identify *all* ballots (no matter what type of postage they bear) being returned by voters and cancelling them, including by hand, if necessary. *Id.* ¶ 34. Letter mail is typically cancelled using an Advanced Facer Cancellation System (AFCS) machine at a processing plant. *Id.* ¶ 35. Based on the USPS's contemporaneous data regarding current AFCS machine capacity within its network, the USPS has ample capacity to cancel all mailpieces that it can identify as ballots in association with the 2020 Election. *Id.* The USPS is also making extra efforts this year to identify and hand-cancel ballots that bypass or are rejected by an AFCS machine. *Id.* ¶¶ 39, 41. Moreover, for the first time, the USPS will use ballot monitors during the week before the election and through Election Day, in order to ensure that all personnel are following the proper procedures for identifying and cancelling ballots. *Id.* ¶ 39.

The USPS is committed to continuing all of these long-standing practices to support mail-in voting for the 2020 Election. Glass Dec. ¶ 28. The USPS Director of Election Season (a fifteen-year USPS veteran) is unaware of any direction from anyone within the USPS discouraging or restraining USPS personnel from taking any measure necessary to ensure the timely delivery of Election Mail, including ballots. Glass Dec. ¶¶ 1, 27.

### 3.   USPS's Increased Efforts in the 2020 Election Season

In fact, for the 2020 Election, the USPS has *increased* its efforts to facilitate the use of mail-in ballots. For example, Postmaster General DeJoy publicly committed that starting on

October 1, 2020, the USPS will engage standby resources in all areas of its operations, including transportation, to satisfy any unforeseen demand related to the 2020 Election. *Id.* ¶ 29; Tinio Dec. ¶ 12 & Ex. 10 at 1-2. These standby resources will include, as needed, additional staffing, transportation, and increased mail processing, among other potential resources. Glass Dec. ¶ 29.[8] The USPS also expanded its election task force by including leaders of the postal unions and management associations, to ensure strong coordination throughout the USPS and with state and local election officials, and to make sure any concerns can be raised and resolved timely at a high organizational level. *Id.* ¶ 10. The USPS has increased the volume and frequency of its communications with election officials in the run-up to this year's election. *Id.* ¶ 32. And as mentioned above, the USPS will, for the first, time, deploy ballot supervisors on facility floors to ensure that USPS personnel are properly identifying ballots, to the greatest extent possible, and appropriately hand-cancelling them *en route* to election officials. *Id.* ¶ 39.

In sum, the USPS will have ample financial, operational, and personnel resources to take all measures necessary—including measures introduced for the first time this year—to effectuate mail-in voting for the 2020 Election.

### III. USPS's Years-Long Mandate to Improve Efficiency and Control Expenses

The majority of the concerns raised by Plaintiffs relate to routine operational adjustments and measures with which Postmaster General DeJoy has had no involvement, and which have either regularly occurred for years before his arrival in office, or were planned and set in motion well before then. In light of the unusual attention that these operational measures have attracted

---

[8] With respect to expanded mail processing, the USPS anticipates having ample capacity to handle any such extra demand using its current complement of operational mail processing machines, which generally have numerous hours per day of unused operating capacity during which they normally sit idle. *See* Glass Dec. ¶ 29.

recently, and to maintain the status quo ahead of and through the 2020 Election, Postmaster General DeJoy has publicly committed to suspending nearly all of these operational measures (namely, equipment and collection box removal, certain routine aspects of overtime management, any changes to retail hours, plans to consolidate or close any facilities, and a limited pilot program for mail carriers).[9] *See, e.g.*, Tinio Dec. ¶ 12 & Ex. 10.

As detailed below, these operational measures were not and have not been motivated by any aim other than to improve the USPS's performance and adherence to service standards, and to help address its precarious financial condition. As discussed in the USPS's Fiscal Year 2019 Annual Report to Congress (which pre-dated the arrival of the current Postmaster General), the USPS's financial condition results, in part, from the steady declines in First-Class and Marketing Mail volumes. *See* Tinio Dec. ¶ 3 & Ex. 1 at 28-29; *see also, e.g.*, Tinio Dec. ¶ 13 & Ex. 11 ((data showing that the volume of First-Class Mail in 2019 was at its lowest point since 1977); *id.* ¶ 14 & Ex. 12 at 1 (2019 statement of the former Postmaster noting the steep decline in First-Class Mail, the USPS's "most profitable product").

### A.   Periodic, Data-Based Reduction in Redundant Processing Equipment and Collection Boxes

For years, and largely as a result of changing operational needs due to the decline in letter and flat mail[10] volume, the USPS has periodically: (1) gathered and analyzed data relating to the utilization of blue collection boxes and mail processing machines, and (2) reduced or reallocated redundant collection boxes and processing equipment.

---

[9] The only exception is the ongoing effort to improve compliance with existing schedules throughout the USPS's transportation and processing networks—which, as discussed below, has not had any lasting negative impact on the USPS's service performance. *See infra* Part III.B.

[10] "Flat mail" refers to periodicals and larger envelopes (for example, newsletters and advertising material). *See, e.g.*, DeChambeau Dec. ¶ 5.

The USPS has over 140,000 collection boxes. *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. The USPS regularly reviews the need for and location of collection boxes in accordance with procedures set out in the Postal Operations Manual ("POM"). *Id.* ¶ 5. With some exceptions, collection boxes are relocated or removed, after a 30-day public notice is provided, if they average fewer than 25 pieces of mail per day during a testing period. *Id.* ¶¶ 5, 8. For each of the last seven years, based on this data-driven process, the USPS has removed an average of 3,100 collection boxes per year, many of which are relocated to more heavily trafficked areas. *Id.* ¶¶ 8, 10. Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal. *Id.* ¶ 6. The USPS has removed approximately 1,500 boxes in 2020 pursuant to this regular process, in line with its usual yearly rate; Postmaster General DeJoy was not involved in any decisions relating to the removal of these boxes. *Id.* ¶¶ 10, 19. However, the removal and relocation of boxes (other than damaged boxes, or boxes in unsafe locations) has been suspended until further notice, not to resume until after the 2020 Election, at Postmaster General DeJoy's direction. *Id.* ¶¶ 18-19.

Similarly, the USPS has, for years, regularly removed and/or replaced unnecessary mail processing and sorting equipment in its approximately 289 mail processing facilities. *See* DeChambeau Dec. ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Declaration of Robert Cintron ("Cintron Dec.") ¶ 5. USPS Mail Processing Operations tracks data regarding mail processing machines throughout the nation, in order to evaluate whether the number and type of machines in use align with the volume and types of mail handled in each facility. DeChambeau Dec. ¶ 8; Couch Dec. ¶ 4; Declaration of Michael L. Barber ("Barber Dec.") ¶ 4. The USPS may also remove machines because they are obsolete; to free up floor space for other needs (*e.g.*, sorting operations or equipment aimed at handling the increased volume of package mail); or as

14

a result of facility consolidations.[11] DeChambeau Dec. ¶¶ 7-12, 18; Couch Dec. ¶ 3. Parts of

disassembled machines can often be used to expand the capacity of remaining machines, thereby

generating more processing capacity at lower cost. Couch Dec. ¶ 11; Barber Dec. ¶ 7.

Based on its data analyses, the USPS has been steadily reducing its letter and flat mail

processing equipment for several years, to align with volume reductions in those types of mail.

DeChambeau Dec. ¶ 13. The USPS removed approximately 388 machines per year from 2015

through 2019. *Id.* The number of machines reduced varies from year to year, based on utilization

data. *Id.* For example, in fiscal year 2016, the USPS reduced 1,120 letter and flat sorting

machines, while the following year it reduced only 197 machines. *Id.* In 2017, the USPS began a

more structured, phased equipment reduction initiative. *Id.* ¶ 14. The first phase focused on

reducing unnecessary Delivery Barcode Sorters (DCBS) and Automated Flat Sorting Machines

(AFSM), which process letter and flat mail, respectively. *Id.* Later phases included reducing

unnecessary Advanced Facer Canceler System equipment, which cancels (or postmarks) letter

mail. *Id.* ¶¶ 6, 16. In 2020, again based on the USPS's data analyses and in keeping with ongoing

equipment reduction efforts, USPS reduced approximately 700 letter and flat sorting machines.

*Id.* ¶¶ 19-21. These reductions were planned and scheduled before Postmaster General DeJoy

took office, and he had no role in their implementation, *id.* ¶ 22, Couch Dec. ¶¶ 5, 9, Barber Dec.

¶ 5; as in prior years the actual removals were scheduled for summer, when mail volumes are

historically lower. DeChambeau Dec. ¶ 19; Couch Dec. ¶ 4. Moreover, these removals were

planned, as they have been in past years, based solely on the USPS's ongoing analysis of mail

volume and mail processing needs nationwide, not because of any considerations relating to the

---

[11] No facility closings or consolidations are scheduled for Fiscal Year 2020 or the first quarter of Fiscal Year 2021 (October 1 through December 31, 2020). *See* Barber Dec. ¶ 11; *see also* Tinio Dec. ¶ 12 & Ex. 10 at 1 ("No mail processing facilities will be closed.").

2020 Election. DeChambeau Dec. ¶ 20.

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment would be suspended until after the 2020 Election. *See* Tinio Dec. ¶ 12 & Ex. 10 at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15. Mail processing machines that are taken out of operation are generally removed from a facility floor and disassembled for their usable parts, some of which may be installed in other machines. Couch Dec. ¶¶ 10-11. Other machines (once all proprietary parts have been removed) may be offered for sale to the general public through the USPS's Corporate Asset Accountability Office. *Id.* ¶¶ 10, 12. As a result, at least some of the machines that have been taken out of use in 2020 cannot be returned to operation. *Id.* ¶ 12. However, based on its ongoing monitoring of data reflecting the processing capacity of each machine in use, and whether that machine has additional capacity to absorb more processing demands, the USPS is confident that its processing facilities have the capacity to process all anticipated Election Mail. DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6.[12]

### B.   USPS's Renewed Focus on Adhering to Existing Transportation Schedules

Plaintiffs also raise concerns about the USPS's recent renewed focus on improving its adherence to existing transportation schedules. As detailed below and in the USPS's declarations, this ongoing effort had been discussed and initiated by USPS management years before Postmaster General DeJoy took office. However, Postmaster General DeJoy became aware of transportation-related concerns immediately upon his swearing in, because he reviewed

---

[12] The assertions made by Jose Carlos Barrios, *see* ECF No. 19-5, do not overcome or call into question the sworn representations made in the declarations of Michael L. Barber, Kevin Couch, and Jason DeChambeau, all of whom are personally involved in and directly knowledgeable about the USPS's oversight and management of its mail processing equipment. The declaration of Dennis W. Stasa, Senior Plant Manager, San Antonio Processing & Distribution Center, further addresses the issues raised by Mr. Barrios.

a just-issued OIG report addressing "late deliveries, . . . late dispatch, extra trips, and all the time and costs" that those issues caused. Tinio Dec. ¶ 7 & Ex. 5 at 10. In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Tinio Dec. ¶ 15 & Ex. 13 at 1. In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.* In turn, noncompliance with transportation schedules risks delay in the next leg of a schedule; a one-hour truck delay may cause mail to miss its scheduled cargo flight, resulting in even longer delay. Cintron Dec. ¶ 14.

Approximately two years ago, Robert Cintron, the current Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules. *Id.* ¶¶ 1, 11-13, 21. He continued this effort after Postmaster General DeJoy took office, and discussed the topic with him and other Postal executives. *Id.* ¶¶ 22-23. Postmaster General DeJoy reemphasized the need to adhere to the USPS's operational plans, including transportation schedules. *Id.* ¶ 23. Mr. Cintron and his team developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips was appropriate. *Id.* ¶ 24 & Ex. 2. On July 14, 2020, Mr. Cintron distributed these guidelines to area executives and advised them of the USPS's renewed

attention to unplanned extra and under-utilized trips. *Id.* ¶ 25.[13]

During the following week, compliance with transportation schedules improved, but the USPS experienced a temporary decline in its service performance (meaning that some mail was delayed during the beginning stages of this effort). *Id.* ¶ 26. However, after USPS began to address the decline, the USPS has observed steady improvements in its service performance. *Id.* ¶ 27; *See* Declaration of Angela Curtis ("Curtis Dec.") ¶ 30.  On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules. In other words, we are improving service performance while more consistently running our trucks on time." ECF No. 19-17 (letter) at 1; *id.* (slide deck) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels); Cintron Dec. ¶ 27. And, in the last two months, there has been a sharp decrease in late and extra trips. *See id.* (slide deck) at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27.

### C.   USPS Personnel Issues: Consistent Overtime Practices, and Staffing Shortages Caused by the Covid-19 Pandemic

Furthermore, Defendants have not attempted to curtail the USPS's ability to handle Election Mail by banning or irrationally restricting employee overtime. The Postal Service's

---

[13] The USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. *See* ECF No. 1-1; Cintron Dec. ¶ 24 n.1. The USPS, upon investigation, learned that this memo was locally prepared; it was not created, reviewed, or approved by USPS Headquarters. *Id.* The memo does not represent official USPS policy, either in July or now; in fact, it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules. *Id.* It has never been USPS policy or guidance to "ban" extra trips, nor was it ever USPS's goal or desire to leave mail behind in processing facilities. *Id.* ¶¶ 24 n.1 & 28; Curtis Dec. ¶ 24 n.1.

customary overtime practices, pursuant to which overtime is generally evaluated and approved

by local field managers (not Headquarters personnel), have remained unchanged, before and

after Postmaster General DeJoy's arrival in office, and the rate at which the USPS has incurred

overtime has remained constant. *See* Curtis Dec. ¶¶ 12, 22-23; Declaration of Joshua Colin,

Ph.D. ("Colin Dec.") ¶¶ 3-4. To the extent the USPS has made past efforts to monitor or address

certain issues with overtime usage, that is unconnected to the 2020 Election, but rather relates to

ongoing, routine measures to improve efficiency and reduce unnecessary costs. *See* Curtis Dec.

¶¶ 12-13; Colin Dec. ¶¶ 3-6. In any event, Postmaster General DeJoy has directed that any such

routine measures be suspended in order to maintain the status quo until the 2020 Election. *See,

e.g.*, Tinio Dec. ¶ 16 & Ex. 14 at 14 ("I did not direct the elimination or any cutback in overtime.

I did however suspend these practices to remove any misperceptions about our commitment to

delivering the nation's election mail."); *id.* ¶ 12 & Ex. 10 at 1 ("[W]e reassert that overtime has,

and will continue to be, approved as needed"); *id.* ¶ 17 & Ex. 15 at 5 ("To clear up any

confusion, overtime has, and will continue to be, approved as needed.").[14]

Since March 2020, the USPS has faced and dealt with serious staffing issues caused by the

COVID-19 pandemic. *See* Declaration of John Prokity ("Prokity Dec.") ¶ 4; Curtis Dec. ¶ 18.

Prior to the pandemic, the USPS experienced, on average, a weekly equivalent of 55,000

employees using full-day leave. Prokity Dec. ¶ 5. In early March, this figure began to increase

---

[14] The USPS is aware of a July 14, 2020 PowerPoint entitled "PMGs expectations and plan," which purports to discuss issues relating to overtime, park points (addressed below), and other topics. *See* Compl. ¶¶ 65, 105; Curtis Dec. ¶ 24 n.1. The USPS, upon investigation, learned that this PowerPoint was prepared by a local manager. Curtis Dec. ¶ 24 n.1. The PowerPoint does not represent official USPS policy, either at the time it was created and distributed, or now. *Id.* For example, the USPS does not have a policy of "taking away" overtime. *Id.* When the district-level manager became aware of this PowerPoint, she took steps to clarify for her direct reports that the PowerPoint was not official USPS guidance, and that clarification was transmitted throughout the field in that district. *Id.*

until it peaked in mid-April at 81,000, or the equivalent of nearly 26,000 additional employees using full-day leave in a week. *Id.* The situation improved somewhat until July, when personnel availability again began to decrease (hitting its lowest levels in the week of July 11, 2020). *Id.*

The USPS has also observed a sharp drop in letter and flat mail volumes during the COVID-19 pandemic. *See* Curtis Dec. ¶ 17. However, because some localities suffered staffing shortages due to the pandemic that negatively affected the USPS's ability to timely deliver mail, *see id.* ¶¶ 20-21, Prokity Dec. ¶¶ 6, 10, the USPS has taken extraordinary measures to hire additional employees.[15] *See* Prokity Dec. ¶ 6. For instance, the USPS has implemented a number of changes to its normal hiring processes to be able to hire employees more quickly, and has negotiated agreements with the postal workers' unions to allow the hiring of non-career employees above the historical contractual limits. *See id.* ¶¶ 7-8. As a result of these and other efforts, nationwide, the USPS has hired an average of 2,000 to 3,000 employees per week, with a total of 88,627 new employees hired between March 1 and August 27, 2020. *Id.* ¶ 9.

### D.   Other Routine Efficiency-Promoting Measures

The remaining issues that Plaintiffs raise are also inaccurately characterized, and unrelated to both the 2020 Election and Postmaster General DeJoy's tenure. For example, there is no nationwide USPS policy setting a fixed cap on the number of park points (*i.e.*, locations where a driver parks and exits a postal vehicle to deliver mail on foot) that a USPS delivery driver may use on a route, nor has Postmaster General DeJoy made any changes to long-standing USPS practice regarding park points. Colin Dec. ¶¶ 12-14.

---

[15] On August 7, 2020, in connection with a high-level organizational restructuring, the USPS implemented a hiring freeze for managerial positions. Prokity Dec. ¶ 6 n.1. This action has had no effect on the hiring of non-management employees, including mail carriers, mail handlers, and clerks. *Id.*; *see also* Curtis Dec. ¶ 25.

Plaintiffs also refer to a limited pilot program, called "Expedited to Street/Afternoon Sortation" (ESAS), which the USPS conducted in 384 delivery units (out of a total over nearly 19,000 delivery units) from late July until August 2020, when it was suspended by Postmaster DeJoy. *Id.* ¶¶ 7, 11. The ESAS test had been discussed and planned before Postmaster General DeJoy took office. *Id.* ¶ 10. Postmaster General DeJoy directed that the test be suspended, which was his only involvement in the initiative, and it will not resume, if at all, until after the 2020 Election. *Id.* ¶ 11.

In sum, Plaintiffs' concerns regarding USPS operations and practices relate almost entirely to management actions that have occurred regularly for years, or to long-planned initiatives unrelated to Postmaster General DeJoy. None related to the 2020 Election, and most have been suspended until after the Election, and will not impair the USPS's ability to efficiently handle Election Mail.

<u>**ARGUMENT**</u>

The Court should deny plaintiffs' motion for a preliminary injunction. Preliminary injunctions are "extraordinary and drastic" remedies that should never be "awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (quotation omitted). To obtain the mandatory injunction they seek, plaintiffs must demonstrate (1) "a strong showing of irreparable harm," (2) a "clear or substantial likelihood of success on the merits," (3) "public interest weighing in favor of granting the injunction," and (4) "that the balance of equities tips in [their] favor." *Yang v. Kosinki*, 960 F.3d 119, 127-28 (2d Cir. 2020). Plaintiffs have not met their burden here.

**I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR CLAIMS**

    **A.   This Court Lacks Jurisdiction to Grant the Relief Sought**

        **1.   Plaintiffs Lack Standing**

The Court should deny Plaintiffs' motion for a preliminary injunction because Plaintiffs

lack standing. "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013). "[S]tanding is a federal jurisdictional question determining the power of the court to entertain the suit." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks omitted).

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 181–82 (2000). "[A] plaintiff must demonstrate standing for each claim and form of relief sought." *Cacchillo*, 638 F.3d at 404. To pursue injunctive relief, Plaintiffs "cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012). Moreover, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof . . . ." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations and quotation marks omitted). The standing inquiry is "especially rigorous when reaching the merits of the dispute would force [a federal court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

a.  <u>Plaintiffs have failed to show injury-in-fact.</u>

Plaintiffs' assertions of injury are too speculative to support standing. "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990); *see Clapper*, 568 U.S. at 410-411 (2013); *City of L. A. v. Lyons*, 461 U.S. 95, 111 (1983). Plaintiffs

have not alleged or shown a "certainly impending future injury." Instead, plaintiffs point only to a generalized slowdown in USPS's operations of roughly two days to one week. *See, e.g.*, Compl. ¶¶ 77-80; ¶ 97; Decl. of Jose Carlos Barrios ¶ 6.

First, the upcoming national election is just under two months away, and so a delay of mail on the scale alleged by plaintiffs would not mean that they will be unable to vote by mail.[16] Plaintiffs identify no reason they cannot avoid any likely injury by sending in their ballots a reasonable time before the election.[17] Indeed, USPS has encouraged voters to vote early, as it has in previous elections, and encouraged states to communicate this message to voters. *See, e.g.*, May 29, 2020 USPS Letter at 2; Glass Dec. ¶ 42. More broadly, Plaintiffs' feared mail delays are unlikely to come to pass, and are instead speculative, as USPS is taking extensive steps to ensure the timely delivery of election mail. *See supra* Background Part I. In addition, USPS has already suspended many of the operational measures that Plaintiffs (baselessly) object could interfere with delivery of their ballots. Any envisioned injury thus is speculative for many reasons, and therefore insufficient to support Article III standing. As a leading Supreme Court decision put it,

---

[16] Some Plaintiffs' status as candidates makes no difference here. An individual's candidacy does not provide them with a constitutional right to have mailed ballots delivered within a certain timeframe. And the candidate-plaintiffs' asserted injuries are ultimately the same as any voter-plaintiff's: the speculative possibility of late delivery of ballots. But a candidate-plaintiff cannot rely on a third-party voter's feared disenfranchisement because they have neither asserted nor satisfied the requirements of *jus tertii* standing, including because there is no "hindrance" to voters raising claims on their own. *See Campbell v. Louisiana*, 523 U.S. 392, 397 (1998) (setting out third-party standing elements). In addition, no candidate-plaintiff has shown that any disenfranchisement would change the course or outcome of their candidacy.

where a plaintiff's claim relies "on a highly attenuated chain of possibilities," it does not "satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.[18]

Plaintiffs' mere subjective fears that their ballots might be delivered late do not support standing. *See, e.g.*, *Clapper*, 568 U.S. at 417–18 (2013) ("'[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)). Indeed, "'a "chilling effect aris[ing] merely from [an] individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that . . . the agency might in the future take some other and additional action detrimental to that individual'" is insufficient to support standing. *Clapper*, 568 U.S. at 418 (quoting *Laird*, 408 U.S. at 11). These holdings are grounded in separation-of-powers principles. *See Laird*, 408 U.S. at 15 (a contrary result "would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress."). Because Plaintiffs here rely on speculative fears of future mail delays and disapproval of defendants' past actions, the *Laird* and *Clapper* line of cases makes clear that they have not established their standing.

The overbreadth of Plaintiffs' requested relief also raises significant separation-of-powers concerns. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*

---

[17] For example, Plaintiff Kathy Rothschild states that she anticipates that her ballot will arrive on September 19, 2020, and the available mail service "is reported to take two to several weeks to arrive." Declaration of Kathy Rothschild ¶¶ 5, 8, ECF No. 19-13. New York law requires a postmarked absentee ballot to arrive within seven days of Election Day. N.Y. Election Law § 8-412(1). Plaintiffs have provided this Court without any basis to conclude that, if Ms. Rothschild mails her ballot within a few days of receiving it, for instance by September 21, 2020, it will not arrive by November 10, 2020, approximately seven weeks later. Accordingly, plaintiffs have failed to show that Ms. Rothschild has a certainly impending future injury.

*v. Whitford*, 138 S. Ct. 1916, 1933 (2018); *see id.* ("The Court's constitutionally prescribed role

is to vindicate the individual rights of the people appearing before it."); *see also Marcavage*, 689

F.3d at 103 ("[T]he plaintiff must establish how he or she will be injured prospectively and that

the injury would be prevented by the equitable relief sought."). But the nationwide injunction

sought by plaintiffs is not tailored to Plaintiffs' asserted injuries, particularly because those

injuries are so speculative and dependent on the independent actions of plaintiffs and state

election officials who set the parameters for mail-in voting.[19] Moreover, Plaintiffs' request would

cast this Court in the role of "superagency," micro-managing USPS's operations in the run-up to

the Election. *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (concluding, in the context of

an APA claim, that "the court must give due deference to the agency's ability to rely on its own

developed expertise"). This role is neither consistent with the judiciary's limited role in our

constitutional order, nor necessary to address Plaintiffs' alleged harms.[20] For example, Plaintiffs

---

[18] Plaintiffs concede that "the scale of disenfranchisement at stake here is unclear," P. MoL at 7, which effectively concedes at least that they lack standing to seek the nationwide relief they are presently requesting. *Cacchillo*, 638 F.3d at 404.

[19] Plaintiffs' argument that voting rights law or equal protection principles require a nationwide injunction, *see* P. MOL at 9-11, overlooks that state election laws vary, such that voters across state lines are already differently situated in terms of the requirements for the submission and counting of their ballots. Indeed, in light of the Electoral College and outside of the apportionment of seats in the United States House of Representatives between states, it is not clear how the "one person, one vote" principle could ever be applied across state lines. If the Court enters preliminary relief, it should limit it to the individual plaintiffs before the Court.

[20] In addition, the Court lacks jurisdiction to enter the requested injunctive relief against the President, whom plaintiffs have named as a defendant in this action. The Supreme Court has repeatedly held that, in general, the federal courts may not enter injunctive relief against the President in the context of his official, non-ministerial, duties. *See Miss. v. Johnson*, 71 U.S. 475, 498-99 (1866); *Franklin v. Mass.*, 505 U.S. 788, 802-803 (1992). The separation of powers principles that prevent the federal courts from enjoining the President's official acts also prevent them from entering declaratory relief against the President. *See id.* at 828 (Scalia, J., concurring). *But see PEN American v. Trump*, --- F. Supp. 3d --- 2020 WL 1434573, at *10 (S.D.N.Y. March 24, 2020); *Knight First Amendment Institute at Columbia University v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018).

have asked this Court to direct USPS OIG to conduct audits of all of USPS's "mail processing plants at a regular interval." Notice of Motion for Injunctive Relief ¶ 3, ECF No. 19. In addition to being unnecessarily burdensome, Plaintiffs have not explained how this request—which would redirect USPS's resources away from its ongoing mail delivery operations—is tailored to address the timely delivery of Plaintiffs' ballots (the only injury they have asserted to support such relief).[21] Similarly, Plaintiffs' (unadministrable) request that the Court order USPS to "restore its First Class Mail on-time delivery score to the 'baseline' level" by September 30, 2020," would extend the Court's injunction over a huge volume of mail that has nothing to do with the upcoming election, over a month before the election occurs. *Id.* ¶ 1(a). Plaintiffs have not demonstrated injury sufficient to support standing to seek such overbroad, impracticable relief.[22]

> b. Plaintiffs have failed to show traceability or redressability.

Plaintiffs have also failed the second and third prongs of the standing test, traceability and redressability. "The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and [plaintiff's] injury."

---

[21] In addition, courts have generally rejected requests for the initiation of actions by OIG offices, and USPS OIG already has an ongoing project to evaluate the challenged operational actions. *See, e.g.*, *Futch v. Fine*, No. 09 04020, 2009 WL 565616, at *1 (D.D.C. March 5, 2009); *Heide v. Scovel*, No. 08-cv-727 (MJD)(JJK), Memorandum of Law & Order, at 12-15, ECF No. 37 (D. Minn. October 2, 2008); *see* Tinio Dec. ¶ 6 & Ex. 4 at 1.

[22] Plaintiffs' request also fails to comply with Federal Rule of Civil Procedure 65(d)(1)(B)-(C), which requires that every injunction "state its terms specifically; and describe in reasonable detail . . . the . . . acts restrained or required." *See also Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000) ("[F]airness requires that the litigants receive explicit notice of precisely what conduct is outlawed [by an injunction.]"). Some of plaintiffs' proposed relief is insufficiently precise to be included in an injunction, such as their proposed prohibition on "[a]ny change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." Notice of Motion for Injunctive Relief ¶ 6(a), ECF No. 19.

*Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (internal quotation marks omitted). And to show redressability, plaintiffs must establish that "it is likely, as opposed to merely speculative, that [their alleged] injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. Plaintiffs' asserted injuries are highly dependent on the voting laws of the state a particular voter will vote in; state election officials' actions, such as when states send voters ballots (and what mail service states use); and when a voter mails in their ballot. Given the wide variation in state laws, as well as the possibility that a voter will mail in their ballot well before the election and thereby likely avoid the risks of any delivery delay, Plaintiffs have failed to trace their asserted injuries to defendants.[23] Similarly, relief directed at USPS cannot redress issues created by the actions of state officials, including when and how ballots are mailed to voters. Relief against USPS also cannot control when a voter mails in a ballot. Finally, were the Court to enter the nationwide, overbroad relief that Plaintiffs seek, the practical effects of such an order would be unpredictable and could divert USPS's resources to matters—such as conducting OIG audits of all 289 mail processing facilities at regular intervals—that bear little connection to the delivery of election mail and therefore not redress Plaintiffs' asserted harms.

### 2.   Plaintiffs' Claims Are Moot.

The Court also should not enter the requested relief for the separate reason that much, if not at all, of plaintiffs' case is moot. "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (no

---

[23] Plaintiffs offer no concrete connection between their circumstances and their allegations of delay. The Complaint alleges delays at facilities in Lancaster, New York and Portland, Oregon, and plaintiffs have provided a declaration from a USPS employee in San Antonio, Texas. *See, e.g.*, Compl. ¶¶ 77, 79; Barrios Declaration. But there is no traceability as the individual plaintiffs have no connection to these locations. *See* Compl. ¶¶ 12-27.

Article III jurisdiction for moot case); *Lamar Advert. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 375 (2d Cir. 2004). USPS has already suspended many of the operational measures criticized by Plaintiffs and demonstrated its commitment to timely delivering election mail; it also has reaffirmed and shown that it has the capacity to do so. Indeed, Plaintiffs appear to no longer challenge USPS's funding levels or use of machinery, but instead question USPS's "institutional will and responsibility." *See* Jamison Decl. ¶ 40. That concern is both belied by the record, and an implicit acknowledgment that claims regarding tangible operational steps have been mooted by USPS's recent suspension of those steps until after the Election.

### B. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

Even if Plaintiffs were likely to overcome the jurisdictional obstacles discussed above, the Court should deny their motion for a preliminary injunction because they are unlikely to succeed on the merits of their claims.

#### 1. Plaintiffs' § 1983 claims fail against federal defendants.

As pleaded in their complaint, Plaintiffs' claims fail as a matter of law. Specifically, Plaintiffs have pleaded their claims under 28 U.S.C. § 1983. *See* Complaint ¶¶ 122-54. However, § 1983 by its plain language authorizes suits arising from conduct under color of state law, and so does not provide a cause of action against federal defendants. *See Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 n.4 (2d Cir. 1991) ("An action brought pursuant to 42 U.S.C. § 1983 cannot lie against federal officers.").[24]

---

[24] In addition, plaintiffs appear to assert their second claim under "the Equal Protection Clause of the Fourteenth Amendment." Compl. ¶ 144; *see id.* ¶¶ 142-54. However, although the Equal Protection Clause of the Fourteenth Amendment informs the Due Process Clause of the Fifth Amendment, "the Fourteenth Amendment . . . applies only to the states." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

**2. The Court should not apply the *Anderson-Burdick* line of cases, but if it does, USPS's actions are constitutional under that framework.**

a. The *Anderson-Burdick* line of cases does not apply here.

Plaintiffs rely on the *Anderson-Burdick* line of cases. *See, e.g.*, Compl. ¶ 125; P. MOL at 12. However, the "*Anderson-Burdick* framework" is not applicable here because it "is used for evaluating state election laws." *Daunt v. Benson*, 956 F.3d 396, 407 (6th Cir. 2020) (brackets omitted); *see, e.g.*, *Yang v. Kosinski*, 960 F.3d 119, 129 (2d Cir. 2020); *Gallagher v. N. Y. State Bd. of Elections*, --- F. Supp. 3d ---, 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020). Specifically, *Anderson-Burdick* cases generally concern the deliberate exercise of states' powers under the Elections Clause of the United States Constitution. *See* U.S. Const., Art. I § 4. But the present case does not involve anything that can be fairly described as an "election law," such as a legal provision that expressly applies to the upcoming election or the conduct of voting. Nor does the case involve state-level actions, nor any exercise of powers under the Elections Clause. Accordingly, the *Anderson-Burdick* cases do not support plaintiffs' claims or legal theories.

The Court should not extend the *Anderson-Burdick* framework to this case. The *Anderson-Burdick* cases deal with asserted injuries to First and Fourteenth Amendment rights through state restrictions on voting. *See, e.g.*, *Yang*, 960 F.3d at 129. But the assumptions underlying this framework do not apply here as they would apply to state election laws. For example, the *Anderson-Burdick* framework takes for granted that a challenged state election law is "purposeful"—because, unlike postal operations, one can assume that state election laws seek to regulate elections—thereby satisfying an essential requirement of an equal protection claim. *See, e.g.*, *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). Plaintiffs have failed to show that USPS's actions were intended to influence the election (much less influence it in a discriminatory manner), as required to advance an equal protection claim. *See infra*. And

29

defendants have shown that the contrary is true. *See supra* Background Parts I & II. Thus, key Fourteenth Amendment concerns that the *Anderson-Burdick* framework is designed to address are absent.

Plaintiffs' invocations of the Fourteenth Amendment's "one person, one vote" principle are also misplaced. That term originated from and generally is applied in actions challenging the apportionment of seats or voting districts within states and systems for counting votes. *See, e.g.*, *Gray v. Sanders*, 372 U.S. 368, 381 (1963) (originating term "one person, one vote" in case challenging Georgia's system for counting primary votes); *Reynolds v. Sims*, 377 U.S. 533 (1964) (invoking "one person, one vote" principle in case challenging apportionment plan for seats in Alabama legislature). The "one person, one vote" principle does not apply here because not only does this case not involve the apportionment of seats or the counting of votes, it does not involve election regulations at all. Rather, it involves the USPS's delivery of mail.

In addition, First Amendment concerns that are central to the *Anderson-Burdick* line of cases are absent here. In the *Anderson-Burdick* line of cases, the Supreme Court has explained that the First Amendment protects associational rights that are often adjacent to the act of voting, and the Second Circuit has recently stated that a plaintiff's "interest . . . 'to cast their votes effectively' falls squarely within the ambit of the protection afforded by the First Amendment." *Yang*, 960 F.3d at 130; *see, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793-95 (1983). However, these cases generally involve a state's express restrictions on voting or on voting for certain candidates. For example, in *Yang*, the Circuit was considering the cancellation of the Democratic Presidential primary in New York state, which had "deprived Plaintiffs . . . of their right to cast a ballot in the presidential primary." *Yang*, 960 F.3d at 132. And, in the two cases from which the *Anderson-Burdick* test takes its names, the Supreme Court was considering Ohio's early filing

deadline for independent candidates (*Anderson*) and Hawaii's ban on write-in voting (*Burdick*). *See Burdick v. Takushi*, 504 U.S. 428, 430 (1992); *Anderson*, 460 U.S. at 793-95. These sorts of categorical restrictions on voting are not present here, and thus First Amendment voting interests are not implicated. Plaintiffs' challenges concern only the timing of the physical delivery of mailed ballots. USPS operational decisions simply do not burden any individual based on their political views, speech, or any other conduct protected by the First Amendment.

Moreover, where, as here, the conduct challenged does not concern free expression through the mail, but rather only the physical delivery of ballots, regardless of the candidate a particular ballot supports or other expressive content, plaintiffs' reliance on First Amendment cases challenging regulations on expression through the mails is misplaced. *See* P. MOL at 11-12 (citing cases). A Supreme Court case cited by plaintiffs in their discussion of First Amendment Postal Service cases explains that "if a governmental regulation is based on the content of the speech or the message, that action must be scrutinized more carefully to ensure that communication has not been prohibited merely because public officials disapprove the speaker's view." *USPS v. Council of Greenburgh Civic Assocs.*, 453 U.S. 114, 132 (1981). However, in that case, where a regulation on the placement of unstamped material in a mailbox was at issue, the Court rejected heightened scrutiny because "there simply is no question that [the statute at issue] does not regulate speech on the basis of content." *Id.* (concerning whether statute should be reviewed under "time, place and manner" restriction of the First Amendment). In this case, similarly, there is simply no question that the operational choices in question do not regulate speech on the basis of content, or at all. Indeed, USPS's operations affect speech only incidentally, and only in that part of USPS's job is to deliver mail containing expressive content.

Accordingly, because the key constitutional interests that animate the *Anderson-Burdick*

framework are absent, the doctrine does not apply here.

                      b.    **Even if the Court found that USPS's operational choices constituted "election laws," this case would be controlled by the *McDonald* framework**

Even assuming *arguendo* the USPS's operational choices could be considered "election laws," they pertain only to absentee ballots, and therefore should be evaluated under the deferential rational basis test pursuant to *McDonald v. Board of Election Com'rs of Chi.*, 394 U.S. 802 (1969); *see Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403-06 (5th Cir 2020) (applying *McDonald* to Texas law concerning absentee ballots). In *McDonald*, the plaintiffs, unsentenced inmates awaiting trial, challenged Illinois' election law's absentee provisions because they "[could not] obtain absentee ballots" from their local Board of Elections and "[could not] readily appear at the polls." 394 U.S. at 803. They challenged Illinois's absentee provisions, as interpreted by the Board, as unconstitutionally discriminatory. *See McDonald*, 394 U.S. at 806. But the Supreme Court held that heightened scrutiny was not appropriate, including because it was "not the right to vote that [was] at stake . . . but a claimed right to receive absentee ballots." *Id.* at 807. The Supreme Court noted that "[f]aced as we are with a constitutional question, we cannot lightly assume, with nothing in the record to support such an assumption, that Illinois has in fact precluded appellants from voting." *Id.* at 808. Accordingly, the Supreme Court upheld the challenged law under the rational basis test. *Id.* at 809 ("[C]hallenged statute must bear some rational relationship to a legitimate state end and will be set aside . . . only if based on reasons totally unrelated to the pursuit of that goal.")

*McDonald* controls because Plaintiffs are claiming—and asking this Court to assume— that USPS's operational choices may ultimately inhibit voting through absentee ballots. USPS's operational choices survive rational basis scrutiny: they reasonably relate to timely and efficiently delivering the nation's mail.

c.  <u>USPS's actions are constitutional under the *Anderson-Burdick* framework, were the Court to apply it.</u>

Were this Court nevertheless to apply the *Anderson-Burdick* standards for state elections laws here, USPS's actions would still pass constitutional muster. In applying these standards, the Supreme Court "[has] repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Burdick*, 504 U.S. at 438. In the Second Circuit, courts apply a "two-step inquiry" when reviewing state laws on elections under *Anderson-Burdick*. *Yang*, 960 F.3d at 129. First, a court determines "the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake," specifically whether restrictions are "reasonable [and] nondiscriminatory" or "severe." *Id.* If the restriction is "reasonable and nondiscriminatory," then courts apply the "*Anderson-Burdick* balancing test," weighing the asserted injuries against the interests of the (typically, state) government. *Id.* If the restriction is "severe," a court applies strict scrutiny. *Id.*

The supposed "restrictions" at issue—which are not restrictions, but operational choices—are "reasonable and nondiscriminatory." "Reasonable regulation of elections *does not* require voters to espouse positions that they do not support; it *does* require them to act in a timely fashion if they wish to express their views in the voting booth." *Burdick*, 504 U.S. at 438. USPS's challenged conduct is reasonable because it consists of USPS's efforts to accomplish delivery of the mail, including Election Mail, that is timely, efficient, and cost-effective, as informed by USPS's operational experience. *See supra* at 7-13. USPS's challenged actions are nondiscriminatory because they do not depend on the content of any person's speech or their preferred candidate "[T]here is nothing content based" about USPS's operations. *Burdick*, 504 U.S.at 438.

Plaintiffs' arguments that the burden on plaintiffs' voting rights is severe relies on the

unwarranted assumption that their ballots will not be delivered. *See* P. MOL at 14-18. This is a speculative assumption and, based on the record presently before the Court, including the opinion of plaintiffs' own purported expert, an unlikely one. *See supra* Background Part II (describing USPS's efforts to deliver election mail); Jamison Decl. ¶¶ 43-44. Specifically, USPS is undertaking extensive efforts to ensure timely delivery of Election Mail, with the express aim of preventing the possible disenfranchisement which plaintiffs hold up as a severe burden. *See supra* at 7-13. Plaintiffs' further argument that the burden on plaintiffs' voting rights should be treated as severe because of the proximity of the upcoming election mischaracterizes the role of USPS. *See* P. MOL at 21-23. Pursuant to the Elections Clause, the states and Congress set the rules for elections; USPS cannot and has not done so. Instead, USPS has pursued operational effectiveness while communicating with states about how they can facilitate orderly election-related mail service. *See supra* at 7-9.

Because USPS's challenged actions are reasonable and nondiscriminatory, if the *Anderson-Burdick* doctrine were applied here, its balancing test would apply, and require weighing plaintiffs' asserted injury against the government's interests. On one side of the balancing test, plaintiffs' fears of disenfranchisement are speculative and unlikely even before consideration of the USPS's robust factual showing here. And USPS has shown that it has ample resources and is committed to timely delivering election-related mail, including by, for example, devoting excess First-Class mail processing capacity to Election Mail. *See* Glass Decl. ¶ 21. Even if they suffered an unexpected lapse in delivery service, plaintiffs likely could avoid injury altogether by simply mailing in their ballots early, as USPS has encouraged voters to do. *See supra* at 8; *see Burdick*, 504 U.S. at 438, 441 (voters could be required to "act in a timely fashion" to vote and that there were "other means available" for plaintiffs to engage in conduct

that was allegedly burdened). On the other side of balancing test is the federal government's interest in USPS delivering the mail, including Election Mail, efficiently and effectively, and maintaining USPS's sustainability, including by continuing USPS's regular operations; as USPS has shown, all of its actions in question have been taken to serve these important goals. Plaintiffs have not shown any interest outweighing the governmental needs that drive USPS's operational decisions.

Plaintiffs' arguments ignore USPS operational interests and instead assume that the federal government is sacrificing constitutional rights to "cost-cutting" or acting in bad faith by trying to promote President Trump's reelection. *See* P. MOL at 25-27. Plaintiffs present no factual basis that fairly supports the inferences they ask the Court to make. USPS has presented evidence of the politically neutral, purely operational reasons for the measures plaintiffs challenge. For example, USPS has explained how its adherence to existing transportation schedules has improved its operations. *See supra* Background Part III.B. At any rate, USPS has already suspended many of the challenged actions through the election, including the removal of collection boxes and sorting machines, even though those steps are merely part of its routine, ongoing operations. *See supra* Background Part III.A. And Plaintiffs identify no factual basis for their assumption that USPS must be disrupting service to assist President Trump's reelection.

Accordingly, if the Court chooses to apply precedents from the context of state-law restrictions on voting here—which it should not—plaintiffs have not carried their burden to show a "clear and substantial" likelihood that USPS's challenged actions are unconstitutional. USPS is making reasonable, content-neutral efforts to timely deliver election mail. Any possible negative impact on the franchise is speculative—and, if it occurs, will be despite, not because of, USPS's efforts—and the federal government has an important interest in continuing and improving

USPS's operations.

      d.   USPS's actions would survive strict scrutiny, were the Court to apply it.

Even if the Court were to conclude that Plaintiffs' voting has somehow been "severe[ly]" burdened, and that strict scrutiny applied, Plaintiffs would still not have met their burden to show a clear and substantial likelihood of success on the merits. In applying strict scrutiny, a court asks whether "the challenged restriction is narrowly drawn to advance a state interest of compelling importance." *Yang*, 960 F.3d at 129 (quotation marks omitted). Here, USPS's operational choices are geared towards delivering the mail on a timely basis and continuing its regular operations. *See generally supra* Background Part III. Plaintiffs have not shown and cannot show that USPS's actions do not advance this compelling interest.

### 3. Plaintiffs are unlikely to prevail on their first claim, construed as a standalone First Amendment claim.

Plaintiffs' preliminary injunction motion does not address a legal basis for any First Amendment claim other than the *Anderson-Burdick* framework. *See* P. MOL at 12 ("Here, the relevant level of scrutiny is either (1) triggered by the level of "burden" under *Anderson-Burdick* or (2) triggered by the one person/one vote and equal protection disparities at work."). Accordingly, plaintiffs have waived any other First Amendment basis for any preliminary injunction. Moreover, the First Amendment is not implicated here for the reasons previously discussed. *See supra* at pp. 32-34. And, even if the Court considers Plaintiffs as raising a First Amendment claim apart from the *Anderson-Burdick* cases, Plaintiffs have not shown a clear and substantial likelihood of success on any such "standalone" First Amendment claim.

On the contrary, any such claim would fail because USPS's challenged actions do not regulate or depend on the content of any speech, and may not even incidentally affect speech at all. Generally, incidental-burden cases arise in the context of legislative action, and have held

that "a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986)); *Wright v. City of St. Petersburg*, 833 F.3d 1291, 1296-97 (11th Cir. 2016); *Hutchins v. D.C.*, 188 F.3d 531, 548 (D.C. Cir. 1999). Here, the USPS's operations impose—at most—only an incidental burden on speech (and that incidental burden arises only because it is USPS's job to deliver mail containing expressive content), and USPS's operational choices relate even less directly than a "conduct-regulating statute" to the First Amendment. Thus, no standalone First Amendment claim is likely to succeed.

### 4. Plaintiffs are unlikely to prevail on their second claim, construed as a Fifth Amendment equal protection claim.

Construing Plaintiffs' second claim—which they appear to base on the Fourteenth Amendment even though that provision does not apply to the federal government—as a Fifth Amendment equal protection claim, they are unlikely to prevail because they cannot establish any discrimination against them at all, much less discrimination that was intentional or purposeful. "To state a claim under the equal protection component of the Due Process Clause, a plaintiff must show that he was treated differently than others similarly situated as a result of intentional and purposeful discrimination." *Zherka v. Ryan*, 52 F. Supp. 3d 571, 581 (S.D.N.Y. 2014) (citing *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir.2005)). Plaintiffs have failed to adequately establish (or even argue) any discriminatory impact of USPS's operational decisions. *See* P. MOL at 14 ("The burden here is . . . potentially discriminatory in its impact."). Moreover, that alone would be insufficient, and it appears plaintiffs are not even arguing that defendants have taken intentional or purposeful discriminatory actions affecting their right to vote. *Id.* at 1, 17 (failing to specify whether the actions plaintiffs are challenging are occurring "by neglect or

intentionally"). Assuming *arguendo* that plaintiffs are asserting intentional and purposeful discrimination by defendants, they are unlikely to prevail. They have not presented any, much less substantial, evidence of it; USPS has explained the legitimate operational needs underlying its actions and has promised to suspend most changes plaintiffs complain of until after the election. USPS's extensive efforts to timely deliver election mail show that it is not intentionally or purposefully interfering with plaintiffs' votes or discriminating against voters in any way. USPS is doing precisely the opposite and working to timely deliver all election mail.[25] *See supra* at 7-13.

The most concrete set of allegations that might bear on discriminatory purpose or intent are alleged statements by President Trump that he would not support allocating $3.5 billion to USPS for universal mail-in voting.[26] *See* Compl. ¶ 109. It is within the President's rights to oppose increased funding for USPS to finance a universal mail-in voting program, and his statements do not suggest that he intends to interfere with current mail-in voting operations. *See id.* Moreover, plaintiffs' own purported expert has opined that "[a]s of June 30, 2020, the USPS reported $12.9 billion cash on hand," which "should be sufficient to see the organization through the election" and that "[t]he issue is not one of cash on hand." Jamison Decl. ¶¶ 39-40. Thus, plaintiffs have not shown a "clear or substantial" likelihood of success on demonstrating the

---

[25] Plaintiffs' objection to the geographic distribution of reductions in sorting capacity fails because it is speculative and conclusory. USPS has explained that reductions in machinery were based solely on USPS's ongoing analyses of mail volume and processing needs and were not because of the Election. DeChambeau Decl. ¶ 20. USPS has suspended reductions anyway. In addition, USPS has the sorting capacity to deal with election mail. Indeed, plaintiffs' own purported expert has stated that the issue is not one of "machinery." Jamison Decl. ¶ 40.

[26] President Trump's statements should not be imputed to USPS, an independent agency.

intentional or purposeful discrimination necessary to succeed on an equal protection claim.[27]

## II.  PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM

Plaintiffs also have failed to meet their burden to show that they will suffer irreparable harm in the absence of a preliminary injunction. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (movant must show "that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent." (quotations omitted)). As discussed *supra* in the context of standing, Plaintiffs have failed to make such a showing because their asserted injuries are speculative. Plaintiffs have failed to show that, if they mail their ballots a reasonable time before the election (which is approximately two months away), they would not be received in time to be counted. More broadly, Plaintiffs have stated that "the scale of disenfranchisement at stake here is unclear," effectively conceding that they have not shown a nationwide injury that is not "speculative, but actual and imminent." P. MOL at 7. In addition, USPS's ongoing efforts to timely deliver election mail make plaintiffs' assertions of harm even less plausible and demonstrate that a mandatory injunction should not issue.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST ARE IN THE GOVERNMENT'S FAVOR

A preliminary injunction is also not appropriate because the balance of the equities and the public interest weigh in defendants' favor. As explained *supra*, USPS is currently undertaking extensive efforts to facilitate the timely delivery of election mail. There is no dispute that USPS has the capacity, including in terms of financing and machinery, to handle the anticipated surge in election mail. And Plaintiffs and other voters have an opportunity to avoid any harm by mailing in their ballots without delay. These considerations demonstrate that the

---

[27] Plaintiffs have also not asserted that any protected class has been affected in a discriminatory manner.

equities weigh against a mandatory injunction deeming judicial micromanagement of USPS's operations to be constitutionally required in the run-up to an election. Such an injunction would require this Court to function as a "superagency" at a critical time for USPS and the country, a task that neither the present record nor the Court's institutional role and nature would allow this Court to properly perform. *Ethyl Corp.*, 541 F.2d at 36. Nor have plaintiffs even explained how the particular actions it is asking this Court to order will improve USPS's operations or justify overriding USPS's expertise and internal management. There is a real risk that entering the requested injunction could counterproductively divert USPS resources and attention to plaintiffs' preferred activities—such as hundreds of OIG audits—rather than focusing on effectively discharging its duties in the exercise of its informed discretion.

## CONCLUSION

The Court should deny plaintiffs' motion for a preliminary injunction.


Dated:   New York, New York
         September 8, 2020

                                   Respectfully submitted,

                                   AUDREY STRAUSS
                                   Acting United States Attorney for
                                   the Southern District of New York,
                                   Attorney for the United States

                          By:      /s/
                                   _____

                                   REBECCA S. TINIO
                                   STEVEN J. KOCHEVAR
                                   Assistant United States Attorneys
                                   86 Chambers Street, Third Floor
                                   New York, New York 10007
                                   Tel.    (212) 637-2774/2715
                                   Email: rebecca.tinio@usdoj.gov
                                       steven.kochevar@usdoj.gov