

**STATEMENT OF**

**POSTMASTER GENERAL AND CHIEF EXECUTIVE OFFICER**

**MEGAN J. BRENNAN**

**before the**

**House Committee on Oversight and Reform**

**United States House of Representatives**

**Hearing on:**

**"The Financial Condition of the Postal Service"**

**April 30, 2019**

**CONTENTS**

INTRODUCTION ........................................................................................................ 1

WHO WE ARE ......................................................................................................... 2

MANAGEMENT ACTIONS........................................................................................ 3

POSTAL SERVICE FINANCIAL CONDITION ........................................................... 5

BUSINESS MODEL CHALLENGES ........................................................................10

    Universal Service Obligation....................................................................................11

    Legally-Mandated Costs ..........................................................................................12

    Price Cap .................................................................................................................14

LEGISLATION ..........................................................................................................15

    Medicare Integration ................................................................................................15

    Market-Dominant Product Rates..............................................................................17

10-YEAR BUSINESS PLAN .....................................................................................17

CONCLUSION ..........................................................................................................18

BIOGRAPHY — MEGAN J. BRENNAN ...................................................................20

Good Morning Mr. Chairman, Ranking Member Jordan and Members of the Committee. Thank you for calling this hearing, to discuss the need for timely and comprehensive postal reform legislation.

I am pleased to represent the more than 630,000 hard-working and dedicated men and women of the United States Postal Service. These men and women play an integral role in every region, community and neighborhood in our nation, every day.

**<u>INTRODUCTION</u>**

When I last came before this Committee in 2017, I described the serious, but solvable, challenges facing the Postal Service, and the urgent need for legislative and regulatory postal reform. Since that time, our financial condition has only worsened.

Total mail volume has dropped from 154 billion pieces in 2016 to 146 billion in 2018, a 5 percent decrease overall. First-Class Mail, our most profitable product, has fared much worse, dropping by 7.4 percent. Although our package business continues to grow, it has become increasingly competitive and the growth rate is half what it was, dropping from 13.7 percent in 2016 to 6.8 percent in 2018, compared to the prior year. In quarter one of 2019, the rate of package volume growth dropped even further, to 5.4 percent. These combined factors are deepening our financial challenges.

In 2018, we posted a net loss of $3.9 billion — the 12th consecutive annual net loss we have incurred. These losses are occurring despite aggressive Postal Service management actions to right-size our organization, amounting to $13.4 billion in annual savings. These losses have forced us to default on legally-mandated retiree health benefits (RHB) prefunding payments since 2012 and additional pension prefunding payments due to the Office of Personnel Management (OPM) in 2017 and 2018. These actions will be addressed in more detail later in my testimony.

The most significant point I can highlight today is the increasing need for urgent action. Had reform legislation been enacted two years ago, we estimate that we would have earned an additional $1 billion in revenue from a modest one-time price increase and saved between $5 billion and $6 billion in RHB costs.

1

The losses from these missed opportunities can never be recovered. In short, it's time to stop digging a deeper financial hole. Putting off action on postal reform legislation will make resolving our financial crisis not only more complex, but also more difficult to achieve due to the nature of the changes that will become necessary to fix the problem.

**WHO WE ARE**

By law, the United States Postal Service operates as a fundamental government service to the people. We provide the nation with a vital delivery platform that enables American commerce, serves every American business and residential address, and binds the nation together, as it has for more than 240 years.

We delivered to 159 million delivery points in 2018 and this figure grows each year. The 146 billion pieces of mail we delivered in 2018 accounted for 47 percent of the world's mail, and we deliver at levels of efficiency and affordability equal to or exceeding any comparable post. The Postal Service is a self-funding entity. We pay for our operations entirely through the sale of postal products and services and do not receive tax revenue to support our business.

The Postal Service plays an indispensable role as a driver of commerce and a provider of delivery services to all communities — and we fulfill this role by leveraging one of the nation's oldest and most effective partnerships with the private sector. The mailing industry continues to help power our nation's economy. More than 13,000 small businesses help us serve the American public through contracts to support mail processing, transportation and retail operations, as well as other business needs. More than 14,000 postal transportation supplier contracts account for approximately $8 billion in annual spend. And we provide access to our products and services in more than 72,000 commercial locations through partnerships with retailers of all sizes.

Even in an increasingly digital world, the Postal Service remains an essential part of the bedrock infrastructure of the economy. The physical delivery of mail and packages to all of America's homes and businesses is the core function of the Postal Service, and this fundamental need of the American people will continue to exist well into the future.

Our customers place great faith in the ability of the Postal Service to deliver for them, both in the literal delivery of mail and packages, and in the larger sense as an organization that is adapting and changing to better meet America's evolving delivery needs.

The Postal Service is speeding the pace of innovation, improving our competitive posture by offering new products and implementing innovations that enhance the value of the mail, while continuing to implement initiatives to lower our cost base and stabilize our systemic financial imbalances. And we're doing so against a backdrop of great change in technology use and consumer habits, and of rapidly rising expectations for delivery services.

## MANAGEMENT ACTIONS

We are now in the 13th year since enactment of the Postal Accountability and Enhancement Act of 2006 (PAEA), making it more than a decade since the passage of any significant postal reform legislation. Since the enactment of the PAEA, we have experienced massive declines in mail volume brought on by the Great Recession of 2008 and the continued diversion of mail transactions to digital alternatives, even as delivery points have continued to grow. In 2007, the first year following the PAEA's enactment, we delivered 212.2 billion pieces of mail; last year, we delivered 146.4 billion pieces — a 31 percent decline. At the same time, because of the nation's growing population, the number of delivery points we serve has increased by 1.0 million per year, on average. The 148 million delivery points we served in 2007 rose to 159 million in 2018, a 7.1 percent increase, while the average number of pieces of mail delivered has dropped from 4.7 to just 3.0 per delivery point each day. We are delivering fewer pieces of mail to more addresses each year, driving up the cost per delivery.

During that same time, we have responded to the challenges that confronted us, taking actions on both the expense side of our business and the revenue side. Our actions have resulted in cost savings of approximately $13.4 billion annually from 2007 through 2018. We achieved these savings by pursuing an aggressive agenda of cost cutting, efficiency improvements, and innovation. For example, in response to the sharp decline in mail volume, we right-sized our operations based on customer demand and workload, and within the constraints of our existing business model. We consolidated processing plants and delivery units; modified retail hours at more than 13,000 Post Offices; reduced the total workforce size by 162,000 through attrition; reduced administrative overhead; and negotiated collective bargaining contracts to control

3

costs, increase workforce flexibility and establish a more affordable, two-tiered wage system. Details of these actions are summarized in the chart below.

### COST CONTROL MEASURES: Sept. 30, 2006 - Sept. 30, 2018

|  |  |  | Number | % |
|---|---|---|---|---|
| **Infrastructure** | Consolidated Mail Processing Facilities | ⬇ | 363 | 52% |
|  | Delivery Route Consolidations | ⬇ | 29,000 | 10% |
|  | Post Offices with reduced Retail Hours | ⬇ | 13,000 | 36% |
| **Workforce** | Work Hours | ⬇ | 289 million | 20% |
|  | Career Employees | ⬇ | 199,000 | 29% |
|  | Non-Career Employees | ⬆ | 37,000 | 37% |
|  | Total Employees | ⬇ | 162,000 | 20% |
|  | Administrative Positions | ⬇ | 25,000 | 33% |
| **Administration** | Reduced Annual Headquarters Spending<br>*Reduced HQ Positions*<br>*Reduction in contractor expenses* | ⬇ | $750 million |  |
|  | Capital Expenditures<br>*Avg. 2006-2009 ~$2.3 billion*<br>*Avg. 2010-2014 ~$0.9 billion*<br>*Avg. 2015-2018 ~$1.3 billion* | ⬇ | $1.0 billion | 44% |
|  | Number of Administrative Areas | ⬇ | 9 to 7 | 22% |
|  | Number of Districts | ⬇ | 80 to 67 | 16% |

The Postal Service continues to control costs and meet current and future customer needs and market trends, as permitted within statutory constraints. Leveraging available data and enhanced technology, we are improving our diagnostic and reporting tools. Recent judiciously targeted capital investment has allowed the organization to process our increasing package volume and mail more efficiently.

We continue to focus on anticipating customer needs and enhancing the value of mail and packages while remaining proactive, flexible and responsive to the marketplace as permitted within our statutory constraints. The affordable, universal package delivery service that we provide enables all Americans to participate fully in the e-commerce economy. In addition, packages provide revenue which is essential to our ability to meet our universal service obligation (USO) to the American people, particularly as First-Class Mail continues to decline.

The growth in our package business is particularly notable because of the increasing speed of market change since the PAEA was enacted. E-commerce and online shipping were in their infancy in 2006, and today we are proud that the Postal Service makes more e-commerce deliveries than any other domestic delivery service. Our achievements in growing our package

4

business and implementing innovations have enhanced the value of the mail to better serve our customers, including strong integration of digital initiatives with physical mail. Though, as discussed above, the package business is increasingly competitive, and the rate of package volume growth continues to slow.

Our actions have been necessary, and we are prepared to do more — including making difficult operational decisions that may impact services — but we urgently need legislative and regulatory reform. Ultimately, the PAEA does not provide the Postal Service with sufficient flexibility to meet the financial challenges caused by declining mail volume. We have worked with Congress continually to address this lack of flexibility, and since the 112th Congress in 2011-2012, have seen no fewer than nine postal reform bills introduced without passage.

Despite the Postal Service's many achievements, our efforts have not been enough — and cannot be enough — to restore the Postal Service to financial health, absent needed reforms. While we continue to work towards a sustainable future, without legislative and regulatory reforms, our financial picture will continue to worsen to the point where we will no longer be able to provide current levels of service, even if the Board of Governors decides to continue the current course of defaulting. My testimony today demonstrates the urgent need for legislation that would provide financial stability for the Postal Service to invest in the future and continue to be an engine of growth, to be a strong business partner, to offer our customers compelling new products and services, and to meet the expectations of the American public.

## <u>POSTAL SERVICE FINANCIAL CONDITION</u>

Our business was severely impacted by the Great Recession of 2008. First-Class Mail — our most profitable product — has declined by 41 percent since 2007 and is expected to continue to decline as a result of divergence to digital communications and the increase in online transactions. Likewise, Marketing Mail saw a substantial volume drop due to the same factors.

This decline in volume has eroded our financial stability, and reduced the available revenue to pay for the nationwide retail, processing, transportation and delivery network that we are required to maintain in order to provide universal service.

**31% Decline in Total Mail Volume (2007 – 2018)**



**41% Decline in First-Class Mail Volume (2007 - 2018)**



The consequence of this loss of mail volume, along with continued growth in the required number of delivery points, and the legally-mandated payments to fund RHB and pensions, has been 12 consecutive years of net losses.

**12 Years of Net Losses Despite Innovation and Improved Efficiency**

**$ (Net Loss)**

| Year | Net Loss ($ Billions) |
|------|----------------------|
| 2007 | ($5.1) |
| 2008 | ($2.8) |
| 2009 | ($3.8) |
| 2010 | ($8.5) |
| 2011 | ($5.1) |
| 2012 | ($15.9) * |
| 2013 | ($5.0) |
| 2014 | ($5.5) |
| 2015 | ($5.1) |
| 2016 | ($5.6) |
| 2017 | ($2.7) |
| 2018 | ($3.9) |

*Note: The 2012 loss was due to legislative deferral of the 2011 $5.5 billion payment for RHB, which made the total payment due for RHB $11.1 billion in 2012.

In addition, as of Sept. 30, 2018, we reported outstanding debt to the Federal Financing Bank of $13.2 billion. In order to ensure that we had sufficient liquidity to fulfill our primary statutory mission of providing universal postal service, we were forced to default on $33.9 billion in mandated prefunding payments for RHB for the years 2012 through 2016. Additionally, we did not make $6.9 billion in payments due to OPM in both 2017 and 2018 for normal costs and amortization of RHB, Civil Service Retirement System (CSRS), and Federal Employees Retirement System (FERS) unfunded liabilities. Without these defaults, the deferral of critical capital investments, and the aggressive management actions described above, we would not have been able to pay our employees, our suppliers, or deliver the mail.

Due to the factors outlined above, we do not have sufficient cash to meet all of our existing legal obligations, fully pay down our debt, and maintain a sufficient level of liquidity to ensure continuity of postal operations and meet our universal service obligation. Our liquidity remains insufficient to support an organization with more than $72 billion in annual expenses, and with liabilities that exceed assets by $124 billion, when all post-retirement obligations are included.

**Total Liabilities, Including Retirement Obligations, Exceed Assets by $124 billion**

**As of Sept. 30, 2018**

| | | | |
|---|---|---|---|
| CSRS Fund Balance | $160.2B | CSRS Actuarial Liability | $185.3B |
| FERS Fund Balance | $119.0B | FERS Actuarial Liability | $137.4B |
| RHB Fund Balance | $47.5B | Retiree Health Benefits Obligation | $114.0B |
| Total Retirement-Fund Assets | $326.7B | Total Retirement-Related Liabilities | $436.7B |
| | | Workers' Compensation | $16.4B |
| | | Debt | $13.2B |
| Unrestricted Cash | $10.1B | Accrued Compensation, benefits, and leave | $4.1B |
| Land, Buildings & Equipment, net | $14.6B | Deferred Revenue | $2.1B |
| Other Assets | $2.0B | Other | $5.3B |
| **Total Assets** | **$353.4B** | **Total Liabilities** | **$477.8B** |

- This chart includes all assets and liabilities of pension and post-retirement health benefits obligations.
- Items highlighted in blue are not shown on our balance sheet under GAAP multi-employer rules and are the OPM's projected valuations.

As shown above, the Postal Service's RHB and pension funds are linked to the bulk of our liabilities. Even so, our retirement plans are already significantly better funded than those of most other entities in both the public and private sectors. In fact, the Postal Service's percentage for CSRS pension funding is more than nine times the level of other civilian federal government entities and is higher than the average funding level for those few Fortune 1000 companies still offering traditional pension plans. In addition, the Postal Service's FERS pension funding is at nearly 87 percent. Likewise, our RHB funding is at a much higher level than those of other entities. Summaries of our pension and RHB funding levels are provided in the following two charts.

## USPS Pension Funding Compares Favorably to Other Entities

| Dollars in billions | Pension | |
|---|---|---|
| | CSRS | FERS |
| USPS Actuarial Liability Funded at 9/30/2018 | 86.4% | 86.6% |
| Civilian Federal Government Funded (Excl. USPS) at 9/30/2018[1] | 9.1% | 80.4% |
| | | |
| Other Entities: | Pension | |
| Percentage of U.S. Department of Defense Funded[2] | 45.9% | |
| Percentage of State Governments Funded | 73.7%[3] | |
| Percentage of Fortune 1000 Companies Funded | 81.0%[4] | |

(1) Source - Civil Service Retirement & Disability Fund Annual Report, FY 2018 (which reports assets as of 9/30/18) and Office of Personnel Management Agency Financial Report, FY2018 (which reports liabilities as of 9/30/18).
(2) As of 9/30/2018. Source - Financial Report of the United States Government, FY 2018.  Note: Dept. of Defense pension funding percentage represents a combination of CSRS and FERS plans.
(3)  Median funding ratio from Bloomberg Comprehensive Annual Financial Reports: *bloomberg.com/graphics/2018-state-pension-funding-ratios/*
(4) Willis Towers Watson Insider *towerswatson.com/en-US/Insights/Newsletters/Americas/insider/2018/01/2016-asset-allocations-in-fortune-1000-pension-plans.*


## USPS Retirement Health Benefit Funding Compares Favorably to Other Entities

| Retiree health benefits | |
|---|---|
| Percentage of Civilian Federal Government Funded (exc. USPS) [1] | 0% |
| Percentage of Fortune 100 Companies Funded[2] | 0% |
| | |
| Percentage of U.S. Department of Defense Funded[3] | 30.5% |
| Percentage of State Governments Funded[4] | 6.9% |
| Percentage of USPS Actuarial Liability Funded at 9/30/2018 | 41.6% |

(1) Other than the Postal Service, federal agencies are not required to pre-fund retiree healthcare liabilities
(2) Willis Towers Watson, November 2014 *towerswatson.com/en-US/Press/2014/11/fortune-1000-companies-have-a-285-billion-dollar-liability-for-retiree-medical.* Of the 501 Fortune 1000 companies that offer retiree health benefits, 334 (67%) have funded 0% of their liabilities.
(3) As of 9/30/2018. Source - Financial Report of the United States Government, FY 2018.
(4) PEW State Retiree Health Plan Spending 2015 *pewtrusts.org/~/media/assets/2017/09/opeb-liablitly-brief_v5.pdf*

## BUSINESS MODEL CHALLENGES

The PAEA imposed upon us a business model that does not provide sufficient flexibility to respond to ongoing volume declines in a manner that allows us to remain financially stable. Some of our most significant costs are fixed by law and are outside the Postal Service's control. Further, our ability to earn revenue to pay for those costs is constrained by law. This fundamental imbalance is the root of our financial instability, and is primarily influenced by three key factors, which will be discussed in more detail below.

- **Universal Service Obligation**: We are required to maintain an expansive retail, transportation, processing, and delivery network, so that we can serve nearly every address six days a week. The cost of the network continues to grow as the country adds approximately 1 million delivery addresses each year. Additionally, total mail volume has declined from 212 billion pieces in 2007 to 146 billion pieces last fiscal year, and projections are that mail volume will continue to decline. Simply put, we deliver less mail to more addresses every year.

- **Legally-mandated benefits costs**: The Postal Service is also legally required to participate in U.S. government pension, health, and worker's compensation programs. By law, from 2007 to 2016, we were required to fund RHB using an onerous and unaffordable prefunding payment schedule, which was unique to the Postal Service. Beginning in 2017, this was replaced by an equally unaffordable system of funding retiree health benefits normal costs and paying down the unfunded liability of the retiree health benefits fund.

- **Price cap**: We operate under a statutory price cap that applies to the mail products that generated approximately 67 percent of total revenue in 2018. Reduced mail volume and the statutory price cap constraints mean there is less revenue to pay for our required and increasingly expensive network and other costs imposed upon us by law. The Postal Regulatory Commission (PRC) has agreed that the price-cap system has failed to achieve key statutory objectives. In today's increasingly dynamic and competitive market — where there are alternatives and substitutes for nearly every product and service we offer — price-cap regulation is not necessary to incentivize efficiency, service quality or pricing restraint.

Universal Service Obligation

The Postal Reorganization Act of 1970 and other provisions of Title 39, United States Code, set the parameters for the Postal Service's USO. The dimensions of the USO can be summarized as follows:

- **Product scope**: Pertains to all postal services, which must be designed to meet public needs.
- **Universality**: The public must have "ready access to essential postal services" to the extent "consistent with reasonable economies." Postal services must be provided "throughout the United States" to, "as nearly as practicable, the entire population of the United States," explicitly highlighting the need to serve "rural areas." And the Postal Service may not unduly or unreasonably discriminate among mailers.
- **Service**: According to riders that Congress has consistently inserted into annual appropriations bills, the Postal Service must deliver mail six days per week, regardless of whether it makes economic sense to do so. In addition, the Postal Service must prioritize "prompt" and "expeditious" mail delivery. The Postal Service must design service standards so as to reasonably assure "delivery reliability, speed and frequency consistent with reasonable rates and best business practices."
- **Price**: All rates must be affordable and certain rates must be uniform across the nation. Some mailers are statutorily entitled to discounted or free rates.
- **Accountability**: The PRC is authorized to adjudicate disputes about undue or unreasonable pricing discrimination, improper closing or consolidation of Post Offices, as well as review the Postal Service's service standards regulations, and certain other matters. The Postal Service must measure and report publicly about its service performance, which the Commission reviews as part of its annual compliance determination.

The USO is discussed in the recent report of the President's Task Force on the United States Postal System, issued Dec. 4, 2018. The Task Force report acknowledges that the Postal Service has limited options to fund the USO, and states that the USO is not clearly defined. The report continues that the USO must be defined with greater specificity in order to provide a better framework to sustainably manage pricing, costs and products.

Defining the USO is an important public policy task — in fact, it is of such importance that Congress has reserved the power to change the USO to itself. We agree that it is the

11

responsibility of Congress to determine how the Postal Service should serve the long-term needs of the nation, while ensuring that the Postal Service can fulfill its USO mandate and other legal obligations in a financially sustainable way.

It is the intent of the Postal Service, led by our Board of Governors, to develop and provide recommendations to Congress to redefine the USO, in consultation with the public and postal stakeholders. Our recommendations will enable the Postal Service to meet the current needs of the American public while pursuing necessary cost control measures.

<u>Legally-Mandated Costs</u>

Above and beyond the costs of providing universal service to the nation, we are required to participate in U.S. government pension, health benefits, and worker's compensation programs for employees and retirees, including the Federal Employees Health Benefits (FEHB) program, CSRS, FERS, and the Federal Employees' Compensation Act (FECA). In 2006, the PAEA imposed a requirement on the Postal Service to prefund the Postal Service Retiree Health Benefits Fund (PSRHBF), on an accelerated basis for 10 years, and on an actuarial basis thereafter.

As noted previously, the fixed RHB payment schedule ended in fiscal year (FY) 2016, and has been replaced with a requirement to make RHB normal cost payments and amortization payments on our unfunded RHB liability. In addition, beginning in FY 2017 we were also obligated to begin making amortization payments on our unfunded CSRS liability. The table below highlights the average required annual retirement-related payments over the past five years, as well as the average projected annual payments for the next five years.

| Retirement and RHB Expenses and Payments | | |
|---|---|---|
| (Billions) | Average 2014-2018 | Average 2019-2023 |
| Pension costs | 4.4 | 6.2 |
| RHB costs | 7.1 | 5.5 |
| **Total obligations** | **11.5** | **11.6** |
| RHB and pension defaults | 6.3 | |
| **Total payment** | **5.2** | |

We remain subject to very sizable retirement-related payments going forward, on top of our operating expenses and the need to increase critical capital investments in information

technology infrastructure, processing and delivery infrastructure, and new delivery vehicles to continue to meet our universal service obligations.

Absent fundamental legislative and regulatory reform, we will have no choice but to default on future retirement-related payments in order to continue paying our employees and suppliers and provide postal services to the American public. This increases the risk that taxpayers may ultimately be called on to fund these benefits. For instance, a continued inability to make the actuarially-based RHB payments would reduce and eventually exhaust the balance in the PSRHBF.

As noted previously, beginning in 2012, the Postal Service was forced to default on RHB prefunding payments, in order to preserve liquidity levels necessary to continue postal operations and ensure a margin of safety in the event of an economic downturn. In more recent years, these defaults have expanded to include the annual RHB normal cost and amortization payments, CSRS amortization payments and FERS amortization payments.

Continuing to default on these payments is not a sustainable strategy for providing stable liquidity for ongoing Postal Service operations. If we were to resume making all currently-mandated payments, we would eliminate our cash-on-hand by Sept. 30, 2020, the end of our next fiscal year. Alternatively, if the Board of Governors decided to continue with the current course of defaulting, we estimate that the Postal Service would have no cash-on-hand by Sept. 30, 2024.

While there are other options available, such as expanding defaults on additional payments to buy more time, these options only extend the date at which insolvency occurs — they do not provide a solution to our financial problems. Defaulting does not address our serious financial situation, nor does it ensure that we will be able to continue our mission of serving the American public in the long run.

Rather, we need a statutory and regulatory structure that allows us to take steps to raise revenue and cut costs in a rational, business-like manner, so that we can fulfill our USO responsibility and also cover our post-retirement benefits obligations. In addition to continued aggressive management actions and planning, this requires two immediate steps: the

enactment by Congress of appropriate postal reform legislation and a favorable outcome of the 10-year pricing system review by the PRC.

Price Cap

The PAEA set forth a requirement that the PRC review, 10 years after enactment, (1) whether the current regulatory system for market-dominant products is achieving various statutory objectives; and (2) if not, how the current system should be modified or replaced.

Two years ago when I testified before this Committee, the PRC 10-year review was underway, and that same review continues today. The Commission collected stakeholder input, considered comments by interested parties and issued two orders on Dec. 1, 2017. In its first order, the PRC agreed with the Postal Service that the current price-cap system is failing to achieve critical statutory objectives — particularly the objective of achieving financial stability for the Postal Service. In its second order, the PRC proposed various changes and solicited additional public comment. The second phase of the 10-year review, analyzing the PRC's proposed changes, is still pending, and the PRC has not issued any further orders or proposals since reply comments were filed by participants more than a year ago, in March of 2018.

The price cap limits price increases on the mail products that generate 67 percent of our total revenue simply on the basis of household inflation (as measured by the Consumer Price Index), without regard to our specific circumstances, including mail volume trends that have declined precipitously in the last decade and that will continue to decline, or our unaffordable but legally-mandated costs.

Even though the Commission agreed that the system is not working, it did not propose that the price cap be replaced. Instead, the PRC has proposed retaining the cap, with certain changes to address what it found to be deficiencies in the system. However, in our current dynamic, competitive market environment, price-cap regulation is no longer necessary to incentivize service quality or pricing restraint, and it was never necessary to spur efficiency. All customers have alternatives to using the mail, and volume trends provide strong incentives for us to be efficient.

We need a regulatory structure that enables us to respond effectively to the challenges and opportunities presented by a dynamic marketplace. The lack of pricing flexibility is a

14

fundamental problem in the flawed business model that the PAEA imposed upon the Postal Service. With the need for both legislative and regulatory reform, we anxiously await the conclusion of the PRC review, as it is well past the 10-year statutory review mark.

**LEGISLATION**

When I testified before this committee in 2017, there was pending reform legislation on the table, containing provisions that had broad support among stakeholders, including postal management, many in the mailing industry and the postal unions. Those provisions had the capability to resolve several long-term financial burdens on the organization, with the potential to generate significant savings. The provisions also reflected private sector best practices, consistent with our responsibilities to the public.

I now strongly urge this committee to revisit those provisions that are both impactful and have the support of a broad cross-section of postal stakeholders (or that are capable of gaining such support in the near term) as they will generate both cost savings and additional revenue. These include:

- Requiring full Medicare integration for parts A, B, and D for postal retiree health plans, or exploring other Medicare integration scenarios.
- Restoring half our exigent price increase for Market-Dominant products.
- Providing some additional product flexibility.

We urge Congress to consider these provisions in any postal reform legislation to be introduced. Combined with a favorable outcome of the PRC's 10-year pricing review and continued aggressive management planning and actions, these provisions would improve our financial stability and ability to continue to meet the USO, and allow for further innovation, investment, and growth for the Postal Service and the mailing industry as a whole.

Details of these provisions are provided in the following sections of Medicare Integration, Market-Dominant Rates, and Product Flexibility.

Medicare Integration

Our significant financial losses are due in large part to the legally-mandated RHB prefunding requirement. Such a requirement to prefund retiree health care obligations is not imposed on most other federal entities or private-sector businesses that offer retiree health benefits. The

15

Postal Service's funded level for RHB far exceeds that of civilian federal government entities, state governments, and those few private sector companies that offer any retiree health benefits.

While the statutorily accelerated RHB prefunding payments expired Sept. 30, 2016, the current actuarial payments are equally unaffordable because FEHBP benefits are not integrated with Medicare for all postal retirees. Previously proposed legislation would have required OPM to create separately rated postal plans within the FEHBP, beginning with the 2020 contract year, which would be fully integrated with Medicare Parts A, B and D. These plans would be offered by any existing FEHBP carrier that covers at least 1,500 postal employees and annuitants, and other carriers that desire to participate. Each year, the Postal Service would make a normal cost payment into the RHB fund, unless such a payment would cause the RHB actuarial liability to be more than 100 percent funded.

Opponents of this provision have argued that it would simply shift cost from the Postal Service to Medicare. While it is true that Medicare costs will increase, it will only do so by approximately 0.13 percent per year. In addition, this provision would actually reverse the cost shifting that currently exists from Medicare to the FEHBP plans, which is imposing additional unwarranted costs on the Postal Service, on our ratepayers, and on our employees.

Since 1983, the Postal Service and its employees have been the second largest contributor to Medicare, contributing more than $32 billion during this period. At present, however, 8 percent of annuitants and dependents do not participate in Medicare Part A and 26 percent do not participate in Part B. Appropriately assigning claims costs to Medicare, instead of FEHBP, would create savings for the Postal Service and participants, and effectively resolve the RHB funding issue.

Requiring full participation in Medicare by eligible annuitants is a universal practice among nearly all private sector and state and local government employers who provide health benefits to retirees. The Postal Service is simply asking to be allowed to take full advantage of those payments, like any other entity required to pay into Medicare.

A requirement for all retirees and survivors over age 65 to participate in Medicare Parts A and B — plus the additional Part D savings — would eliminate approximately 90 percent of the Postal

Service's unfunded RHB liability and reduce expenses by $33.5 billion over 10 years from the implementation date.

Market-Dominant Product Rates

The partial restoration of the exigent price surcharge is critical to the Postal Service's financial health. The PRC-ordered rollback of the surcharge occurred April 10, 2016, reducing our revenue and net income by approximately $1 billion that year, with the change taking effect near the fiscal mid-year, and by nearly $2 billion per year going forward: an unsound decision considering the Postal Service's financial condition.

The price cap that is currently imposed on market-dominant products and services is clearly not enabling the Postal Service to achieve financial stability despite our best efforts to control costs. The exigent surcharge, combined with aggressive management actions, softened the financial blow that the Postal Service suffered as a result of the massive loss of mail volume spurred by the Great Recession.

Previously proposed legislation would have reinstated half of the 4.3 percent exigent increase (2.15 percent) and made it part of the rate base. If the reinstatement were to be made, our revenue would increase by an estimated $6.7 billion over 10 years (2019-2028).

**10-YEAR BUSINESS PLAN**

We have outlined the business model challenges imposed on us by the PAEA consistently over time, and have identified the urgent need for legislative and regulatory reform. In addition to the urgently needed reforms identified above, the Postal Service, led by its Board of Governors, is developing a 10-Year Business Plan to address broader business and structural changes that need to be implemented.

We acknowledge that there is no easy solution to put the Postal Service on a financially sustainable path. We also recognize that reasonable differences of opinion will exist about what services the Postal Service should provide and about how those services should be funded. But ultimately, hard choices are required to ensure a financially stable Postal Service.

The key areas that our 10-Year Business Plan will address, and that any plan for national postal services needs to address, are: the USO definition, as discussed above; pricing and product flexibility; and affordable employee benefits.

As we continue to finalize the plan, we will keep Congress apprised and will engage stakeholders. We recognize that many points in our plan will likely require legislation that currently does not have consensus amongst stakeholders, and that we will need to build that consensus over time. While we do so, we believe it is important to move forward with legislation that includes those proposals that have already gained broad support and agreement among stakeholders.

### **CONCLUSION**

Mr. Chairman, the United States Postal Service delivers for the American public — both literally and figuratively. We serve every American business and residence. We do so reliably and affordably, and we strive continually to earn the trust of the American public by maintaining the privacy and security of the items we deliver. We enable America's commerce by meeting its marketing and communications needs, by delivering the physical content that powers e-commerce, and by serving as an indispensable business partner to America's entrepreneurs and business owners.

The Postal Service, led by our Board of Governors, will continue to pursue cost savings and revenue growth within our authority, in all aspects of our operations, and will further work to build consensus around the 10-Year Business Plan.

America deserves a financially stable Postal Service that can continue to play this vital role in our economy and society. In a dynamic and increasingly digital, mobile- and device-driven world, the Postal Service has opportunities to enhance the way we enable commerce. However, we do not have the financial resources to fulfill existing statutory obligations and invest in the Postal Service's future. Overall, our financial situation is very serious, but solvable. The need to adopt urgent legislative and regulatory reforms is simply too important to delay.

Thank you, Mr. Chairman, Ranking Member Jordan and Members of the Committee, for the opportunity to submit this testimony. I welcome any questions that you and the committee may have.

# # #

## BIOGRAPHY — MEGAN J. BRENNAN

**Megan J. Brennan**
**Postmaster General and Chief Executive Officer**



Megan J. Brennan is the 74th and the first female Postmaster General of the United States and the Chief Executive Officer of the world's largest postal organization.

Appointed by the Governors of the Postal Service, Brennan began her tenure as Postmaster General in February 2015. In the prior four years, Brennan served as Chief Operating Officer and Executive Vice President of the Postal Service, and held prior roles as Vice President of both the Eastern Area and Northeast Area Operations. Brennan began her 32-year Postal Service career as a Letter Carrier in Lancaster, Pennsylvania.

Brennan's core focus is to advance transformative strategies to invest in the future of the Postal Service, and shape growth opportunities for the organization and the industries it serves. These strategies encompass better use of data and technology, speed the pace of product and service innovations, continue process improvements throughout the organization, and fully engage and leverage the talents of the organization's 630,000 employee workforce.

As Postmaster General, Brennan strives to significantly improve the quality and range of the delivery services the Postal Service provides to its customers. Under her leadership, the Postal Service aims to become far more technology- and customer-centric, and to continually change and improve to better meet the needs of the American public.

Brennan earned a master of business administration degree as a Sloan Fellow at the Massachusetts Institute of Technology. She is also an alumna of Immaculata College in Pennsylvania.

Source: *about.usps.com/who-we-are/leadership/officers/pmg-ceo.htm*

20