**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie
Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana
M. Woody, Perry Sainati, Robert Golub, Mary Winton Green,
Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman,
*and* Rebecca Rieckhoff, *individually, and on behalf of all others similarly
situated,*

                                Plaintiffs,

        v.

United States Postal Service, Louis DeJoy, *as Postmaster General of
the United States Postal Service*; and Donald J. Trump, *as President of
the United States,*

                                Defendants.

Docket No. 20-cv-6516-VM

---

## PLAINTIFFS' REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

---

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com

Ali Najmi
**LAW OFFICE OF ALI NAJMI**
261 Madison Avenue, 12th Floor
New York, New York 10016

*Attorneys for Plaintiffs*

September 10, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................iii

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL RESPONSE ........................................................................................................2

ARGUMENT .........................................................................................................................4

    I.    Defendants' Procedural Arguments Lack Merit. ...........................................................4

        A.    Plaintiffs have standing. ......................................................................................4

          i.    Voter-Plaintiffs have standing. ......................................................................5

          ii.    If the Court accepts Defendants' arguments on voter-Plaintiffs lacking an injury-in-fact, the candidate-Plaintiffs necessarily have standing. .........................................................8

        B.    Plaintiffs claims are not moot. ............................................................................9

    II.    Defendants' Constitutional Arguments Are Misguided. .............................................11

        A.    No sound constitutional principle could permit the federal government to take actions that would be unconstitutional for states. ...........................................................11

        B.    If Defendants are correct that *Anderson-Burdick* does not apply, strict scrutiny is simply automatic. ...........................................................12

        C.    Defendants misunderstand how scrutiny shifts the burden of proof. ...............13

        D.    No intent is required in voting rights cases of this kind. ..................................14

        E.    Defendants' *McDonald* argument ignores the existence of *O'Brien*. ....................16

    III.    Defendants' Other Points Lack Merit. ........................................................................17

CONCLUSION......................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allee v. Medrano,*
    416 U.S. 802 (1974) .......................................................................................................... 10

*Am. Coll. of Obstetricians & Gynecologists v. United States FDA,*
    Civil Action No. TDC-20-1320, 2020 U.S. Dist. LEXIS 122017 (D. Md. July 13,
    2020) .................................................................................................................................... 6

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ................................................................................................... 13, 15

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany,*
    No. 03-CV-502, 2003 U.S. Dist. LEXIS 11386 (NDNY July 7, 2003) ........................... 5

*Black Voters Matter Fund v. Raffensperger,*
    No. 1:20-cv-01489-AT, 2020 U.S. Dist. LEXIS 143209 (N.D. Ga. Aug. 11, 2020) ........ 6

*Bullock v. Carter,*
    405 U.S. 134 (1972) .......................................................................................................... 5

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ........................................................................................................ 13

*Burson v. Freeman,*
    504 U.S. 191 (1992) ........................................................................................................ 13

*Bush v. Gore,*
    531 U.S. 98 (2000) .......................................................................................................... 15

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ........................................................................................................ 20

*Chi. Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson,*
    475 U.S. 292 (1986) ........................................................................................................ 10

*Cipriano v. Houma,*
    395 U.S. 701 (1969) ........................................................................................................ 12

*City of Erie v. Pap's A.M.,*
    529 U.S. 277 (2000) (Scalia, J. concurring) ................................................................... 10

*City of Mesquite v. Aladdin's Castle,*
    455 U.S. 283 (1982) ........................................................................................................ 10

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) (Breyer, J., dissenting) ........................................................................5

*Cooper v. Harris,*
137 S. Ct. 1455 (2017) ....................................................................................................13

*Crawford v. Marion County Elec. Bd.,*
553 U.S. 181 (2008)........................................................................................................13

*Credico v. N.Y. State Bd. of Elections,*
751 F. Supp. 2d 417 (E.D.N.Y. 2010)............................................................................14

*Daunt v. Benson,*
956 F.3d 396 (6th Cir. 2020) (Readler, J., concurring)............................................ 12, 13

*Davis v. Mann,*
377 U.S. 678 (1964)........................................................................................................18

*Democratic Exec. Comm. of Fla. v. Lee,*
915 F.3d 1312 (11th Cir. 2019) ......................................................................................15

*Dunn v. Blumstein,*
405 U.S. 330 (1972)........................................................................................................12

*Evans v. Cornman,*
398 U.S. 419 (1970)........................................................................................................12

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.,*
218 F. Supp. 2d 369 (S.D.N.Y.2002)..............................................................................16

*Fisher v. Univ. of Tex.,*
570 U.S. 297 (2013)........................................................................................................14

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
528 U.S. 167 (2000)........................................................................................................10

*Gallagher v. N.Y. State Bd. of Elections,*
2020 U.S. Dist. LEXIS 138219 (SDNY Aug. 3, 2020)................................................*passim*

*Goosby v. Osser,*
409 U.S. 512 (1973)........................................................................................................16

*Gray v. Sanders,*
372 U.S. 368 ...................................................................................................................18

*Hill v. Stone,*
421 U.S. 289 (1975)........................................................................................................16

*Knox v. Serv. Emps. Int'l Union, Local Human Res.,*
    532 U.S. 598 (2001) ..........................................................................................10

*Kramer v. Union Free Sch. Dist.,*
    395 U.S. 621 (1969) .................................................................................. 12, 16

*L.A. Cty. v. Davis,*
    440 U.S. 625 (1979) ..........................................................................................10

*Lau v. Meddaugh,*
    229 F.3d 121 (2d Cir. 2000) ...........................................................................20

*League of Women Voters of the United States v. Newby,*
    426 U.S. App. D.C. 67 (2016) ...........................................................................5

*Lemon v. Kurtzman,*
    411 U.S. 192 (1973) ..........................................................................................19

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ...........................................................................20

*McDonald v. Board of Election Comm'rs,*
    394 U.S. 802 (1969) .................................................................................. 16, 17

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) .......................................................................................5, 6

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
    508 U.S. 656 (1993) ..........................................................................................10

*New York v. U.S. Dep't of Homeland Sec.,*
    969 F.3d 42, 2020 U.S. App. LEXIS 24492 (2d Cir. 2020)......................... 6, 7, 18

*O'Brien v. Skinner,*
    414 U.S. 524 (1974) ..............................................................................11, 16, 17

*Pennell v. San Jose,*
    485 U.S. 1 (1988) ................................................................................................5

*People First of Ala. v. Merrill,*
    No. 2:20-cv-00619-AKK, 2020 U.S. Dist. LEXIS 104444 (N.D. Ala. June 15,
    2020).....................................................................................................................6

*Price v. N.Y. State Bd. of Elections,*
    540 F.3d 101 (2d Cir. 2008) ........................................................................ 16, 17

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ..........................................................................................12

*Richmond Tenants Org., Inc. v. Kemp*,
956 F.2d 1300 (4th Cir. 1992) ...........................................................................19

*Stauber v. City of N.Y.*,
2004 U.S. Dist. LEXIS 13350 (S.D.N.Y. July 16, 2004) .................................9

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
137 S. Ct. 2012 (2017) ....................................................................................10

*Trump v. Int'l Refugee Assist. Project*,
137 S. Ct. 2080 (2017) (per curiam) ..............................................................19

*United States v. Classic*,
313 U.S. 299 (1941) .........................................................................................12

*United States v. Generix Drug Corp.*,
460 U.S. 453 (1983) .........................................................................................10

*United States v. Sanchez-Gomez*,
138 S. Ct. 1532 (2018) ....................................................................................10

*USPS v. Council of Greenburgh Civic Assocs.*,
453 U.S. 114 (1981) .........................................................................................12

*Virginia Soc'y for Human Life, Inc. v. FEC*,
263 F.3d 379 (4th Cir. 2001) ...........................................................................20

*Yang v. Kellner*,
2020 U.S. Dist. LEXIS 79331 (S.D.N.Y. May 5, 2020), *aff'd Yang v. Kosinski*, 960
F.3d 119 (2d Cir. 2020) ................................................................................9, 15

*Yang v. Kosinski*,
960 F.3d 119 (2d Cir. 2020) .......................................................................14, 16

**Statutes**

39 U.S.C. § 3661(b) .................................................................................................19, 20

42 U.S.C. § 1983 ..............................................................................................................4

**Other Authorities**

Brian Brox and Joseph Giammo, <u>Late Deciders in U.S. Presidential Elections</u>, 30
AM. REV. OF POL. 333, 334-36 (2009) .................................................................6

Fed. R. Civ. P. 15(a)(1) ...................................................................................................4

U.S. Const. amend. I .................................................................................................1, 12, 15

U.S. Const. amend. XIV ............................................................................................4, 12

## PRELIMINARY STATEMENT

In terms of constitutional theory, Defendants opposition seems to boil down to, to paraphrase, "when the [federal government] does it, that means that it is not illegal." *See, e.g.*, Defendants' Opposition Memorandum ("Def. MoL") at 29. Fortunately, that principle is nowhere to be found in the First Amendment canon. The First Amendment – and its concomitant protections against government interference in the right to vote – applies with just as much force to arms of the federal government as it does to the states (perhaps more so, since some parts of the Bill of Rights technically remain unincorporated).

Factually, reading Defendants' opposition and the declarations accompanying it, one might be inclined to believe the widespread delays in USPS delivery were a mass, shared hallucination. One might also be inclined to believe that the reports of chaos and "transformative" new policies existing at all were likewise imagined. But outside Defendants papers, Postmaster DeJoy's "transportation rules [are] causing chaos" and USPS workers are, as instructed, "continuing the chaos." Jamison Reply Ex. 1. Indeed, even on their own terms, Defendants' footnotes to their denials (*see, e.g.*, Curtis Dec., nn. 1 & 2[1]) seem to suggest that *other* categorical denials cannot be taken at face value – what "unauthorized" guidance might those denials omit?

In any event, these challenges can and should be easily dispatched. The federal constitution restricts the acts of USPS when they burden the right to vote. There is no serious question of whether there are currently substantial and continuing delays of the mail that *will* burden the right to vote in November. Thus, the Court can and should act to protect the right to vote.

---

[1] The Curtis Declaration makes the categorical claim that local management did not give certain directions, before footnoting that Ms. Curtis "ha[s] seen copies of" documents that involve "local managers" giving *exactly* the directions denied above. *See also* Jamison Dec. ¶ 35 (opining these memos were likely created at the area or district level, and "the word local is a misnomer").

**FACTUAL RESPONSE**

Plaintiffs provide this brief factual response, aware of the fact that the Court has now scheduled a fact-finding hearing.  Most importantly, Defendants' assertion that the changes at issue have "not had any lasting negative impact on the USPS's service performance" is simply wrong on the record.  Def. MoL at 13 n. 13; 16-18.  While Defendants are correct that lifting some of the changes led to a "return[] to early July [service] levels," early July already had a significant delay below baseline, and the "return" has not even made up *half* of the decline in service that began in late June.  Def. MoL at 18; *see also* Green Ex. 2 at 2.  As the document Defendants reference shows, however, current services remain 5.6% below baseline – a modest, but hardly complete recovery from the 8.1% below baseline as of August 1 (and the approximately 10% below baseline as of about July 18).  And that modest recovery certainly does not establish beyond all doubt that the problem is gone.  *But see* Def. MoL at 18 (seeming to suggest the "temporary decline in []service performance" has been fully addressed).  Indeed, more than half the problem still remains.

Similarly, Defendants' categorical denials undermine their positions, ultimately showing that management is not fully addressing issues.  For example, on September 6 (thus, after all issues were addressed, according to Defendants) a facility in Portland put up a large banner,[2] reading:

> No Employee has Authorization to Hold Trucks
> ALL HCR & PVS TRIPS WILL DEPART ON TIME, NO EXCEPTIONS
> DO NOT HOLD A TRUCK – NO MORE HOLDING TRUCKS
> Make sure every single employee understands – All Trips Depart On Time
> WE WILL **NOT** HAVE
> Late Processing…[,] Load After Depart[,] PVS Schedule failure

Jamison Ex. 1 (caps and bold in original).  *But see contra,* Curtis. ¶ 24 n. 1 ("Headquarters did not ban

---

[2] Ultimately, the declarations submitted by Defendants only acknowledge those documents Plaintiffs have – because of leaks – discovered.  As Mr. Jamison reveals, there have been other "stand up talks," that were less explicit than the July 15 one, but came around the same time frame and hit similar themes, include for example, that in Ohio "Mail Processing has been tasked with a reduction of 290,000 workhours."  *See* Jamison Dec. ¶ 19.  Yet these appear nowhere in Defendants' declarations.  This mirrors what happened in the House with the presentation that showed the dramatic decline in mail service.  *See* P. MoL at 4-5, *citing* House Tr. at 22-23.

all … late trips"); Cintron Dec. ¶ 25 (suggesting policy was never to "prevent all … trips under any circumstances"). The banner likely "would have been ordered by and installed at the direction of the Senior Plant Manager" because "[n]o one else would have the authority to direct office personnel to create such a sign" and "[n]o lower level manager or tour supervisor would be authorized to promulgate the policy expressed in the sign and order the display of the sign." Jamison Reply Dec. ¶ 30. As Mr. Jamison explains "specific design of the sign may have [even] originated at Headquarters level or at the PDC[,] but in any event it is unlikely that the decision to display such messaging occurred without the direct involvement of senior managers." *Id.* Thus, given the Curtis and Cintron declarations, the "most benign explanation is that knowledge at the most senior levels of the organization is not being shared with parties who have been asked to provide testimony in this proceeding." *Id.* ¶ 31.

Similarly, while Defendants supplied a manager (Mr. Stasa) as a declarant to explain and deny certain events in the San Antonio Plant, Mr. Stasa seems unaware of many basic facts on the mailroom floor, and his declaration suggests that his intermediate supervisors simply do not deliver relevant information to him. *See* Barrios Reply Dec. ¶¶ 5-6; 19-24.

Beyond that, the broad denials also raise more questions than they answer. As Plaintiffs' expert[3] in USPS operations explains, the "question" the denials raise is "where did the local managers get the ideas discussed in the documents if not from higher up in the chain of command?" Jamison Dec. ¶ 23 *See also*, ¶ 25 ("This is an example of plausible deniability. The local managers wanted to please the boss, so they made a decision to please her over the ultimate goal of on-time mail delivery – there's little question about why they would make that decision."). Similarly, Mr. Jamison explains that for things like overtime decisions, "there is certainly a verbal channel for passing messaging … down the chain of command," and often local manages may "interpret[ a]

_____

[3] Defendants do not object to Mr. Jamison's credentials and experience, or raise any challenge to his expertise.

directive to reduce costs as something that will please the bosses up the chain" and then "make the reductions more dramatic." *Id.* ¶ 15. In short, particularly given the categorical denials which are footnoted with exceptions (*see, e.g.*, Curtis Dec. ¶ 24), and the apparent lack of knowledge that as Defendants' declarants were signing statements saying otherwise, a plant was putting up an " ALL … TRIPS WILL DEPART ON TIME, NO EXCEPTIONS" sign, the question really becomes: what footnotes are missing?

Nor do Defendants explain many basic tensions in their factual assertions (many of which are analyzed at length in Plaintiffs' expert's Reply Declaration). For example, while the volume of election mail may only amount to, at most,[4] "2-5 percent of total volume of mail in October and November," given what all parties agree were extraordinary efforts involved in handling election mail in past years, it is hard to see how engaging in those same efforts at ten times the scale would not be – at least – a challenge. *But see* Def. MoL at 3.

## ARGUMENT

### I. Defendants' Procedural Arguments Lack Merit.

Defendants make two[5] major procedural arguments: that Plaintiffs lack standing and that the claims here are moot. Both arguments are wrong-headed and should be disregarded.

#### A. Plaintiffs have standing.

As a background rule, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical,

---

[4] This framing, of course, does not consider that the real crunch is all in the week before the election – and often (for any number of reasons) USPS management saves the extraordinary efforts for the days just before Election Day. *See, e.g.*, Barrios Reply Dec. ¶¶ 20-24.

[5] Defendants also correctly note – in another argument that might fairly be labeled procedural – that the Complaint mislabeled the causes of action at issue in referencing 42 U.S.C. § 1983 as well as in labeling Equal Protection claims against Federal Defendants as arising out of the Fourteenth Amendment (rather than the Fifth). *See* Def. MoL at 28. This was a drafting error, made in the context of an emergency drafting process (and one counsel apologizes for). Plaintiffs have now filed an amended complaint that re-labels the causes of action appropriately, which they did as of right. ECF No. 36; *see* Fed. R. Civ. P. 15(a)(1)(A)(within 21 days of service on 8/20) or (B).

correlative effect on voters," and visa-versa. *Bullock v. Carter*, 405 U.S. 134, 143 (1972). And more broadly, once the Court assures itself that "at least one plaintiff satisfies the requirements for standing, the standing of any other plaintiff need not be resolved on this motion." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, No. 03-CV-502 (NAM/DRH), 2003 U.S. Dist. LEXIS 11386, at \*11-12 (NDNY July 7, 2003).

Additionally, for standing purposes, the Court should "accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party." *Pennell v. San Jose*, 485 U.S. 1, 7 (1988) (alteration adopted). And, as explained below, standing is evaluated at the time of filing – before Defendants' voluntary cessation of any conduct.

### i. Voter-Plaintiffs have standing.

The injury required for standing need not be definite and "*certainty* is not, and never has been, the touchstone of standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 431 (2013) (Breyer, J., dissenting) (emphasis in original). Thus – adjusting for context – the Supreme Court has used phrases ranging from "realistic danger of sustaining a direct injury" to "reasonably probability" to "substantially likely" to "certainly impending" in describing the likelihood of injury required. *Id.* at 432-33 (collecting cases). For injunctive purposes in election cases, then, it is important that "Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." *League of Women Voters of the United States v. Newby*, 426 U.S. App. D.C. 67, 75 (2016). That is, where voters face a meaningful likelihood of harm, they have standing to pursue injunctive relief. *Cf. Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-55 (2010) ("conventional alfalfa farmers" had standing to challenge a regulatory action that "g[ave] rise to a significant risk of gene flow to non-genetically-engineered varieties of alfalfa" through random cross-pollination between their crops and genetically engineered, deregulated crops nearby). As pled in the Complaint, the "predictable result of the USPS slowdowns, policy changes, and withdrawal from aggressive efforts

to deliver ballots is that untold numbers of ballots will not be counted based on circumstances entirely out of the voters' control." Comp. ¶ 127. And the actions at stake "all but guarantee that thousands upon thousands (if not millions) of ballots will simply not reach their destinations on time, will likely lack postmarks that are required by state law, and that the volume of election mail that is coming may be delayed for weeks." Comp. ¶ 5. Accepting these and other allegations as true (which the Court should for standing purposes), there is little question the injury requirements are satisfied.

Additionally, some Plaintiffs are considering – and Plaintiff Shannon Spencer has settled on – voting in person, which will put them at risk of COVID to avoid the risks of their votes not counting. Spencer Dec. ¶¶ 5-6. Such steps to avoid COVID risks, along with the risks themselves, are injuries that confer standing – as courts have found throughout this pandemic. *Black Voters Matter Fund v. Raffensperger*, No. 1:20-cv-01489-AT, 2020 U.S. Dist. LEXIS 143209, at *55-61 (N.D. Ga. Aug. 11, 2020) (finding injury and standing where state law forced a plaintiff to choose between paying postage or risking COVID by voting in-person); *People First of Ala. v. Merrill*, No. 2:20-cv-00619-AKK, 2020 U.S. Dist. LEXIS 104444, at *22 (N.D. Ala. June 15, 2020) (finding injury and standing where state law required in-person presentation of a photo-ID to vote absentee); *Am. Coll. of Obstetricians & Gynecologists v. United States FDA*, Civil Action No. TDC-20-1320, 2020 U.S. Dist. LEXIS 122017, at *40 (D. Md. July 13, 2020).[6] *Cf. also*, *Monsanto*, 561 U.S. 139, 154 (discussing, as

---

[6] To that end, a "voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote," and as Defendants argue, the delays – at a minimum – amount to a requirement that voters "avoid any likely injury by sending in their ballots a reasonable time before the election." *People First of Ala*, 2020 U.S. Dist. LEXIS 104444, at *21; Def. MoL at 23. Thus, being forced to vote early – and decide *how* to vote early – is itself an injury that confers standing. *See* Brian Brox and Joseph Giammo, Late Deciders in U.S. Presidential Elections, 30 AM. REV. OF POL. 333, 334-36 (2009) (discussing the significant share – up to 30% in some elections – of voters who decide how they will vote in the last two weeks of the election, and the reasons they do so, including that "[b]y delaying the decision until the last minute, these late deciders allow the campaign to take its course, gathering as much information as possible before Election Day itself forces them to make a choice."). Thus, even if Defendants argue that it is "illogical" for Plaintiffs or other voters to wait until closer to election day, "the consequences of [that] decision" – a decision reserved for voters by state law – "may [nonetheless] suffice to establish standing." *New York v. U.S. Dep't of Homeland Sec.,* 969 F.3d 42, __, 2020 U.S. App. LEXIS 24492, *24-25 (2d Cir. 2020).

injuries, that farmers were taking "certain measures to minimize the likelihood of potential contamination" of their crops by unregulated crops).

More broadly, the Second Circuit's recent decision in *New York v. U.S. Dep't of Homeland Sec.* ("*NY v. DHS*") is instructive here. Where "an agency action has a predictable effect on the decisions of third parties, the consequences of those third party decisions may suffice to establish standing, even when the decisions are illogical or unnecessary." 969 F.3d 42, __, 2020 U.S. App. LEXIS 24492, *24-25 (2d Cir. 2020), *citing Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Here, though Defendants complain of the predictable effect that USPS delays will have when filtered through various states election laws, it remains true that delays in the mail *will* lead to votes being tossed out. Indeed, just as in *NY v. DHS*, where the Circuit observed that "it is disingenuous for DHS to claim that the injury is not sufficiently imminent" "[w]here the agency itself forecasts the injuries," here, USPS has forecast exactly the injuries at stake. 2020 U.S. App. LEXIS 24492 at *25. That is, USPS sent 46 states letters that made clear that, even without a slowdown, a "mismatch" between the laws of *46 states* and USPS service standards means that voters face a "significant risk that [they] will not have sufficient time to complete and mail the completed ballot back to the election official in time for it to arrive by the state's return deadline" and that risk is (in some cases) "exacerbated by the fact that the law [in some states] does not … impose a time period by which election officials must transmit a ballot to the voter." *See, e.g.,* Comp. Ex. 5 at 1-2. It is hard to see how USPS could make this projection, and yet reject the basic notion that shifting mail delivery two days later does not *also* "execarbate[]" the risk. For standing purposes, under *NY v. DHS,* the injuries caused by mail delays are imminent and concrete enough for the voter-Plaintiffs to sue on USPS's own terms.

Finally, Defendants arguments on traceability and redressability are wrong for the very same reasons. Even if USPS believes the application of state election law or the acts of state election

officials are irrational, USPS delays will still – redressably and traceably – lead to predictable disenfranchisement. Thus, redressability and traceability reduce to this: the mail is currently well below the baseline and is delayed somewhere between days and weeks in most parts of the country. If the Court orders USPS to fix that backlog and prevent a new one from building (with sufficient checks and monitoring to ensure delays get fixed), the harms faced by Plaintiffs will be prevented. No more is required for standing.

ii. *If the Court accepts Defendants' arguments on voter-Plaintiffs lacking an injury-in-fact, the candidate-Plaintiffs necessarily have standing.*

Defendants' argument on candidate standing is barred by their argument on voter standing. *See* Def. MoL at 23 n. 16. Indeed, after reciting at length *all* of the "hindrance[s]" that they believe voters should face in raising their own claims, Defendants then assert (with no apparent sense of irony) that "there is no 'hindrance' to voters raising claims on their own." *Id.*

But these two positions cannot coexist. If an individual voter, looking forward to events beyond their control, must show that an injury that will occur randomly is *certain* to hit them in particular, that is certainly a "hindrance" to raising a claim on their own. Consider, for example, a hypothetical USPS policy of randomly shredding one in every thousand ballots mailed after October 25. On Defendants' theory of standing, no *voter* could ever challenge this policy, because they could never show *they* would be injured, and in any event, voters could "avoid any likely injury by sending in their ballots a reasonable time before the election." Def. MoL at 23. Assuming this were how standing worked (it is not), there should be no doubt that there is a substantial "hindrance" to such voters raising their own claims. Yet that policy is also (we hope) obviously unconstitutional. Thus, Defendants' own arguments supply the candidate-Plaintiffs with standing – and, as a prudential matter, if a sufficiently random disenfranchisement would preclude voters from ever having standing on their own, then candidates would be the sole parties able to vindicate the right to vote.

Beyond that, Defendants' assertion that a candidate-Plaintiff must show that challenged

disenfranchisement will "change the course or outcome of their candidacy" is simply wrong on the law. In *Gallagher,* the Court rejected exactly this argument, explaining, "Candidates have an interest not only in winning or losing their elections, but also in ensuring that the final vote tally accurately reflects the votes cast." *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *29 (SDNY Aug. 3, 2020). Thus, candidates who had *already won their races* had standing to challenge an application of state law that tossed out voter ballots based on USPS errors. In *Yang,* the Second Circuit also affirmed a finding of standing that rejected the same argument. *See Yang v. Kellner*, 2020 U.S. Dist. LEXIS 79331, at *12-15 (S.D.N.Y. May 5, 2020) (rejecting arguments that "Plaintiffs lack standing because 'the Democratic presidential primary election would not actually have determined whether they would, in fact, serve as delegates'" and that Andrew Yang, because he suspended his campaign and was unlikely to win any delegates, lacked standing) (alterations adopted), *aff'd Yang v. Kosinski*, 960 F.3d 119, 127 n. 21 (2d Cir. 2020) ("we have examined *sua sponte* the question of Article III standing and concluded that Plaintiffs and the Sanders delegates have standing to challenge the Board's April 27 Resolution"). In short, candidate standing does not require anything like what Defendants suggest, and they do not cite a single case suggesting otherwise.

      **B.**      <u>Plaintiffs claims are not moot.</u>

Defendants wrongly assert that USPS's voluntary "suspen[sion of] many of the operational measures" at issue sounds in standing. Def. MoL at 23. But "abandonment of [a] policy presents an issue of mootness rather than standing." *Stauber v. City of N.Y.*, 2004 U.S. Dist. LEXIS 13350, at *52 (S.D.N.Y. July 16, 2004), *citing Dodge v. County of Orange*, 208 F.R.D. 79, 85 (S.D.N.Y. 2002). That is, as the Supreme Court has explained, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to

the exercise rather than the existence of judicial power." *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982).[7]

Here, the claims are not moot for two reasons: (1) there remains a profound and undisputed delay in the mail that will impact the election and (2) Defendants' voluntary cessation is both incomplete and, apparently, unenforced.

*First,* as the documents they cite show, USPS has not even made it *halfway* back from its dramatic dip in service standards. Mail remains significantly more delayed than it should be, and the risk that poses to the right to vote remains profound for all the reasons above.

*Second*, and more importantly, the supposed cessation of new policies that have slowed the mail is either illusory or unenforced. Even just "[t]he *possibility* that respondent may change its mind in the future is sufficient to preclude a finding of mootness." *United States v. Generix Drug Corp.*, 460 U.S. 453, 456 n.6 (1983). And here, Plaintiffs have already supplied ample evidence that Defendants' promises that policies have been changed or rolled back are indefinite and equivocal. *Compare, e.g.,* Def. MoL at 18 n. 13 ("It has never been USPS policy or guidance to 'ban' extra trips") *and* Cintron Dec. ¶ 25 ("I did not direct any field managers … [to] prevent all late and extra trips under any circumstances, as was clear from our discussions); *with* Jamison Rep. Ex. 1 (sign at a USPS plant, put up September 6, reading "ALL … TRIPS WILL DEPART ON TIME, NO EXCEPTIONS" and "Make sure every single employee in our building understands – All Trips

---

[7] *See also, United States v. Sanchez-Gomez,* 138 S. Ct. 1532, 1537 (2018); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017); *Knox v. Serv. Emps. Int'l Union, Local Human Res.,* 532 U.S. 598, 609 (2001); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287–89 (2000) ("The test for mootness we have applied in voluntary-termination cases is not whether the action originally giving rise to the controversy could not *conceivably* reoccur, but whether it is absolutely clear that the … behavior could not *reasonably be expected to recur.*") (Scalia, J. concurring) (emphasis in original); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993); *Chi. Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 305 n.14 (1986); *United States v. Generix Drug Corp.*, 460 U.S. 453, 456 n.6 (1983) ("The possibility that respondent may change its mind in the future is sufficient to preclude a finding of mootness."); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *L.A. Cty. v. Davis*, 440 U.S. 625, 631 (1979); *Allee v. Medrano*, 416 U.S. 802, 810 (1974).

Depart On Time").[8]  And this suggests, as Plaintiffs' expert explains, that "knowledge at the most senior levels of the organization is not being shared with parties who have been asked to provide testimony in this proceeding."  Jamison Reply Dec. ¶ 30.  And of course, there remain the apparently rampant and uncontrolled "cowboys and loose cannons taking policy into their own hands at lower levels."  *Id.* ¶ 26, discussing Curtis Dec. ¶¶ 27-31.

## II.     **Defendants' Constitutional Arguments Are Misguided.**

What is most notable about Defendants' constitutional argument is the precedents they carefully step around.  Among others, *Bush v. Gore*, *O'Brien v. Skinner*, *Gallagher v. NY State Bd. Of Elections,* and *Blount v. Rizzi* do not appear in Defendants' brief – or are only cited for a non-substantive point.

### A.     No sound constitutional principle could permit the federal government to take actions that would be unconstitutional for states.

Mail errors *do* have a constitutional dimension when they touch on election mail.  Thus, *Gallagher* found a constitutional violation by the New York State Board of Elections where it – consistent with state law – refused to count ballots that "despite the postal service's best efforts … were not postmarked … due to [what could be] a number of human or mechanical errors." *Gallagher*, 2020 U.S. Dist. LEXIS 138219, *15.  Yet, other than a brief appearance in a recitation of standards, *Gallagher* is not mentioned – much less distinguished – in Defendants' papers.  *But see, for example,* P. MoL at 20.  Arguably, "[t]his failure to respond to Plaintiff's substantial argument can be taken as a concession of the case's applicability."  *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *63 n.4.  In any event, there *is* no response to this:  where voters "face disenfranchisement through no

---

[8] As Mr. Jamison explains, either USPS is engaging in some sort of double speak that the Court needs to address, or it is so "beset by cowboys and loose cannons taking policy into their own hands at lower levels" that the Court should intervene.  Jamison Dec. ¶ 26.  However, taking the USPS denials at face value in the face of this evidence is no longer possible.  *See also*, Jamison Dec. ¶ 31 (given this inconsistency, the "most benign explanation is that knowledge at the most senior levels of the organization is not being shared with parties who have been asked to provide testimony in this proceeding").

fault of their own" and "voter's right to vote, therefore, may hinge on random chance," there is a profound, constitutional problem. *Id.* at *65; *61.

Similarly absent from Defendants' analysis are all but one of the cases holding that the same rules that apply to any other government actor apply to USPS.[9] Again, with Defendants' general silence on this point, there is no real question that First Amendment scrutiny applies to USPS actions – and when those actions place a burden on voters, *some* kind of scrutiny is appropriate. So, what is left of Defendants' argument on this point amounts to this: burdening the constitutional right to vote is okay when the federal government does it. And *that* point may be the rare proposition that needs no citation – the entire purpose of the Fourteenth Amendment was to apply the Bill of Rights, already applicable to the federal government, to the States.

>    **B.**      **If Defendants are correct that *Anderson-Burdick* does not apply, strict scrutiny is simply automatic.**

Plaintiffs may, as Defendants suggest (Def. MoL at 29-32), have succumbed to "[t]he temptation to overindulge in the *Anderson-Burdick* test." *Daunt v. Benson*, 956 F.3d 396, 423 (6th Cir. 2020) (Readler, J., concurring). But *Anderson-Burdick* does not increase the level of scrutiny restrictions on the right to vote must satisfy – it *reduces* it. In the background, "[o]bviously included within the right to choose [representatives], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted," and that "constitutional command is without restriction or limitation." *United States v. Classic*, 313 U.S. 299, 315 (1941). Thus, many older voting rights decisions apply strict scrutiny automatically as soon as the right to vote is

---

[9] Defendants do cite *USPS v. Council of Greenburgh Civic Assocs.*, but make a basic logical error in their analysis of it. Def. MoL at 31, *citing* 453 U.S. 114, 132 (1981). *USPS*'s majority opinion does, of course, turn on whether a particular regulation was content-based. But the fact that a rule that follows a particular syllogism (*if* content-based, *then* strict scrutiny) does not mean the inverse of the syllogism works (e.g., *if not* content-based, *then never* strict scrutiny doesn't follow). Whether some *other* First Amendment rule also applies to USPS is irrelevant to the decision in *USPS*. Surely Defendants would concede that a content-neutral bar on a particular (even if non-suspect) class of persons sending mail would raise constitutional issues, despite the rule's content neutrality. If that's right, Defendants' analysis here only confirms that USPS actions are subject to exactly the same First Amendment scrutiny any other government action would be.

restrained,[10] just as one might find in a prior restraint case.

Enter *Burdick* (and *Anderson*). As explained in *Burdick, Anderson* grew out of a concern that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest … would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).[11] In other words, the "key constitutional interests that animate the *Anderson-Burdick* framework" (Def. MoL at 31) are interests that defer to the States' "power to regulate their own elections." 504 U.S. at 433. Of course, those interests are absent when a *federal* agency places a burden on the right to vote. Thus, if Defendants are *right* that *Anderson-Burdick* cannot be applied to the *federal* government (Def. MoL at 29), the presence of a restriction on voting triggers strict scrutiny automatically.[12]

### C. Defendants misunderstand how scrutiny shifts the burden of proof.

Defendants misconstrue the burden of proof once *any* kind of scrutiny applies. In discussing strict scrutiny, Defendants complain that "Plaintiffs have not shown and cannot show that USPS's action do not advance [a] compelling interest" in "delivering the mail on a timely basis and continuing its regular operations." Def. MoL at 36. Everything about this application of strict scrutiny is wrong, and this error infects all of Defendants' analysis.

First, under strict scrutiny, once a plaintiff makes the required showing (a severe burden on the right to vote, content-based restriction on speech, racial discrimination, and so on.), the "burden

---

[10] *See, e.g., Dunn v. Blumstein*, 405 U.S. 330 (1972), *Evans v. Cornman*, 398 U.S. 419, 423 (1970); *Cipriano v. Houma*, 395 U.S. 701, 704 (1969); *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 627 (1969); *and Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

[11] Indeed, mere weeks before deciding *Burdick*, the Supreme Court applied strict scrutiny to a restriction on soliciting votes within 100 feet of a polling place, with no mention of "balancing" the State's interest (or, for that matter, intentional or purposeful discrimination, as Defendants suggest is required), despite citation to *Anderson*. *See Burson v. Freeman*, 504 U.S. 191, 210 (1992).

[12] For a fuller exploration of the relationship between *Anderson-Burdick* and the background rule, *see* Brief for Professor Erwin Chemerinsky as Amicus Curiae Supporting Neither Party, *Crawford v. Marion County Elec. Bd.*, 553 U.S. 181 (2008) (No. 07-21, 07-25). Of course, the *Crawford* Court did not adopt Professor Chemerinsky's approach, and in the wake of *Crawford*, courts tend to handle just about everything related to elections through the prism of *Anderson-Burdick*. *See Daunt v. Benson*, 956 F.3d 396, 423 (6th Cir. 2020) (pushing back on the post-*Crawford* "temptation to overindulge in the *Anderson-Burdick* test.").

… shifts to the" government to show the challenged measure "serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017). In other words, "[s]trict scrutiny is a searching examination, and **it is the government that bears the burden**." *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (emphasis added). *See also*, P. MoL at 25 ("Once a plaintiff shows a burden on the right of access to the ballot – even if that 'burden … is not large' – it becomes the government's responsibility to justify that burden"), *citing Price*, 540 F.3d at 112.

Second, a generic interest in continuing ordinary operations is never sufficient – even under lighter forms of scrutiny. Thus, even under *Anderson-Burdick*'s intermediate scrutiny, Courts have demanded defendants "show[] what legitimate interest it might have," and may not "resort[] only to [a] general, and quite understandable, interest in seeing state laws enforced, to the letter, as written." *Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010). Indeed, "to accept that rationale and nothing more would be tantamount to a categorical rejection of any 'as applied' challenge." *Id.* Under strict scrutiny, where the government must show not only a compelling interest, but narrow tailoring and that the means used is the least restrictive alternative, an assertion that the measures are only "geared towards delivering the mail on a timely basis" falls well short of Defendants' burden. Indeed, Defendants make no attempt at all to show why the measures "make it necessary to burden the constitutional rights of Plaintiffs." *Yang*, 960 F.3d at 134 (cleaned up).

Since Defendants do not even argue that they made an affirmative showing of narrow tailoring and necessity (and they have not), if strict scrutiny applies, the challenged policies are unconstitutional.

> D.        No intent is required in voting rights cases of this kind.

While, certainly, the *presence* of "purposeful or intentional discrimination" would be a constitutional problem, in a right to vote case, its absence is unimportant. Def. MoL at 37-39.[13]

---

[13] The cases Defendants cite for this point are not voting rights cases.

Rather, "[t]o establish an undue burden on the right to vote under the *Anderson-Burdick* test, Plaintiffs need not demonstrate discriminatory intent behind the [restrictions] because we are considering the constitutionality of a generalized burden on the fundamental right to vote, for which we apply the *Anderson-Burdick* balancing test instead of a traditional equal-protection inquiry." *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1319 (11th Cir. 2019), *citing Obama for America v. Husted,* 697 F.3d 423, 429-30 (6th Cir. 2012) *and Anderson v. Celebrezze,* 460 U.S. 780, 806 (1983). Similarly, as far as one-person, one-vote is concerned, there is no mention anywhere in *Bush v. Gore* of the *government's* intent in disenfranchising voters, because that intent is irrelevant. 531 U.S. 98 (2000).

To that end, the Court in *Gallagher* rejected the exact argument Defendants advance here, both on *Bush v. Gore* and conventional *Anderson-Burdick* analysis:

> The State Defendants argue that Plaintiffs have not established a clear likelihood of success on their equal protection claim because they have failed to show that Defendants' conduct constituted intentional or purposeful discrimination. To the extent that this is an attempt to question the equal protection principles set forth in *Bush v. Gore*, and their application here, such an attempt is not persuasive. The Supreme Court held in that case that an equal protection violation occurs when a state's vote counting procedures lacked "minimum procedures necessary to protect the fundamental right of each voter," and made no mention of the government's intent to disenfranchise voters. *Bush*, 531 U.S. at 109. Now that systemic postmarking issues have been revealed, and the effect is that § 8-412 requires identically situated ballots to be counted or invalidated based on random chance, the state violates the Equal Protection Clause when it deliberately continues to apply that policy.

*Gallagher*, 2020 U.S. Dist. LEXIS 138219, *63-64. *See also*, *id.* at 53-54 (noting and rejecting defendants' argument "that the asserted injuries are, at most, a result of the USPS's inadvertent failure to postmark certain ballots" and therefore plaintiffs had "not demonstrated that the State Defendants purposefully burdened their right to vote," finding that "the Constitution is not so toothless.").

The reason for this approach makes policy sense: in terms of the integrity of elections, it

matters very little whether election officials, legislatures, or anyone else actual *intend* to disenfranchise

voters.[14]  In *Yang*, for example, there was no question in cancelling the democratic primary election,

the *intent* was "protecting the public from the health risks posed by COVID-19 by, for example,

minimizing social contacts and interactions" and "utilizing the Board's limited resources to make

sure that other (contested) elections can be conducted safely and efficiently during the current

pandemic." *Yang v. Kosinski*, 960 F.3d 119, 134 (2d Cir. 2020).  But in acting to forward those

interests – by, essentially, neglect (*see,* Def. MoL at 37-38) – the Governor and Board of Elections

impermissibly burdened the right to vote.  Put otherwise, because of the importance of the right to

vote, courts do not need to await a mustache twirling villain before they act to protect voters.  A

burden on the right to vote is enough.

> E.      Defendants' *McDonald* argument ignores the existence of *O'Brien.*

Defendants' argument from *McDonald* is grounded in law that – while not expressly

overturned – is largely abrogated at this point.  *See* Def. MoL at 32.  As the Supreme Court explained

in *O'Brien,*[15] in *McDonald*, there was a "possibility that the State might furnish some other alternative

means of voting" than an absentee ballot, and thus "the Court's disposition of the claims in

*McDonald* rested on failure of proof." *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974), *discussing McDonald*

*v. Board of Election Comm'rs*, 394 U.S. 802 (1969) (noting that, among other things, the state might

"possibly furnish the jails with special polling booths or facilities on election day").[16]  Thus, in *Gooshy*

---

[14] Similarly, no intent requirement exists in a wide variety of First Amendment contexts:  there is no requirement, for example, that content-based restrictions on speech *intentionally* target that speech.  Nor is there any requirement that a prior restraint on publication *also* be intentionally discriminatory – it need only have the effect of restricting speech *before* the speech happens.

[15] As with *Gallagher* and *Bush* discussed above, Defendants "do not cite—much less distinguish—[*O'Brien*]," which amounts to a "concession of the case's applicability." *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *63 n.4, *citing In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 U.S. Dist. LEXIS 141449, 2012 WL 4471265, at *11 (S.D.N.Y. Sept.28, 2012) (recognizing that a party "concedes through silence" to arguments by its opponent that it fails to address) *and First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-93 & n.116 (S.D.N.Y.2002) (considering an argument not addressed in opposition brief to be waived).

[16] Even putting aside that *McDonald* is pre-*Anderson* and pre-*Burdick*, the Supreme Court and Second Circuit both cabin *McDonald* in this way.  *See also, Hill v. Stone*, 421 U.S. 289, 300 n.9 (1975) ("In *McDonald*, however, the only issue before the Court was whether pretrial detainees in Illinois jails were unconstitutionally denied absentee ballots. The

16

*v. Osser*, 409 U.S. 512 (1973), and then in *O'Brien*, the Supreme Court found that measures essentially identical (on paper, at least) to those in *McDonald* constituted "a restriction which is so severe as itself to constitute an unconstitutionally onerous burden on the exercise of the franchise" because the fact certain voters could not receive an absentee ballot functioned as an "absolute bar to voting." 414 U.S. at 530 (alterations adopted).

Read together, *O'Brien* and *McDonald* require strict scrutiny here – at least as far as international, immunocompromised, and some other voters are concerned (*see* P. MoL at 14-16). For those voters, in many instances because of the pandemic, the *only* method of voting available is mail-in absentee ballot. *See, e.g.*, Green (Mary Winton) Dec. ¶ 8 ("If I do not vote absentee by mail, I will be unable to vote at all."). And tens if not hundreds of thousands class members similarly situated to the relevant plaintiffs will be – as a matter of pure statistics – disenfranchised if the current delay in USPS services is not addressed. In short, then, this case has exactly that "proof" that *McDonald* lacked: delays in absentee ballot delivery *will* function as a bar on voting for many voters, and no one will swoop in and deliver these voters "some other alternative means of voting." 414 U.S. at 529. *See also*, *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008).

### III. **Defendants' Other Points Lack Merit.**

Defendants make several other points, some of which Plaintiffs address in the interest of completeness.

Defendants argue Plaintiffs have not shown irreparable harm. Def. MoL at 39. Not so. As

---

Court expressly noted that there was nothing in the record to indicate that the challenged Illinois statute had any impact on the appellants' exercise of their right to vote … Any classification actually restraining the fundamental right to vote, the Court noted, would be subject to close scrutiny"); *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 626 n.6 (1969) ("In *McDonald*, on the other hand, we were reviewing a statute which made casting a ballot easier for some who were unable to come to the polls. As we noted, there was no evidence that the statute absolutely prohibited anyone from exercising the franchise; at issue was not a claimed right to vote but a claimed right to an absentee ballot."); *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 & n. 9 (2d Cir. 2008) ("it is important only that there is at least some burden on the voter-plaintiffs' rights … whatever [plaintiffs'] reasons for finding it difficult to vote in person[, New York Law] would always permit them to vote by absentee ballot in any other election," and thus "[t]he Supreme Court's opinion in *McDonald* does not alter our analysis.").

Plaintiffs explained in the opening brief (P. MoL at 28-29), and Defendants do not address, "[i]n the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." *Gallagher*, 2020 U.S. Dist. LEXIS 138219, *43, *citing Conn. Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004). In their argument on this point, Defendants also mischaracterize a point in the opening brief as a concession. Def. MoL at 39, quoting P. MOL at 7 ("**while** the scale of disenfranchisement at stake here is unclear, **there is no doubt it will be meaningful**") (omitted text in bold). The point was merely that, since the delays may well compound before election day – and may be aggravated by any number of other factors – it is unclear whether it is thousands, tens of thousands, or hundreds of thousands of voters that will be disenfranchised. But since "there is no doubt [disenfranchisement] will be meaningful," any harm is irreparable, even if the precise "scale … is unclear." *See Gallagher,* U.S. Dist. LEXIS 138219, *68 (thousands of ballots invalidated by USPS errors constitutes a "strong showing of irreparable harm").

Defendants make a passing analogy to the Electoral College, saying, "in light of the Electoral College … it is not clear how the 'one person, one vote' principle could ever be applied across state lines." Def. MoL at 25. But the Supreme Court has more than once rejected "analogies to the electoral college" applied anywhere outside the "specific historical concerns" and compromises that motivated Alexander Hamilton in crafting the Electoral College. *Gray v. Sanders*, 372 U.S. 368, 377-78; 376 n.8 (1963). *See also, Davis v. Mann*, 377 U.S. 678, 692 (1964) (rejecting "the so-called federal analogy"). That is, Defendants suggest that the Electoral College is the rule. But it is the exception. And so one person, one vote applies everywhere but those areas already monopolized by the Constitution. This Court, just like a state, cannot introduce *new* measures that violate one person, one vote principles.

Defendants object to some of the relief requested. Much of this is easy to address. If, as Defendants suggest (Def. MoL at 40), OIG is already conducting audits that will produce

meaningful data in the relevant time frame, then simply providing that data to counsel and the Court will suffice.[17]  Given that the 5.6% slowdown remains in place even as Defendants assure the Court that there are *no* measures in place that could slow down the mail, it stands to reason that some monitoring is required.  The exact scope of that monitoring is a harder question – and perhaps an appropriate subject for supplemental submissions.

Similarly, "[i]t is well established … that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case."  *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992); *see also Lemon v. Kurtzman,* 411 U.S. 192, 200 (1973) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable."); *Trump v. Int'l Refugee Assist. Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment.").  What is in the Notice of Motion is a proposed framework that includes metric targets, and a non-exclusive list of ways to achieve those metrics.  Contrary to Defendants' suggestion, reducing delays *now* is vital to ensuring USPS is prepared to deal with the volume of Election Mail that will come over the next months – and vital to ensuring that USPS and the Postmaster are not (once again) surprised that the measures they've taken cause, rather than cure, delays.  *See* House Tr. at 60-61.

Defendants' complaint about the language "[a]ny change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" (Def. MoL at 26 n. 22) is disingenuous at best.[18]  That language is borrowed *directly* from a statute that already governs USPS services (and so compliance imposes no additional investigative burden).  39 U.S.C. §

---

[17] On this point, Defendants are wrong that "plaintiffs [have not] even explained how the particular actions it is asking this Court to order will improve USPS's operations."  As explained by Plaintiffs' expert, "OIG audits of all USPS mail processing plants well before the election would help identify where slowdowns are occurring" and "[i]f necessary the USPS-OIG and the Postal Inspection Service should be utilized to conduct audits and ensure best practices are in place."  Jamison Dec. ¶ 37, 48.

[18] The complaint that this language is not definite enough only appears in Defendants' brief, and not any affidavit.  Presumably, had they been asked, Defendants' declarants would have recognized this language and understood exactly what it meant.

3661(b) provides that anytime "the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" it must first "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change," and there must be hearings and public comment on that change. If USPS is asserting that the statute does not give them "notice of precisely what conduct" triggers the advisory opinion requirement, there is a much more profound issue than whether the requested injunction is appropriate. *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000). In any event, unless USPS plans to violate 39 U.S.C. § 3661(b), all the proposed injunction does is requires such proposals to be held and not implemented until the election is over.

Zooming out, the Court is free to narrow the remedies when Defendants show some particular measure is unneeded or is, indeed, harmful. By analogy, Courts have narrowed the requested scope of a preliminary injunction where more limited protections would offer complete relief and any broader injunction would "encroach[] on the ability of other circuits to consider the [issue]." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 648–49 (9th Cir. 2011); *see also Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 381 (4th Cir. 2001). Though "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," the "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Here, at issue is an unprecedented national slowdown in the mail, just before an election, at the direction (or, if his testimony is to be believed, remarkable lack of direction) of a Postmaster General with no USPS experience. A broad problem calls for broad relief.

## CONCLUSION

For the reasons above and in the moving papers, Plaintiffs respectfully request the Court

grant their motion for injunctive relief.

Respectfully submitted,

/s/

_____

J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
COHEN&GREEN P.L.L.C.
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
LAW OFFICE OF ALI NAJMI
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com