UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────── x
Mondaire Jones, et al.,
*individually, and on behalf of all others*　　　　　　　　　　Docket No. 20-cv-6516-VM
*similarly situated,*
　　　　　　　　Plaintiffs,　　　　　　　　　　　**DECLARATION OF**
　　　　　　　　　　　　　　　　　　　　　　　　　　**MARK JAMISON**
v.

United States Postal Service, et al.,
　　　　　　　　Defendants.
─────────────────────────── x


COUNTY OF JACKSON　　　　　)
　　　　　　　　　　　　　　　　) ss.:
STATE OF NORTH CAROLINA　)


I, MARK JAMISON, being duly sworn, depose and say:

　　1.　I am a natural person, residing in Cullowhee, North Carolina, and I make this Declaration based on my personal knowledge and where applicable, on matters within my experience, training, and professional knowledge.

　　2.　I have written this declaration at request of plaintiff's counsel regarding the declarations included with United State Postal Service (USPS) brief.   I am giving this declaration in support of Plaintiffs reply on their motion for a preliminary injunction.


**Declaration of John Prokity dated September 5, 2020**

　　3.　In paragraph 5, Prokity references Manager Workforce Planning, Insights & Analytics and discusses effects of Covid19, including: prior to the pandemic, the USPS had an average of 55,000 employees using full-day leave/week; that number went up to 81,000 mid-April; leveled off at 69,000 in May 2020; it improved in June and worker availability fell "to its lowest levels" in mid-July, no specific figures were given for June and July.  Prokity states that the shortage of workers led to

delays in processing and delivery, and that while most areas have improved, the Philadelphia area has continued to "experience staffing shortage issues as of August 21, 2020".  All of these items were in force before DeJoy started in mid-June 2020.  This speaks to slowed mail delivery in the Philadelphia metro area that was referred to in the original complaint in this case.

### Declaration of Robert Justin Glass dated September 8, 2020

4.   In the Glass Declaration (paragraph 8), he states, with regard to the July 2020 Marshall letter that "noting instances where, under the Postal Service's reading of that jurisdiction's election laws, certain state-law deadlines may be in tension with the Postal Service's existing delivery standards and recommendations."  This appears to be an attempt to characterize the Marshall letter as merely a friendly reminder. It lacks the surrounding context of DeJoy's tenure within the USPS.

5.   In paragraph 10, Glass notes that on the 8/21/20 the USPS Board of Governors established the Election Mail Committee.  What he fails to note is that this was in response to pressure and media scrutiny resulting from DeJoy's actions.

6.   In paragraph 15, Glass establishes that ballot mail is first class "just like other single-piece mail such as holiday cards and bill payments". However, he's gone through a great deal of effort to discuss special procedures for election mail including additional outreach and special tags and handling. This makes it clear that USPS has previously acknowledged that although ballot mail is first class it warrants special attention.

7.   Glass acknowledges the differences between first class and marketing mail (paragraph 16), and states in paragraph 19 that "The Postal Service recognizes the importance of Election Mail…" and that it is time sensitive (paragraph 20)

8.   In paragraph 21, Glass discusses how election mail has been handled in the past, including the fact that ballots sent as marketing mail are "advanced" to first class mail when there is

processing capacity. He points out that this happens when volumes are light. Under those circumstances, marketing mail is advanced and processed with first class as machine capacity permits but other testimony and exhibits show that letter mail volumes have decreased during pandemic. Additionally, paragraph 23 notes that employees additionally take extraordinary efforts to accelerate delivery of ballots.  This supports plaintiff's assertion that in the past USPS has made special and extraordinary efforts to deliver election mail. However, nothing in this testimony addresses the discombobulation caused by DeJoy.

9.   In paragraph 27, Glass states that he is not aware of any intentional efforts to slow election mail. And in paragraph 29 he discusses DeJoy's commitment made on August 18, 2020 to use "standby resources" and refers also to testimony before both branches of Congress. However, Glass fails to give context for DeJoy's statements, which were given after considerable uproar and made under a certain amount of duress and pressure. I go by the motto of trust but verify in situations like this. DeJoy has also made statements before the House particularly that were combative. When asked about reconnecting machinery he refused to agree to do that, but he didn't offer to explain why that might not be a good idea. These actions of DeJoy's can be characterized as reluctant and in response to significant pressure.

10.  In paragraph 33, Glass explains why certain mailpieces do not receive postmark but says USPS will "try" to cancel or postmark. In response to this, first, it is important to distinguish between cancellation and postmark. Cancellation can simply mean defacing a stamp so it cannot be reused – Glass is referring to revenue protection when referring to cancelling. A postmark is the application of a date to the mailpiece, which is the salient point with respect to ballots.

11. With regard to the section titled, Ability of the Postal Service to process Election Mail, none of this is in dispute. The issue is not the ability of the USPS to process election mail, but the will within the USPS leadership to ensure Election Mail is processed with alacrity and intention.

12. One of the Glass exhibits is a September 2016 letter from Stroman to Alabama Election Officials coordinating between USPS and election officials. Was there a similar letter sent out in 2020? The USPS is under different leadership now and facing a global health crisis that is impacting mail delivery. I believe that the USPS needs to make this kind of outreach in 2020 to ensure that election officials in all 50 states are coordinating with the USPS.

**Declaration of Jason DeChambeau dated September 8, 2020**

13. In paragraph 10, DeChambeau discusses how removing machines provides labor costs savings, but he ignores the hours required to disassemble machines.

14. In paragraph 17, DeChambeau states that by May 2020, USPS Headquarters had concluded, based on ongoing data monitoring and analyses, that the letter and flat mail volumes was unlikely to return to the significantly higher pre-March level. Most of this declaration comports with what we've argued, i.e. that the machine removals were part of previous plans. The question was whether removals during the pandemic were necessary and a proper use of resources. If the question was space needed for parcel sortation then where is the evidence offered that was their motivation or intent? Quite the opposite, USPS officials argue that removals were sort of business as usual during the pandemic. Specifically, to the above sentence I would ask – Where's your crystal ball? Since the USPS has no idea what a new normal will look like post pandemic, was it appropriate to reach the conclusion that pre-pandemic mail volumes would not return? One might argue that the heavier use of the mails might spur renewed use post pandemic. In any event, with limited resources – see Prokity's previous testimony of added sick leave and missed days – was the decision to do removal timely? Again, the USPS has a new postmaster general, a largely new board of governors and reducing machine capacity, especially in a way that is permanent would result in abandoning a major investment in equipment.

**Declaration of Angela Curtis dated September 8, 2020**

15. In paragraph 13 of her Declaration, Curtis asserts that overtime is approved at the field level not USPS Headquarters. The Postal Service is top down. Budgets are determined at a national Headquarters level and filter down through Areas to Districts. While a particular District Manager may insist on approving all overtime in her district, it is certainly likely that the manager is responding to a general goal or directive that originated at Headquarters. The Postal Service has a very refined concept of plausible deniability. An order may come down from Headquarters in written form that overtime should be reduced by X %. At that point, as long as overtime is reduced by at least X%, Headquarters is happy. And if a particular District Manager interprets that directive to reduce costs as something that will please the bosses up the chain, she may decide to make the reductions more dramatic (X+%) to please them. While there may not be a written trail of evidence, there is certainly a verbal channel for passing messaging like this down the chain of command. One place where we've seen this manifest between District Managers and their direct reports, known as POOMs (post office operations manager), is post office closures. Heavy handed procedures that violate regulations may occur at a local or district level while Headquarters simply claims that its directives followed the letter of the law. But no one ever gets fired or reprimanded for going a bit "further" than asked to go.

16. In paragraph 18, Curtis discussed how craft employees (e.g., letter carriers or clerks) who have little to no supervisory experience are often asked to temporarily fill a supervisory position (when this happens these people are referred to as 204b's).  She goes on to state that having fewer supervisors led to increased numbers of 204b's, which was "a contributing factor to unnecessary overtime at some facilities, because temporary supervisors were often less able to provide adequate or effective oversight." (paragraph 19).

17. In paragraph 20 she states that it was these very staffing shortages (caused by the management hiring freeze) that led to "significant temporary difficulties" in on time mail delivery in some areas (including Philadelphia). Now she states that because the hiring freeze was only at the management level and for non-bargaining unit employees that it had "had no impact on craft employees". If you're filling empty frontline management positions with 204bs that come from the craft employees and you're not finding experienced replacement supervisors who can better manage the craft employees, that will have a huge impact on the effectiveness and productivity of those craft employees.

18. I have also seen an Ohio Valley District Standup Talk that references specific reductions in workhours.[1] There were identical talks given in South Jersey and Central Pennsylvania[2], except for the specific number of workhours to be reduced. I suspect that the exact same Standup Talk was distributed to all 67 USPS districts, and those would be useful to look at. The Ohio numbers suggest a reduction in workhours of approximately 6 percent in each of the three areas: mail processing, retail post offices, and city carriers. If this talk were delivered nationwide, it would clearly represent a change in operations that should have required an advisory opinion from the PRC. Several of the other lawsuits focus on this issue.

19. The passage in the Ohio Valley District Standup Talk about reducing workhours in mail processing centers specifically ties the reduction to the removal of machines: "To work toward this workhour reduction, the district is currently in the process of removing 23 mail processing machines." This seems to contradict the rationale provided by the USPS reply brief saying the machine removal was due to the fact that they were not being used sufficiently, that

---

[1] Available at: https://postalnews.com/blog/2020/07/14/standup-talk-on-usps-changes-recently-delivered-to-ohio-postal-workers/
[2] Available at: https://www.postaltimes.com/postalnews/standup-talk-on-pmg-changes-given-to-employees-in-ohio-nj-pa-and-more/#main

decommissioning machines is routine, that the machines become "obsolete," that they needed the floor space to handle the surge in packages, etc. As for how removing machines saves workhours in the short term, I'm not sure except that it means less maintenance work, but that discounts the hours used to remove or disassemble machinery.

20. In the long term, removing machines means reducing the Postal Service's mail processing capacity. The USPS says this is being done because of decreased mail volume, but I'd note that the 2018 Trump Task Force report recommends more outsourcing of mail processing work to the private sector. In other words, it's not just about the volume but about outsourcing more. The task force document states, on p. 65, "Evaluate areas of USPS operations where the USPS could expand third party relationships in order to provide services in a more cost efficient manner (e.g., midstream logistics and processing)."[3]

21. Reducing carrier workhours is the object of the change in their work patterns (park points, etc.). I would also point out that eliminating blue boxes along a route may reduce carrier time by reducing collection service points, which makes me wonder if there is an aspect of removing the blue boxes that is related to workhour reduction. The USPS says it routinely culls underperforming boxes, so nothing new there, but one would like to know how many are planned for removal, did USPS lower the threshold for how many mailpieces per box qualifies as a removal, and is the blue box removal part of some overall plan that has yet to be announced? I'd note that removing blue boxes also comes up in the Task Force report as a way to cut costs.

22. The Ohio standup refers to reducing workhours at post offices. Earlier this summer, the Postal Service began closing some offices at the lunch hour and earlier in the day, and it looked as

---

[3] Available at: https://home.treasury.gov/system/files/136/USPS_A_Sustainable_Path_Forward_report_12-04-2018.pdf

though some post offices were being closed. Senator Manchin of West Virginia went crazy on this and it came to a quick stop. But it shows that the plan was afoot.

23. In paragraph 24, Curtis asserts that there have been no new directives on delivery limitations or hiring. And in the course of that paragraph she references two documents: "a July 10, 2020 memo called "Mandatory Stand-Up Talk: All Employees," and a July 14, 2020 PowerPoint presentation entitled "PMGs expectations and plan."" Curtis and the USPS do not deny the authenticity of these two documents. She just says, "These documents were prepared by local managers and were not reviewed or approved by Headquarters. She states that the documents were "distributed locally, not nationally. They do not represent official Postal Service guidance or direction." The question I have is, where did the local managers get the ideas discussed in the documents if not from higher up in the chain of command? Curtis goes on to say, "These documents purport to discuss issues relating to late and extra truck trips, overtime park points, and other topics." Small point, but the documents do not "purport" to discuss these matters. They do. Curtis also says, "the presentation was not an official Postal Service presentation." But if the presentation was made by local USPS managers, why aren't they "official"?

24. In paragraphs 27-31, Curtis talks about transportation schedules and DeJoy's renewed "emphasis on compliance with long-established schedules". She cites the ultimate goal of this renewed emphasis as "improving our service standards (on-time delivery to customers) and increasing efficiency (by, e.g., mitigating extra trips and unneeded overtime). There have been a number of points raised by Curtis and others that have cited the need for increased "efficiency", a word they use to mean cost effectiveness. This is disturbing to me because the main goal of the USPS is not to make or save money; it is to "bind the nation together".

25. In paragraph 28, Curtis states that she "took responsibility to help ensure that the Eastern Area contributed to the renewed emphasis on adherence to established schedules". Again, the

absence of a Headquarters directive that specifically states a directive is not the same as an absence of local directives or initiatives. In paragraph 29, Curtis states, "I became aware of local management occasionally exercising poor judgement regarding the dispatch of mail…local managers let trucks leave at the scheduled time and held the mail for delivery on the next truck available." She is effectively saying that it was not her fault that mail got left behind for the next truck delivery (even though she had made it clear that her priority was adhering to established schedules). This is an example of plausible deniability.  The local managers wanted to please the boss, so they made a decision to please her over the ultimate goal of on-time mail delivery – there's little question about why they would make that decision.

26. Based on her declaration, it seems Ms. Curtis has a problem with all sorts of nonofficial communications promulgating unsanctioned policies. How is it that an organization that claims it is on top of things and is making concerted efforts to execute thoughtful policy is so beset by cowboys and loose cannons taking policy into their own hands at lower levels. And more to the point, if that's a serious problem how can Plaintiffs take the USPS's assurances about local execution of ballot mail policies at face value? What is to stop these same cowboys and loose cannons from "exercising poor judgement" with regard to our sacred right to vote.

### Declaration of Robert Cintron dated September 8, 2020

27. In paragraph 4, Cintron confirms the interconnectedness of transportation – confirming plaintiff's argument that delays accumulate and that therefore it is important for trucks to wait for the mail so that the USPS doesn't have mail that sits around for days.

28. In paragraph 14 he discusses how delays accumulate and cause further delays. The point may not be adherence to schedules as much as the coordination of plant cycles and the way delays in one

operation create intensifying delays down the line. This argues plaintiff's point that there is a need for extra trips to alleviate backups, not fewer trips to increase efficiency.

29. In paragraph 24, Cintron discusses efforts beginning in July 2020 to "renew focus on compliance with transportation schedules' and the development of written guidelines." The program associated with this was called the Sortation Equipment Reconciliation (SER) and it has since been shut down as the result of a national level grievance between the USPS and the National Association of Letter Carriers.[4][5] He indicates that "Headquarters did not ban all … late trips". The final sentence says DeJoy was not involved in the planning or implementation of these guidelines. But on page 17 of the USPS brief it states that Cintron "continued this effort after Postmaster General Louis DeJoy took office, and discussed the topic with him and other Postal executives." This is a direct contradiction and given DeJoy's professional expertise in logistics, it seems implausible that he would not have been involved in the development of the guidelines.

30. Attached as Exhibit 1 to this declaration is a true copy of a tweet with an image of a sign at a Portland Mail Sorting Plant.[6] In my experience, a sign like that would have been ordered by and installed at the direction of the Senior Plant Manager. No one else would have the authority to direct office personnel to create such a sign. No lower level manager or tour supervisor would be authorized to promulgate the policy expressed in the sign and order the display of the sign. Based on the latest USPS organization chart a Senior Plant Manager in Portland would report to either the District Manager or directly to the Regional Processing Operations Western Area VP. Attached as Exhibit 2 is a true copy of the latest organizational chart for the USPS. The Postal Service is very particular and detailed in its messaging and in the manner in which it communicates directives to

---

[4] Available at: https://www.nalc.org/news/nalc-updates/nalc-files-national-level-grievance-regarding-post-office-sortation-equipment-reconciliation
[5] Available at: https://www.nalc.org/news/nalc-updates/national-level-grievance-over-expedited-streetafternoon-sortation-esas-settled
[6] Also available at: https://twitter.com/GeoffRBennett/status/1302732181949816832

field level operations. For example, during my time as a postmaster, local offices received a specific package of retail signage and specific directions on placement from Headquarters. From my observations post offices continue to operate with these sorts of messaging directives. In mail processing and plant operations, Section 4 Mailing Processing Procedures describes in detail the lines of communication and which levels of the organization are responsible for preparing plans and guidelines. From Section 421 Headquarters "b. Prepare and issue instructions, procedures, policies, guidelines, and directives pertaining to manual, mechanized, and automated mail processing and equipment."[7] The responsibility for preparation of directives like that encompassed by the sign would originate at Headquarters level and be fulfilled at the Processing and Distribution Center (PDC)/ Facility (see Section 424). The specific design of the sign may have originated at Headquarters level or at the PDC but in any event it is unlikely that the decision to display such messaging occurred without the direct involvement of senior managers.

31. The existence of the sign and the testimonies of Curtis and Cintron are inconsistent. The most benign explanation is that knowledge at the most senior levels of the organization is not being shared with parties who have been asked to provide testimony in this proceeding.

### Declaration of Joshua Colin dated September 8, 2020

32. In paragraph 3, Colin states, "there is no Postal Service ban or cap on amount of overtime that local supervisors or managers are permitted to approve". This leads me to ask a series of questions: As an upper level manager, do you hold local managers to a budget? Is overtime a part of that budget? Have salary increases or yearly reviews within the last ten years included a metric related to overtime percentage? In the next section he goes on to basically contradict himself by using the

---

[7] Available at: http://www.local323.org/_323database/_dbcontent/_USPS/POM_9--12_08.pdf

Case 1:20-cv-06516-VM   Document 38-1   Filed 09/10/20   Page 12 of 15

Declaration of Mark Jamison                                                                        Page 12

phrase unnecessary overtime – if some overtime is necessary and some is not then wouldn't a ban or cap on only unnecessary overtime be prudent management?

33. He describes the afternoon sortation (ESAS) pilot program. There is a long history of programs like this. The idea is to keep carriers on the street as close to 8 hours as possible. What is interesting is that the test ended August 21 which, coincidentally, is when DeJoy had to back off a bunch of initiatives that he was pushing forward. This declaration was written in a vacuum with no context. The real question is: why in god's name would you test a program like this in the middle of a pandemic when you have already testified to using more casual non-career personnel. If there are already issues related to staffing and your ability to accomplish the mission on a timely basis why would you initiate a program like this during a critical time when performance for the public is essential? Even acknowledging that the program might increase efficiency at some point, are these the conditions under which you wish to test it?

### Declaration of Kevin Couch dated September 8, 2020

34. In paragraph 5, referring to machine removal Couch states "I have not seen any change in this long established process since postmaster General DeJoy took office…" However, the APWU was served notice of additional machine removals by letter to APWU President Dimondstein on June 17, 2020, two days after DeJoy started. I would want to know how many machines were removed in each month for the last year? Was this part of an ongoing program? Why was notice served on this date? Had notice for other machinery scheduled to be removed been served to the APWU as contractually required? If so when? And when were those machines removed? DeJoy was hired in May by the Board of Governors. It has been reported that discussions took place with Mnuchin.[8] This round of removals coincides with DeJoy's being named to the position although he

---

[8] Available at: https://www.cnn.com/2020/08/20/politics/louis-dejoy-postmaster-scrutiny-democrats/index.html

didn't start until June 15. Did he have any discussions with operations managers prior to his start date?

### The USPS brief

35. The note at the bottom of page 18 tries to dismiss the Standup Talk memo regarding extra trips. It claims the memo was locally prepared and did not represent Headquarters policy. It may not have been generated at Headquarters, although the heading and graphics are consistent with Headquarters directives, but the word local is a misnomer trying to deflect attention. That memo was prepared at a district or area level in all likelihood.

36. On page 26, the Defendants call a direction to have USPS Office of the Inspector General conduct audits unduly burdensome and claim the request would redirect USPS resources from ongoing mail operations. However, conducting audits is what OIG does - in the period 10/1/18 - 3/31/19 they wrote 36 white papers, made 83 recommendations and conducted almost 1200 investigations.[9]

37. In addition to having OIG conduct audits, another remedy would be to deploy the postal inspectors and postal police to oversee mail facilities and ballot processing.

38. I question whether the Board of Governor's Chair, Robert Duncan's position as a director of Mitch McConnell's Senate SuperPAC is a violation of the Hatch Act. At the very least it's a terrible conflict of interest. Along with the revelations of DeJoy's possible violations of campaign contribution laws there is a prima facie case to be made that DeJoy and Duncan are primarily political operators. This would mean that any assertions that they are operating the US Postal Service in a totally apolitical manner would have to be taken with a grain of salt.

---

[9] Available at: https://www.uspsoig.gov/sites/default/files/document-library-files/2019/2019_SARC_1_Spring.pdf

39. It isn't enough to argue that procedures have heretofore been designed to give election mail priority. Having programs and protocols in place speaks to only one aspect in assuring USPS institutional energy will be directed towards fulfilling an obligation to the American people to give election mail and particularly ballots the highest priority and attention. Those programs and protocols become a Potemkin Village, a mere facade, if the senior executives who direct the institution are compromised by being clearly identifiable as partisan political operators. A chorus singing, "we're doing our job" may be mouthing the lyrics to a tune that is obviously and undeniably off-key. Regardless of past efforts and good intentions, the events of the last three months plus the declarations of President Trump have raised legitimate questions and concerns in the public mind. Mere assertions of good will and intent are insufficient to assuage the very real and demonstrated problems that have arisen with Mr. DeJoy's tenure.

40. The USPS strategy seems to be to claim, "This is what we've always done. Nothing is different and nothing has changed." It's as if they are writing in a vacuum, as if President Trump never made any comments about the Postal Service on Twitter and to reporters and as if the last three months with DeJoy at the helm simply never happened. It's gaslighting raised to the nth degree. They offer a totally oblivious view to the context of the times.

41. This brings to mind a scene from The Naked Gun, where Leslie Nielsen's character ridiculously tells a crowd watching a building explode that there is, "nothing to see here".[10]

---

[10] Available at: https://www.youtube.com/watch?v=aKnX5wci404

Case 1:20-cv-06516-VM   Document 38-1   Filed 09/10/20   Page 15 of 15

Declaration of Mark Jamison                                                                                   Page 15

As permitted in 28 U.S.C § 1746, I, Mark Jamison, declare that, under penalty of perjury that the foregoing is true and correct.

Executed On: September 10, 2020

*Mark S. Jamison*
_____
Mark Jamison