**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, *and* Rebecca Rieckhoff, *individually, and on behalf of all others similarly situated,*<br><br>                              *Plaintiffs,*<br><br>                    v.<br><br>United States Postal Service, Louis DeJoy, *as Postmaster General of the United States Postal Service*; *and* Donald J. Trump, *as President of the United States.*<br><br>                              *Defendants.* | Docket No. 20-CV-6516<br><br>~~FIRST~~(PROPOSED) SECOND AMENDED COMPLAINT |

Plaintiffs, for their complaint, allege as follows:

**INTRODUCTION**

1.      The United States Postal Service ("USPS") is, at this point, a central cog in the basic functioning of American democracy.  As Justice Holmes put it:  "use of the mails is almost as much a part of free speech as the right to use our tongues." *United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson,* 255 U.S. 407, 437 (1921) (Holmes, J., dissenting).  And legally speaking, USPS has "as its basic function, the obligation to provide postal services to bind the Nation together."  39 U.S.C. § 101.

2.      There is arguably no American institution more (small-d) democratic than USPS – both as a matter of history (described in some depth below) and practice.  Even at the bottom of the Grand Canyon, where mail must travel two-

and-a-half hours on the backs of ten mules each day, people receive their mail.

3.      Amid a global, once-in-a-century pandemic, USPS has become all the more important to the basic functioning of our democracy:  with the risks of gathering voters in one place, indoors, to wait on line and all touch the same election machinery, most States have expanded vote-by-mail alternatives to keep their citizens safe.  For November, an estimated 76% of Americans are eligible to cast their ballots by mail without any "excuse" – and if the recent primary election is any indication, a record number of voters intend to use that eligibility to exercise their most basic right in the safest manner available in a public health crisis.

4.      Against this background, President Donald J. Trump and his newly appointed Postmaster General Louis DeJoy have set about to ensure USPS cannot reliably deliver election mail.  As a Trump deputy campaign manager put it, "[t]he President views vote by mail as a threat to his election."  *See* ¶ 106, below.  *See also, generally,* Sam Levine, <u>Trump Admits He Is Undermining USPS To Make It Harder To Vote By Mail</u>, GUARDIAN (Aug. 13, 2020).[1]

5.      While President Trump himself is holding up necessary funding for the Post Office, a flurry of steps taken by DeJoy all but guarantee that thousands upon thousands (if not millions) of ballots will simply not reach their destinations on time, will likely lack postmarks that are required by state law, and that the volume of election mail that is coming may be delayed for weeks.

6.      The Constitution does not require the Courts to shy away from

---

[1] *Available at* https://www.theguardian.com/us-news/2020/aug/13/donald-trump-usps-post-office-election-funding.

ensuring the right to vote is not eroded by neglect and bad faith invocation of administrative cost-cutting.  Quite the opposite.

7.      As this Court recently put it:  "the Constitution is not so toothless." *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *53 (S.D.N.Y. Aug. 3, 2020).  Constitutionally, we cannot "ignore a … systemic problem that arbitrarily renders [thousands of] ballots invalid."  *Id.*

8.      And, perhaps just as importantly, we *should* not.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction under ~~42 U.S.C. § 1983 and~~ 28 U.S.C. § 1331.

10.     Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as some of the Plaintiffs live in this district, intend to vote in this district, and are running for office in this district.  Additionally, some of the acts and omissions that give rise to this action occurred, in part, in this district – while others will have their effects (in short, disenfranchisement) in this district.

## PARTIES

12.     Plaintiff Mondaire Jones is an attorney and the Democratic nominee for the United States House of Representatives in New York's 17th Congressional District, representing Rockland and Westchester Counties, and will be on the November General Election ballot.  As a candidate for federal office, he is deeply committed to ensuring the integrity of the electoral process.

13.     Plaintiff Alessandra Biaggi is a New York State Senator, running for second term in New York's 34th Senate District, representing the Bronx and Westchester, and will be on the November General Election ballot.

14.     Plaintiff Chris Burdick is a candidate for New York State Assembly in New York's 93rd Assembly District, representing parts of Westchester County, and will be on the November General Election ballot.

15.     Plaintiff Stephanie Keegan is a candidate for New York State Assembly in New York's 94th Assembly District, representing parts of Putnam and Westchester Counties, and will be on the November General Election ballot.

16.     Plaintiff Seth Rosen is 20-year resident of the Upper West Side in New York County, NY, a candidate for New York City Council in 2021, and a voter who intends to vote by mail-in absentee ballot in the November General Election.

17.     Plaintiff Shannon Spencer is an elected member of the Borough Council in Collegeville, Pennsylvania, where she is also registered to vote (she joins this lawsuit in her personal capacity, and not on behalf of the Borough Council). Shannon is spending some months in Virginia dealing with her deceased parents' estate (both passed away earlier this year).  She had planned to vote absentee in November, in part because of her duties in Virginia, and in part because she would prefer to avoid crowded spaces due to the 2019 novel coronavirus.  However, she is highly concerned by President Trump's and Postmaster DeJoy's actions harming and slowing the Post Office, and is therefore very concerned about whether her mail-in ballot would get to the county election office in time to be counted.

18.     Plaintiff Kathy Rothschild is a QuickBooks consultant to small businesses and non-profits, and a Manhattan-registered voter who intends to vote by mail-in absentee ballot in the November General Election because she resides in a foreign country – namely, Costa Rica.  She is also an official Voting Assistance Officer with the Federal Voting Assistance Plan.  Ms. Rothschild has major concerns right now particularly around the state of mail in Costa Rica and the travel advisories from the State Department. *See, Travel Advisory for Costa Rica*, U.S. DEP'T OF STATE (August 6, 2020) (the Travel Advisory Level for Costa Rica is currently Level 4 – "[d]o not travel to Costa Rica due to COVID-19" – the highest level the State Department uses).[2]  It currently costs $72 to mail an envelope to the United States, and because of the travel time involved, if USPS is too slow, it is very possible that – and beyond Ms. Rothschild's control – her ballot will not reach the New York City Board of Elections in time to be counted, even if she mails it long in advance of the election.

19.     Plaintiff Diana M. Woody is a Newark resident of Essex County, NJ, and a voter who intends to vote by mail ballot in the November General Election. Mx. Woody is voting by mail to protect themself from the exposure risks of in-person voting during the COVID-19 pandemic.

20.     Plaintiff Perry Sainati is a resident of Chicago, IL, who is registered to vote in Cook County, and is the president of Belden Universal, a manufacturing company.  He has requested an absentee ballot and will be voting by mail in the

---

[2] *Available at* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/CostaRica.html

November General Election in part because he recently underwent bone marrow transplant, has a weakened immune system, and would not be safe voting during the pandemic.

21.     Plaintiff Robert Golub is a retired Conservative rabbi, a volunteer who works with nonprofit social service organizations, and a New York County voter. He holds dual citizenship between Israel and the United States and is currently staying in Israel (with a primary residence in New York, NY), and believes he will most likely be unable to return to New York to vote in person amid the pandemic. Thus, Rabbi Golub intends to vote by mail-in absentee ballot in the November General Election, and has applied for his ballot.

22.      Plaintiff Mary Winton Green is a 97-year old retired philanthropist, and a Cook County, IL voter.  Mrs. Green first voted for President Roosevelt in 1944, and is a proud descendent of the suffragettes.  Her great aunt, Theodora Winton Youmans, "was the only Wisconsin native to ever rise to leadership in the state suffrage movement.  As president of the Wisconsin Woman's Suffrage Association, Youmans's organizational skills led to the remarkable turnaround in public opinion that sent suffrage from defeat in 1912 to victory in 1919." *Youmans, Theodora Winton, 1863 – 1932*, WISCONSIN HISTORICAL SOCIETY, *available at* https://www.wisconsinhistory.org/Records/Article/CS14693.  Mrs. Green's doctors have told her she must stay in her house and cannot vote in person.  If she cannot vote reliably by mail, she cannot vote at all.

23.     Plaintiff Marsie Wallach is a producer of digital and film content,

registered to vote in Cook County, IL, and has already requested her mail-in ballot. Ms. Wallach intends vote by mail in the November General Election because of the risks associated with the pandemic, unless she believes it is clear that issues around USPS policies and the mail will have an effect on whether her vote counts.

24.  Plaintiff Matthew Wallach is a digital colorist for film and television. He is a California registered voter.  He frequently votes by mail because his work involves long periods of foreign and domestic travel away from home, when he works on site during the filming of motion pictures.  This year he is registered to vote by mail because of COVID concerns as well as the possibility of extended travel for business.

25.  Plaintiff Mac Wallach is currently unemployed due to the pandemic, but usually works in the theater, television, and film industry.  Mr. Wallach is registered to vote in Chicago (Cook County), IL, and has applied to vote absentee because he believes it is not safe to congregate in large groups indoors amid a pandemic, and voting by mail is usually reliable.

26.  Plaintiff Carol Sussman is an 85-year old Suffolk County, New York voter who is unemployed, disabled, and in an assisted living facility.  Mrs. Sussman has applied for her absentee ballot on the basis of a "permanent illness or physical disability" because she needs assistance walking and cannot walk one step alone – and would not be able to vote at all, if not by mail.

27.  Plaintiff Rebecca Rieckoff is a Wisconsin voter registered to vote in Marathon County, Wausau, WI.  She has registered to vote absentee and has been

voting absentee for years – currently, because she is a full-time law student living and attending school outside of Wisconsin.

28.     Defendant USPS is (under 39 U.S.C. § 101) an independent establishment of the executive branch of the United States Government.  It is charged with the obligation of providing postal services to the citizens of the United States and as part of its operations maintains postal service facilities throughout the United States, including in New York, New York (in this District).  Postal Service headquarters are located at 475 L'Enfant Plaza, S.W., Washington, D.C. 20260.

29.     Defendant Louis DeJoy is the Postmaster General of the USPS and is sued in his official capacity.

30.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

31.     Upon information and belief, the Defendants collectively and between them possess the authority and power to provide the relief requested by Plaintiffs.

32.     Defendants are therefore the correct *Ex parte Young* defendants.

**FACTUAL ALLEGATIONS**

**History and Background on the USPS.**

33.     "The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States … The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and

business correspondence of the people."  39 U.S.C. § 101.

34.     As it stands today, there are currently more than 31,000 individual post offices in the United States, ranging from grand affairs that take up city blocks to one tiny office at the bottom of the Grand Canyon (which serves the people on the Havsupai reservation).  *The Revolutionary Post*, 99% INVISIBLE (Jan. 24, 2017)[3] ("Unlike private competitors Fedex and UPS, the US Post Office cannot pick and choose where they deliver based on profit.  It is obliged, by law, to provide daily pickups and deliveries to every community in the country, even if that community is located in the bottom of the Grand Canyon").  To that end, in order to operate that office – which has been in place since 1896 – USPS must send ten pack mules every day to make a two-and-a-half-hour trip into the Canyon.  *Id.*

35.     Historically, our nation has in fact had two post office systems, one before the Revolution, and one ever since—and Benjamin Franklin ran both.  And more importantly, both played a foundational role in the development of American democracy.

36.     Operation of the first postal office, a service of the British Crown, led to the fight over the Stamp Act and "taxation without representation" when England, without seeking the consent of colonial legislatures, imposed higher prices on what was essentially a monopolized service:  mail from the mother country.  *See* William Smith, HISTORY OF THE POST OFFICE IN BRITISH NORTH AMERICA (1920) at 81-82.

---

[3] Available at https://99percentinvisible.org/episode/the-revolutionary-post/.

37.     Franklin was dismissed from his position with the Colonial Post Office (by the Crown, of course) after the Boston Tea Party.  Soon after, "measures were on foot which in a short time deprived the post office of its business in America.  In March 1774, the colonists began a movement to establish a postal system … The committee of correspondence in Boston, which was the organ through which the opponents of government carried on their work, wrote to the committee in Salem … suggesting the advisability of establishing a post office in America."  *Id.*

38.     Aside from the possibility of surveillance of private letters (a practice of the British military after war broke out), a major objection the nascent American freedom movement had to the British organization was that it also "had complete control over the fortunes of newspaper publishers."  *Id*. at 84.  And "[a] plan" was drawn up "for an independent American post office, and laid … before the committees of correspondence of all the colonies."  *Id*. at 85.

39.     Then, in September 1774, the first Continental Congress met, and took over responsibility for the new Post Office from the committees of correspondence. The Congress, with the goal of "providing for the speedy and secure conveyance of intelligence" appointed Benjamin Franklin as the first Postmaster General.  *Id*. Soon after, the British ceased operation of their American Post Office.  *Id*

40.     At the head of the new American Post Office, Franklin designed a system in which "post riders were placed at intervals of twenty-five or thirty miles over the whole stretch from" Portland, Maine "to Georgia, the mails being carried from post to post from one end of the country to the other, three times a week …

Three advice boats, also, were employed to run from North Carolina, South Carolina and Georgia to the place of assembly of the continental congress." *Id*. at 88-89.

41.    When the new Constitution was adopted in 1789, then, it provided that "[t]he Congress shall have Power … to establish Post Offices and post Roads." U.S. CONST., art. I § 7.

42.    When established, the new American postal system became "the incubator of our uniquely lively, disputatious culture of innovative ideas and uncensored opinions … [The] novel, uniquely American post … subsidized the delivery of newspapers to the entire population, which created an informed electorate, spurred the fledgling market economy, and bound thirteen fractious erstwhile colonies into the *United* States." Winifred Gallagher, HOW THE POST OFFICE CREATED AMERICA (2016) at 1 (emphasis in original).

43.    To that end, George Washington spoke of "the instrumentality" of the post "in diffusing a knowledge of the laws and proceedings of the Government," while Benjamin Rush, in more colorful language, described the new system as "the only means of carrying heat and light to every individual in the federal commonwealth." *Id*. at 31.

44.    Looking back, it seems perhaps axiomatic that, "like sound currency, decent civil service, and efficient transportation, a mail system [is] a sine qua non of nationhood."   Winifred Gallagher, HOW THE POST OFFICE CREATED AMERICA (2016) at 12.  And indeed, "[b]y the time President Jefferson left office in 1809, America had almost 2,300 post offices and 36,000 miles of routes." *Id*. at 35.

45.     The Post Office's vital role in democracy, politics, and basic speech continued as the country grew.  Rather, from the outset the Post Office "subsidiz[ed] the transportation industry that would spur [the] development" of national highways.  *Id.* at 45.  And among other core development, in the 1830's, "voluntary associations" like the Abolitionists began using the U.S. mails for activism.  *Id.* at 77.  *See also*, *id. generally* Chs. 3-5.

46.     The United States Supreme Court has repeatedly recognized this nation-building, speech-promoting, connective role of the Post Office.

47.     In *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114 (1981), the Court recounted that, "[b]y the early 18th century, the posts were made a sovereign function in almost all nations because they were considered a sovereign necessity.  Government without communication is impossible, and until the invention of the telephone and telegraph, the mails were the principal means of communication … The Post Office played a vital yet largely unappreciated role in the development of our new Nation … During this developing stage, the Post Office was to many citizens situated across the country the most visible symbol of national unity."  453 U.S. at 121.

48.     In a case concluding that the Post Office was not subject to the Sherman Act, the Court held that the Post Office's "goals are not those of private enterprise.  The most important difference is that it does not seek profits, but only to break even, which is consistent with its public character.  It also has broader obligations, including the provision of universal mail delivery [and] the provision of

free mail delivery to certain classes of persons." *United States Postal Serv. v. Flamingo Indus. (USA) Ltd.,* 540 U.S. 736, 747 (2004) (cleaned up).

49. The Post Office – with its history, unsurprisingly – forms a basic part of the Constitution's promise of free speech. As Justice Holmes put it in a famous dissent, while "[the] United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues." *United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson,* 255 U.S. 407, 437 (1921).[4]

50. Indeed, "the use of the mails is not a privilege to which the Congress or the Post Office [or the President] can attach any condition it chooses. When a postal law affects expression, the exercise of the postal power must be tested against the first amendment [with the accompanying level of scrutiny]." *Hiett v. United States*, 415 F.2d 664, 669 (5th Cir. 1969).

**USPS and the November General Election.**

51. In the election sphere, virtually – if not literally – every state and jurisdiction running elections in November has placed significant reliance on the USPS continuing to operate as it has until, essentially, this month.

52. And, "[w]hen 80% of the electorate uses early absentee voting as the method by which they cast their ballots, the method has transcended convenience

---

[4] Justice Holmes' "frequently quoted admonition" is now the settled, majority view. *Blount v. Rizzi,* 400 U.S. 410, 416 (1971). *See also, e.g., Associated Students for University of California v. Attorney Gen. of United States,* 368 F. Supp. 11, 21 (C.D. Ca. 1973) ("Justice Holmes' now-famous dissent has been adopted by the Court as the correct rule of law"), *citing Blount; Lamont v. Postmaster General*, 381 U.S. 301, 305 (1965).

and has become instead a practical necessity.  Thus, when severe burdens are placed on this form of voting, it has a significant impact on elections and the right to vote." *Feldman v. Reagan*, 843 F.3d 366, 398 (9th Cir. 2016) (Thomas, C.J., dissenting).  *See also, generally O'Brien v. Skinner*, 414 U.S. 524, 530 (1974) (denial of right to receive absentee ballot is unconstitutional).

53.    The continued, uninterrupted flow of mail ballots through the mail thus involves the settled expectations of voters, candidates, and the States themselves.

54.    And changing the quality and quantity of USPS services – as described below – in the middle of this election cycle will predictably and irreparably harm everyone involved, to say nothing of the damage it will cause to the integrity of the election itself.

55.    For example, New York officials described the current relationship between the State Board of Elections and the USPS as a "partnership" made "for conducting the election."  Brigid Bergin, Here's What Could Invalidate Your Absentee Ballot. And It's Beyond Your Control, GOTHAMIST (July 6, 2020).[5]  *See*

---

[5] While this is hardly an exhaustive list of similar statements, for other examples, *see, e.g.*:
    **Oregon**: Andrew Theen, Wyden, Merkley decry 'diabolical' plan by Trump to destroy Postal Service, potentially imperiling vote by mail and fair elections, OREGONIAN (Aug. 15, 2020) (Oregon officials describing the "excellent partnership they've built [with USPS] during two decades of vote-by-mail."), *available here*.
    **Florida**:  Buddy Goodin, Election Mail (Presentation), USPS (May 2012) (describing USPS "commit[ment] to "[c]ontinue partnership with state and local Election Officials" on vote-by-mail in Florida), *available here*.
    **Michigan**, **Ohio**, **Louisiana**, **New Mexico:**  Exhibit 6 (letter from National Association of Secretaries of State, signed by the Secretaries of these four states, saying, "We view the USPS as a vital partner in administering a safe, successful election and would like to learn more about any planned changes around USPS

*also*, David Wildstein, <u>Post Office Returning Completed Ballots To Voter, Not County Election Office</u>, NEW JERSEY GLOBE (June 18, 2020)[6] (reporting a USPS comment that mail voting processes "include[] close coordination and partnerships with election officials at the local, county, and state levels" and that "we are conducting and will continue to proactively conduct outreach with state and local election officials and Secretaries of State.").

56.     And as the Chairwoman and Vice Chair of the U.S. Election Assistance Commission (a federal agency created by the Help America Vote Act of 2002) put it:

> "[M]ost do not realize the growing role of the United States Postal Service (USPS) in ensuring all eligible Americans are able to cast a ballot … While the USPS may not dominate the discussion around elections, we cannot ignore the role this federal agency plays in our efforts to ensure every eligible voter is able to cast their ballot…
>
> Ensuring all eligible Americans are able to cast a ballot, no matter where they are in the world or what their mental or physical abilities are, is just as important as ensuring their vote is counted accurately. Forging relationships between local election administrators and postal officials, and the federal partners who advise them, will go a long way to ensuring this happens."

Christy McCormick and Ben Hovland, <u>Post Office and Election Office, Critical Partners in Democracy</u>, U.S. ELECTION ASSISTANCE COMMISSION (May 9, 2019).[7]

57.     In short, the USPS is and has long been a central and relied-upon part of how state and local officials administer elections.

58.     And part of that reliance is the fact that – as this Court found in

---

service due to COVID-19, preparations for increased election-related mail, USPS staffing levels and processing times, and other pertinent issues").

[6] *Available at* https://newjerseyglobe.com/campaigns/post-office-returning-completed-ballots-to-voter-not-county-election-office/.

[7] *Available at* https://www.eac.gov/post-office-and-election-office-critical-partners-in-democracy.

*Gallagher*, discussed below – the USPS has always gone above and beyond to ensure that election mail is delivered.

59.     In New York City for the June 23, 2020 Primary Election, the USPS went through extensive efforts to ensure mail ballots were delivered and postmarked as required by New York law.  For example, USPS made herculean efforts to deliver the "over 30,000 absentee ballots which needed to be delivered to voters by the next day" and "during the week before Election Day, the Morgan Facility assigned 'gatekeepers . . . to filter through [any ballot return envelopes] that didn't go through the cancellation machines and actually pull [them] out one at a time and hand cancel them.'"  *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *14-5 (S.D.N.Y. Aug. 3, 2020).  And at the June 30 deadline for ballots to be delivered, after "proactive[]" outreach from the local board, USPS made special deliveries of ballots to ensure they were received by election officials in time.  *Gallagher*, 20-cv-5504-AT, ECF No. 87 at 207:5-8; 196:6-15.

60.     Similarly, in Tulsa, Oklahoma, the secretary of the county election board described how, "[d]uring elections, they've always been extremely helpful. They've opened up for us after hours on election night so we could pick up any last minute ballots. They'll hold them aside for us."  Sierra Pizarro, <u>USPS Changes Impact Mail Delivery, Will Oklahoma Absentee Ballots Be Slowed?</u>, KJRH (Aug. 12, 2020).[8]

61.     Upon information and belief, USPS has historically engaged in similar

---

[8] *Available at* https://www.kjrh.com/news/local-news/usps-changes-impact-mail-delivery-will-oklahoma-absentee-ballots-be-slowed.

efforts across the country, all because – historically – "Postal service [officials] …

[have taken] seriously their commitment to postmark [and deliver] absentee

ballots." *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at \*14.

**Recent Policy Changes and Events with the USPS.**

62.     In the home stretch of the 2020 General Election cycle, the USPS has

instituted dramatic and profound changes in how it approaches its mail service

commitments,[9] that fundamentally change the rules of how mail voting works.

63.     In a recent memo, Postmaster DeJoy acknowledged that the policies at

issues in this case have altered USPS efficiency and service, writing,

"[u]nfortunately, this transformative initiative" – presumably referencing some or

all of the policies detailed below – "has had unintended consequences that impacted

our overall service levels."  Kristen Holmes and Veronica Starcqualursi, In New

Letter, USPS Chief Acknowledges 'Unintended Consequences' Of Recent Policy

Changes," CNN (Aug 14, 2020, updated Aug. 17, 2020).[10]

64.     Other memos detailed the policy changes at length.

65.     A first memo (no copy of this memo appears to be available publicly)

from Postmaster DeJoy detailed some of the changes in policy.  *See* Jacob Bogage,

<u>Postal Service Memos Detail 'Difficult' Changes, Including Slower Mail Delivery</u>,

---

[9] Attached hereto as Exhibit 6 is a letter to Postmaster DeJoy from Senator Schumer and Speaker Pelosi, which states that "contrary to certain prior denials and statements minimizing [the] changes," Postmaster DeJoy has now "confirmed" many of the "operational changes" detailed in this Complaint.
[10] *Available at* https://www.cnn.com/2020/08/14/politics/dejoy-usps-changes-2020-election/index.html.

WASHINGTON POST (Jul. 14, 2020).[11]

66.    Among the changes in this first memo:

a.  USPS's new policy is that "If the plants run late, they will keep the mail
    for the next day."  *Id.*  This contrasts with the traditional practice that
    "postal workers are trained not to leave letters behind and to make
    multiple delivery trips to ensure timely distribution of letters and
    parcels."  *Id* (quotation from Post reporting, not USPS memo).

b.  USPS will, going forward, categorically forbid all overtime, and strictly
    curtail all other measures used to ameliorate staffing shortages.  *Id.*

c.  USPS letter carriers are forbidden to use more than four "park points"
    (where a letter carrier parks a truck, delivers some amount of mail on
    foot, and then returns to the truck) on their routes.  *Id.*

67.    In a second memo, a true copy of which is attached hereto as Exhibit 1
(linked in the Bogage Washington Post, cited in ¶ 65 above), USPS detailed further
changes and their effects.

68.    Specifically:

a.  USPS "may see mail left behind or mail on the workroom floor or docks (in
    P&DCs), which is not typical" (which the memo acknowledges might be
    "difficult for employees" to see).  Ex. 1 at 1.  *Compare also*, *Gallagher*, 20-
    cv-5504-AT, ECF No. 90 at 338:1-339:5 (describing how New York's Post
    Office runs all mail received in a day, and doesn't stop running until all

---

[11] *Available at* https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

mail for the night is processed).

b. "Extra trips are no longer authorized or accepted." Ex. 1 at 1.

c. "Carriers must … return [from mail routes] on time," even if they have not yet fully completed their deliveries for the day. *Id.*

69. Additionally, Postmaster DeJoy announced that as part of a "new organizational structure" USPS would be implementing a "hiring freeze." Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission, USPS (Aug. 7, 2020).[12]

70. And yet another policy change, the USPS rolled out a program called "Expedited to Street/Afternoon Sortation," designed to send letter carriers out to deliver mail more quickly in the morning by prohibiting them from sorting any mail in their offices before they go. A true copy of the memo outlining this pilot program is attached hereto as Exhibit 2. *See also*, Rachel M. Cohen, USPS Workers Concerned New Policies Will Pave The Way To Privatization, INTERCEPT (July 29, 2020).[13]

71. Given the importance of sorting election mail from other mail to ensuring it is handled correctly (*see Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *11-16), this change is likely to have additional, significant consequences for election mail – consequences beyond its predicted effect of "delay[ing] mail from getting to its final destination by at least one day, if not longer." *Id.*

---

[12] *Available at* https://about.usps.com/newsroom/national-releases/2020/0807-pmg-modifies-organizational-structure.htm.
[13] *Available at* https://theintercept.com/2020/07/29/usps-postal-service-privatization/.

72.     All of this, of course, is in a context where the USPS will be handling a record volume of absentee and other mail ballots (alongside what will likely be record *turnout*), with an unprecedented 76% of Americans eligible to vote by mail as States have taken extraordinary steps to ensure voters can cast their ballots safely without risking infection from a once-in-a-century pandemic.  Juliette Love et al., <u>A Record 76% of Americans Can Vote by Mail in 2020</u>, New York Times (Aug. 14, 2020):[14]



---

[14] *Available at* https://www.nytimes.com/interactive/2020/08/11/us/politics/vote-by-mail-us-states.html.

73.     In none of these memos has DeJoy explained either (1) why this change in policy *must* happen right before the General Election or (2) how these measures will even result in actual cost savings.

74.     In reaction to these memos and changes, postal workers and their unions (among many others) have expressed deep concerns about the potential effects of these new policies on the mail.

75.     For example, the Intercept quoted a letter carrier in Illinois as saying, "This is the worst any of us have ever seen it … One of the things that's always been a central tenet of the Post Office is that the mail gets through, no matter how late you have to work, what the weather is, and now it feels like that's being thrown out the window."  Cohen, *cited in* ¶ 70 above.

76.     Similarly, the national president of the American Postal Workers Union, Mark Dimondstein, commented that "These are changes aimed at changing the entire culture of USPS," continuing "[t]he culture I grew up with, and of generations before me, is that you never leave mail behind.  You serve the customer, you get mail to the customer. Prompt, reliable, and efficient."  Aaron Gordon, Internal USPS Documents Outline Plans to Hobble Mail Sorting, MOTHERBOARD (Aug. 14, 2020).[15]

77.     A postal employee in Lancaster, New York said that with the new policies, the facility there is about two days behind normal processing time. Michelle Ye Hee Lee et al., Postal Service Backlog Sparks Worries That Ballot

---

[15] *Available at* https://www.vice.com/en_us/article/pkyv4k/internal-usps-documents-outline-plans-to-hobble-mail-sorting.

<u>Delivery Could Be Delayed in November</u>, WASHINGTON POST (July 30, 2020).[16]  She

commented, "[t]he cardinal rule is, 'don't delay the mail,' and we're in a 180-degree

switch where we're delaying mail every day." *Id.*

78.     And a collection of USPS employees speaking to the Washington Post

stated that the current backlogs are becoming so dire that if the new procedures

remain in place, workers may be unable to locate all the ballots in time for them to

be processed.  A worker in California said, "If they keep this up until the election,

there's no telling how many days-worth of delays there could be. I mean, we'll be

delivering political mail days after the election." *Id.*

79.     More generally, Daniel Cortez, a union official representing mail

clerks, said post offices have a "massive built-in delay right now" because of the new

policies, and the compounding effect of previous regulatory changes in 2012 and

2015 that "slowly eroded" the agency's ability to deliver first class mail on time.  *See*

Theen, *cited in* note 5.[17]  To address "built-in delay" of this kind in the past,

according to Cortez, workers would often clock overtime because it was important to

get mail to customers as soon as possible, but that's no longer allowed (because of

new policies).  *Id.*  Thus, now Cortez says he routinely sees mail sent from one

Portland post office facility to another arrive up to *a week* later.

---

[16] *Available at* https://www.washingtonpost.com/politics/postal-service-backlog-sparks-worries-that-ballot-delivery-could-be-delayed-in-november/2020/07/30/cb19f1f4-d1d0-11ea-8d32-1ebf4e9d8e0d_story.html.

[17] While not directly challenged here, the 2012 and 2015 changes are properly considered as part of the "overall scheme" that governs the right to vote. *Lerman v. Bd. of Elections*, 232 F.3d 135, 145 (2d Cir. 2000).  That is, one does not have to pretend the changes in USPS policy and practice do not add to and interact with the already existing challenges faced by USPS and "the challenged regulation is not evaluated in isolation." *Id.*

80.    Upon information and belief, these delays would be even more significant in the case of mail that is arriving from another state – or another country.

81.    The changes even break with past USPS practices in implementing changes – where USPS has consulted unions and other industry groups before making large changes.  *Id.* (reporting comments from the manager of Coalition for a 21st Century Postal Service, a postal industry advocacy group, that "We haven't been told anything, we haven't been consulted, and over the last three decades the Postal Service has had a good track record of talking to unions and industry groups if there are going to be changes.").

82.    And summarizing the changes, one postal union official simply wrote in large letters on one of the memos: "This will slow mail processing."  *Id*.

**The Planned "Reduction" in USPS Machinery and Its Effects.**

83.    USPS has, without explanation or reason, removed or destroyed at least 671 sorting machines across the country since June.  Erin Cox, et al., <u>Postal Service Warns 46 States Their Voters Could Be Disenfranchised By Delayed Mail-In Ballots</u>, Washington Post (Aug. 14, 2020).[18]

84.    Attached hereto as Exhibit 3 is a true copy of a USPS plan and presentation titled "Equipment Reduction," dated May 15, 2020 (the "Equipment Reduction Plan").  The Equipment Reduction document reflects a plan to reduce the numbers of "Letter Sorting" machines and "Flat Sorting" machines, at an average

---

[18] *Available at* https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html.

rate of around 20%.  *See* Ex. 3 at 2.

85.     According to the Equipment Reduction Plan, USPS has a "target" of reducing 969 total machines by the end of FY20 Q4, with the majority in FY20 Q3 (which ends on September 30).  Ex. 3 at 2-4.

86.     Motherboard (a Vice News publication) reported that they had "[m]ultiple sources within the postal service" reporting that "they have personally witnessed the machines, which cost millions of dollars, being destroyed or thrown in the dumpster."  Gordon, *cited in* ¶ 76 above.

87.     Local unions and workers have expressed particular concern about the removal of machines:  Iowa Postal Workers Union President Kimberly Karol was quoted saying, "I'm not sure you're going to find an answer for why [the machines being removed] makes sense, because we haven't figured that out either."  *Id.*

88.     Similarly, an employee in a Buffalo distribution facility explained: "Look at it this way:  Your local grocery store was forced to cut 1/3 of its cash-out lines, but management expected the same productivity, quality, and speed for the customer."  The same employee said their facility was set to lose six out of 21 mail sorting machines, and concluded, "It's" – e.g., maintaining the same productivity, quality, and speed – "just never going to happen."  *Id.*

89.     Also similar, in Erie, PA, two of six delivery bar code sorters have been "unplugged" and "shutter[ed]."  Matthew Rink, Erie Loses Mail-Sorting Machines In USPS Purge, GoErie.com (Aug. 16, 2020).[19]  Referencing the election, a mail carrier

---

[19] *Available at* https://www.goerie.com/news/20200816/erie-loses-mail-sorting-machines-in-usps-purge.

who worked for 37 years until he retired in 2015 described this change as happening at "the worst possible time," suggesting changes should come "later on" and we should "have the election" first.  *Id.*  Otherwise, he said, "the reduction in equipment not just in Erie but in large Postal Service centers in cities like Pittsburgh will have a ripple effect."  *Id.* (quotation paraphrased in article).

90.    These removals – and later removals that are, upon information and belief, planned to take place in the run up to the November General Election – have led to a massive decrease in the USPS's capacity to sort and cancel mail, particularly in population-dense areas (graphic prepared by Washington Post):



91.    That is, some major cities have already had their ability to sort mail reduced by *hundreds of thousands* of pieces of mail per hour.  In context with the new policies on overtime, where ballots must be sorted and postmarked by post-

office machines the day they are received to be counted – which, historically they have been – this change means it is a virtual certainty that a significant number of ballots received by USPS, mailed by voters in the time permitted by law, will not be counted.

92.     Nationwide, as of August 14, USPS's capacity to process mail has been reduced by more than 21.4 *million* pieces of mail per hour.

93.     And, as the graphic above shows, the burden of this diminished capacity falls wildly differently across various states and areas – and seems, at least in part, targeted at either (1) locations in States where the General Election will likely be close or (2) major cities, likely to skew Democratic, that will impact the national popular vote tally.

94.     One of the machine types at issue – sometimes called Advanced Facer-Cancelers (because they change the direction the mail is facing, before applying a "cancelation" or postmark) – forms a basic part of how USPS can handle the volume involved in election mail.  *See, e.g., Gallagher*, 20-cv-5504-AT, ECF No. 90 at 232:16-233:13; 240:10-21.

95.     And without those machines, more problems with postmarks (which many States rely on in determining the validity of a ballot) and delivery speed will inevitably emerge as USPS workers are required to hand-cancel a larger volume of mail and more potential for human error enters the process.  *See Gallagher,* 2020 U.S. Dist. LEXIS 138219, at *15; *and* 20-cv-5504-AT, ECF No. 90 at 325:20-326:8; 327:18-328:4.

96.     Such potential for error, upon information and belief, will lead to a

constitutionally impermissible scenario:

> Consider then, the case of two absentee ballots cast on June 22[, the day
> before election day], at the same time, at different post offices, and assume
> that both are not postmarked.  Under the rule that an absentee ballot
> returned by mail is valid if it arrives at the local board before the close of
> polls on June 23, [election day and the last day permitted by law], whether
> either vote is counted depends entirely on the speed of the post office
> handling their ballot. If the first post office delivers the ballot to the local
> board ahead of schedule, meaning that it arrives by June 23, then that vote
> would be counted.  If the second post office delivers the ballot to the local
> board in two days, meaning by June 24, then that ballot would be
> invalidated. A voter's right to vote, therefore, may hinge on random chance.

*Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *60-61 (record citations omitted).

97.     As reported by the Washington Post, "[t]he new policies have [already]

resulted in at least a two-day delay in scattered parts of the country, even for

express mail, according to multiple postal workers and union leaders.  Letter

carriers are manually sorting more mail, adding to the delivery time.  Bins of mail

ready for delivery are sitting in post offices because of scheduling and route

changes. And without the ability to work overtime, workers say the logjam is

worsening without an end in sight."  Lee, *cited in* ¶ 77 above.

98.     On top of all of the above, USPS began a process of removing many

mailboxes from service, across several states including in New York, Pennsylvania,

Oregon, and Montana.  Jacob Bogage, Postal Service Will Stop Removing Mailboxes,

WASHINGTON POST (Aug. 14, 2020).[20]  That process appears to have been stopped

after public blowback, however.  *Id.*

---

[20] *Available at* https://www.washingtonpost.com/business/2020/08/14/people-are-freaking-
out-about-mailbox-removals-postal-service-says-its-routine/.

**Official Backlash.**

99.     Given all of this, Arizona's Secretary of State has even asked the State's attorney general to launch a *criminal* investigation into the circumstances at issue here.  A true copy of that letter is attached hereto as Exhibit 4 (unfortunately, the image quality of the letter available publicly is poor), tweeted by the Arizona Secretary of State at https://twitter.com/SecretaryHobbs/status/1294315111738273792?s=20 ("I've asked Attorney General Brnovich to investigate recent changes at USPS, and whether or not the Trump administration has committed a crime").

100.     Representatives Ted Lieu and Hakeem Jefferies sent a similar letter to FBI Director Christopher Wray, saying (echoing the language of 18 U.S.C. § 1701) that the Defendants have "retarded the passage of mail" and, "if their intent in doing so was to affect mail-in balloting or was motivated by personal financial reasons, then they likely committed crimes."  A true copy of that letter is attached hereto as Exhibit 8 (like Exhibit 4, the only publicly available copy of this letter is unfortunately low quality).

101.     Many public officials and others have attempted to address these issues with USPS.  A true copy of a letter sent to Postmaster DeJoy by the National Association of Secretaries of State is attached hereto as Exhibit 7.  *See also*, Ex. 6.

102.     Despite the high-profile nature of these issues and awareness that the delays *will* cause election issues (*see, e.g.,* Ex. 6 at 1, Postmaster DeJoy has "confirmed" the significant changes), USPS has not explained its changes and

actions.[21]

103.   Instead, Postmaster DeJoy and USPS's explanations have sounded entirely in a (pretextual) generic desire to cut costs. *See, e.g.*, Louis DeJoy, Postmaster General Statement on Operational Excellence and Financial Stability, USPS (July 27, 2020) ("The Postal Service is in a financially unsustainable position, stemming from substantial declines in mail volume, and a broken business model. We are currently unable to balance our costs with available funding sources to fulfill both our universal service mission and other legal obligations.").[22]

104.   As four Senators put it in a letter to Postmaster DeJoy, "Your failure to provide Congress with relevant information about these recent changes or to clarify to postal employees what changes you have directed as Postmaster General, undermines public trust and only increases concerns that service compromises will grow in advance of the election and peak mail volumes in November." *Id.*

105.   And there is no question about the net effect of the changes at issue. As an internal USPS memo reported on by Fortune explains, "If we cannot deliver all the mail due to call offs or shortage of people and you have no other help, the mail will not go out."  Nicole Goodkind, Inside Trump's War On The Postal Service,

---

[21] Speaker Nancy Pelosi has now called the House back into session for an "urgent" hearing on August 24, and "invit[ed]" Postmaster DeJoy and the chair of the USPS Board of Directors to testify. *See* Jacob Bobage and Joseph Marks, House Accelerates Oversight Of Postal Service As Uproar Grows, Demanding Top Officials Testify At 'Urgent' Hearing, WASHINGTON POST (Aug. 16, 2020).  It is unclear at the time of filing whether Postmaster DeJoy intends to accept the invitation, or whether the Senate (or indeed, the President) will act – regardless of what testimony the House elicits.
[22] *Available at* https://about.usps.com/newsroom/national-releases/2020/0727-pmg-statement-on-operational-excellence.htm.

FORTUNE (Aug. 14, 2020).[23]

**President Trump's Involvement with USPS and Opposition to Mail Voting Generally.**

106.    As the President's former senior counsel and now-deputy campaign manager, Justin Clark put it, "[t]he President views vote by mail as a threat to his election."  60 Minutes, How the Coronavirus and Politics Could Impact Voting In the 2020 General Election, CBS NEWS (Jun. 28, 2020).[24]

107.    Asked about funding issues at the Post Office, President Trump made clear that, in his mind, the *reason* for cutting costs and not delivering needed funding is to make sure mail voting is practically impossible.

108.    President Trump has no actual objection to mail voting (at least, when it is convenient for him, personally):  both he and the First Lady received mail-in ballots for Florida's Primary Election this year.  Mail-in ballots sent to Trump, First Lady in Florida, AP NEWS (Aug. 13, 2020).[25]

109.    In explaining his opposition to funding (in the amount recommended by the USPS's Board of Governors) for the Post Office, President Trump said:

> "So, they want $25 billion for the Post Office.  They want $2.5- or $3.5 billion for universal mail-in — $3.5 billion.  And the bill is not going to happen because they don't even want to talk about it because we can't give them the kind of ridiculous things that they want that have nothing to do with the China virus.  It has nothing at all to do with China virus, much of what they're asking for.  So, therefore, they don't have the money to do the universal mail-in voting.  So, therefore, they can't do it, I guess.  Right?

---

[23] *Available at* https://fortune.com/2020/08/14/usps-trump-mail-in-voting-postal-service-2020-election-stamps-post-office/.
[24] *Transcript and video both available at* https://www.cbsnews.com/news/election-voting-2019-20-coronavirus-pandemic-60-minutes-2020-06-28/.
[25] *Available at* https://apnews.com/f8df2b53a0d348b19049e6c901f3a0f7.

Are they going to do it even though they don't have the money?  They're asking for the $3.5 billion.  They're asking for $25 billion for the Post Office so they can do this, I guess, and other things.  At $25 [billion], I would hope it would be a lot of other things, too.

But, therefore, they don't have it.  They don't have the money to do the universal mail-in votes. […]

Therefore, they're not going to get the $3.5 billion.  Therefore, they can't do the universal mail-in vote.  It's very simple.  How are they going to do it if they don't have the money to do it?

Remarks by President Trump in Press Briefing, White House (August 13, 2020).[26]

110.   In other words, President Trump's view on funding the post office takes a simple if/then form:  if USPS isn't funded sufficiently to deliver absentee and other mail ballots, then USPS can't deliver those ballots.  If USPS can't deliver those ballots, then voters who wish to vote by mail can't – even if they have no other way to vote.

111.   In the President's words, "it's very simple."

## Proceedings in *Gallagher v. New York State Board of Elections* ("*Gallagher*"), 20-cv-5504-AT (SDNY) and Related Facts.

112.   This Court has already held a hearing on a preliminary injunction and heard two full days of testimony concerning many of the factual issues in this case.

113.   The preliminary injunction hearing in *Gallagher* had as its prime concern the fact that if the Court had not acted, "the votes of thousands of New Yorkers—almost one in ten votes cast in certain races—[would have been] disregarded, because of a systematic failure" of the USPS to postmark ballots

---

[26] *Available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-081320/.

properly. *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at

\*55 (S.D.N.Y. Aug. 3, 2020)

114.   In that testimony, having directed the parties to procure it, the Court

heard nearly a full day of testimony from USPS witnesses.

115.   That testimony included detailed descriptions of the machinery

described above, its importance, and how it fits into absentee and other mail voting

systems, as well as USPS delivery standards and goals, how well the USPS has

historically achieved those goals, and its relationships with state boards of election.

116.   During the hearing, the Court itself asked certain questions of USPS

managers, getting at the heart of this case.  For example:

> THE COURT:  …I'm going to ask some questions, Mr. Tanko.  I have been
> reading in the press recently that there are steps that are being taken at the
> national level to slow the mail. Is that something that you are seeing?  Are
> there practices that are being put in place or about to be put in place to slow
> the mail?
>
> THE WITNESS: So, I would say -- I can comment on the practices that have
> been put in place recently and one of the things that we are really committing
> to is making sure that all of our transportation leaves on time.  So, there
> have been some times where our transportation nationwide has been late
> because it is not meeting specific partners and we are holding transportation
> up to try to get as much mail as we can within that window.  Once it misses
> that window, then it might miss that next service commitment.  So, this is
> helping us identify where we are having struggles in our processing
> operations and where do we need to fix it.  But, now our commitment is that
> every single trip, whether it be from a plant, a network processing center, or
> a post office, according to our plans we are moving those trucks on time with
> the mail.  So, I don't know if in the press it talks about slowing the service
> down.  I see it as our opportunity to identify where our struggles are and
> where we can improve.  But it doesn't adjust our service commitments based
> on, you know, all of the policies that have been put forth recently.
>
> THE COURT: So you don't feel that any new policy is impeding the delivery
> of the mail or will impede?

THE WITNESS: No, I do not believe -- based on my knowledge about what happens in New York I do not believe so…

*Gallagher*, 20-cv-5504-AT, ECF No. 90 at 295:25-297:10.  *See also:*

THE COURT:  OK. Mr. Calabrese, I have seen news reports that certain steps were being taken at the national level, certain decisions are being taken that would have the impact of slowing down the mail. Would you comment on that?

THE WITNESS:  I -- I don't know what slowing down the mail means. We have no mandate to slow anything down here. Our processing is as is.

THE COURT:  So you don't know of any changes that are planned that would have the effect of people getting their mail later than normal?

THE WITNESS:  Anything being planned should get to customers the same service standard. It just would alleviate some of the inefficient processes that we have along the way.

*Gallagher*, 20-cv-5504-AT, ECF No. 90 at 345:21-346:11

117.    The Court also heard and credited testimony that "the postal service promises a 'two-day service standard,' which means that over 98 percent of mail placed in a collection box or delivered to a post office will arrive within two days." *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *14.[27]

118.    The very same days the Court was hearing testimony in *Gallagher*, however, as described in more depth above, USPS was sending letters to 46 states – including New York – that said quite the opposite.  True and correct copies of all of those letters are attached hereto collectively as Exhibit 5.  *See* Exhibit 5 (letter to

---

[27] As the Court observed, the testimony was at least a little muddled on this point. *Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *6 ("to the extent that Tanko's testimony about the postmarking and delivery of mail contradicted that of Calabrese, the Court adopts Calabrese's version of the facts because, as Tanko conceded, Calabrese has superior knowledge and experience with respect to postal service operations and procedures").

NYS Board of Elections at 29-30).  *See also*, Cox, et al., cited in ¶ 83 above.

119.    Rather than the "two-day service standard" testified to in *Gallagher* (2020 U.S. Dist. LEXIS 138219, at *14), the letter from USPS's general counsel and vice-president warns that "most domestic First-Class Mail is delivered 2-5 days after it is received by the Postal Service" and that "the Postal Service cannot adjust its delivery standards to accommodate the requirements of state election law."  Ex. 5 at 29-30; *passim*.  *See also*, Lee, *cited in* ¶ 77 above (USPS facility in Lancaster New York is currently two days behind normal processing time).

120.    The same USPS letter also specifically warns of a "mismatch" between New York election law and USPS service standards, "there is a risk that the voter will not receive [a] ballot before Election Day or have sufficient time to complete and mail the completed ballot back to election officials in time to satisfy the state's postmarking deadline.  That risk is exacerbated by the fact that the law does not appear to impose a specific time period by which election officials must transmit a ballot to the voter in response to a request."  *Id.* at 30.

121.    This seeming *change* in delivery commitment is of deep significance, and upon information and belief, reflects a change in policies, capabilities, and commitments (whether formal or informal) for the USPS.

## COUNT I
### (42 U.S.C. § 1983:  *First Amendment* - *Right to Vote*)

122.    Plaintiffs incorporate by references all the allegations above.

123.    The right to vote is *the* "fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

"Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).

124.    "When a postal law affects expression, the exercise of the postal power must be tested against the first amendment [with the accompanying level of scrutiny]." *Hiett v. United States*, 415 F.2d 664, 669 (5th Cir. 1969).

125.    And when a case "call[s] upon" the Court "to consider the constitutionality of [a burden on the right to vote] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of constitutionality. *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983).  Rather, the Court "conduct[s] a two-step inquiry that applies to election-related restrictions." *Id*.  In the first stage, the Court evaluates the burden the restriction places on voters and in the second applies the sliding-scale, "*Anderson-Burdick* balancing test" if the restriction is not severe and "the more familiar test of 'strict scrutiny'" if the restriction is severe.  *Id*.

126.    The burden on most voters, during a pandemic, of either (1) not voting by absentee or other mail ballot at all or (2) of not *knowing* whether the USPS will reliably deliver their ballots is an exceptionally severe burden.

127.    The predictable result of the USPS slowdowns, policy changes, and withdrawal from aggressive efforts to deliver ballots is that untold numbers of ballots will "not [be] counted based on circumstances entirely out of the voters' control," a consequence this Court has described as "exceptionally severe." *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *47

(S.D.N.Y. Aug. 3, 2020).  *Cf. also*, *Doe v. Walker*, 746 F. Supp. 2d 667, 679-80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote.").

128.   This burden is all the more severe because it has first come about in the middle of an election cycle, upsetting the settled expectations of voters, candidates, and States alike.

129.   And the burden in particular on some voters – voters who because of health or where they live, will not vote at all if they cannot vote by mail – is even greater:  it is the simple question of whether or not they can vote.  *O'Brien v. Skinner*, 414 U.S. 524, 533 (1974) (statute is unconstitutional as applied where the "[d]enial of absentee registration and absentee ballots is effectively an absolute denial of the franchise to these appellants").  Such a burden is all but automatically unconstitutional.

130.   Yet, some states frame reliance on USPS as being an issue of "ignorance of the law" and a lack of voter caution – as New York City's Board of Elections argued to this Court:

> "Voters['] … ignorance of the law is no excuse[:] …their ballots had to bear a postmark, and they bore the risk of it not being postal marked, timely or otherwise, if they relied on the postal service for delivery.  That is clear."

*Gallagher*, 20-cv-5504-AT, ECF No. 90 at 425:3-7.  Such arguments show the importance – and efficiency – of resolving this issue by preventing and minimizing

those "risks," *before* they harm voters.

131.   On the other side of the scale, Defendants have no corresponding, cognizable state interest.

132.   The only interest Postmaster DeJoy has identified is cost-saving and efficiency.

133.   Yet while cost-saving is important in government in many ways, it is well-settled that "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis,* 373 U.S. 526, 537 (1963).  *See also Califano v. Goldfarb*, 430 U.S. 199, 217 (1977); *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 152, 100 S. Ct. 1540, 1546 (1980); and for a more recent opinion where this kind of reasoning flows throughout, *see Brown v. Plata*, 563 US 493 (2011).

134.   And as far as USPS is concerned, cost-saving may not even be *that,* when it runs against the legal command that the agency "shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people."  39 U.S.C. § 101.  For example, while no private firm would ever find it cost effective to serve a tiny community that required a two-and-a-half hour, daily mule trip to deliver mail, USPS does and has for more than a century.[28]  *See* ¶ 34 above.

---

[28] To that end, it is notable that the private firms in the delivery space have, historically at least, relied on USPS's universal delivery for "last mile" transit.  *See* Jacob Bobage and Josh Dawsey, Postal Service To Review Package Delivery Fees As Trump Influence Grows, WASHINGTON POST (May 14, 2020) (the "Postal Service frequently contracts with shippers and Internet retailers to perform 'last mile' delivery, or the final leg of an item's journey"),

*See also*, *United States Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 747 (2004) (cleaned up) (USPS "does not seek profits, but only to break even, which is consistent with its public character.  It also has broader obligations, including the provision of universal mail delivery [and] the provision of free mail delivery to certain classes of persons.").

135.   Similarly, the interest President Trump has seemingly identified in perceived benefits to his own personal (*see, e.g.* ¶ 106 above), political fortunes is – put simply – not a legitimate state interest at all.

136.   Thus, upon information and belief, there is no corresponding state interest to even weigh against the burden the USPS policy and practice changes place on the right to vote.

137.   And, under either level of review, the restrictions at issue – a mid-election cycle change in long-standing policies and practices, amid a pandemic, that virtually ensures that absentee and other mail votes are worth *far* less then in-person votes, and are often not counted at all – do not sufficiently advance any government interest to pass muster.

138.   This is not to say, necessarily, that similar cost-cutting measures proposed sufficiently far in advance of an election would have to be unconstitutional (though they might – particularly given how dubious the proposition is that costs will actually be reduced).

139.   Rather, without giving States and local election officials *any*

---

*available at https://www.washingtonpost.com/business/2020/05/14/trump-postal-service-package-rates/.*

reasonable time to adapt both their processes and election laws (as USPS acknowledges, *see, e.g.*, Ex. 5 at 2, "[t]o be clear, the Postal Service is not … recommending that such laws be changed to accommodate the Postal Service's delivery standards"), the burden posed by upsetting the "settled expectation[s]" of voters, candidates, and States cannot be justified. *Yang v. Kosinski*, 960 F.3d 119, 132 (2d Cir. 2020).

140. Beyond that, the measures employed here may not even succeed in creating a net reduction in costs. The reduction in sorting machines across the country will lead to the need for USPS employees to sort and cancel millions of pieces of mail *by hand*. Thus, even if the interest in cost-reduction were cognizable in the abstract, because, "if anything, [these measures will] increase[]" costs, and therefore "carr[y] no weight in the context of this case*." Credico v. New York State Bd. Of Elections*, 2013 US Dist. LEXIS 109737 at *71-72 (EDNY 2013), 10-cv-4555-RJD-CLP.

141. Thus, as applied, the practices, policies, and changes in policy described in depth above pose an unjustified burden on the right to vote, with no corresponding justification. And so, they are unconstitutional.

## **COUNT II**
*(Fifth Amendment - Equal Protection and One Person, One Vote)*

142. Plaintiffs incorporate by references all the allegations above.

143. The principle of "one person, one vote" requires that courts seek to "[e]nsure that each person's vote counts as much, insofar as it [i]s practicable, as any other person's." *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54

(1970).

144.    And the Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated [] be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

145.    Indeed, "[a]n early case in our one person, one vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties [and t]he [Supreme] Court found a constitutional violation." *Bush v. Gore*, 531 U.S. 98, 107 (2000), *describing Gray v. Sanders*, 372 U.S. 368, (1963).

146.    The Supreme Court has also already ruled that, once absentee voting is part of the scheme for elections, all absentee voters must have similar guarantees that their votes count, as much as possible, the same as any other person's. *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974).

147.    Amid a pandemic, where many voters – for example, voters who are immunocompromised like Mr. Sainati, or told not to leave their homes like Mrs. Green – see no choice but to vote absentee, the effects of the policies here will fall in a pernicious and discriminatory pattern.

148.    Similarly, voters abroad may face – depending on the pandemic – legal barriers to voting in person.  For example, Plaintiff Rothschild, abroad in Costa Rica, faces the State Department's current Travel Advisory stating "[d]o not travel to Costa Rica due to COVID-19." *Travel Advisory for Costa Rica*, U.S. DEP'T OF STATE (August 6, 2020).  It would be profoundly unwise – if it is not simply impossible – for her to travel to the United States to cast her ballot in person.

149.   Upon information and belief, for many voters abroad, even if they *could* afford to travel back to the United States to vote, there may be advisories – and future executive orders – forbidding such travel.

150.   And even for voters who rely on absentee ballots to vote in much less dramatic circumstances (attending college in another state, for instance), the result is no different:  without absentee ballots, they will not be able to vote at all.  And with the current policy changes, their votes will inevitably be significantly less likely to count.

151.   Thus, in a sense, the Supreme Court has already held that the kind of policies employed here – measures that have the effect of making it so voters are "simply not allowed to use the absentee ballot and are denied any alternative means of casting their vote" (*see, e.g.*, ¶ 109 above, with President Trump saying, "they're not going to get the $3.5 billion.  Therefore, they can't do the universal mail-in vote.  It's very simple.") – are unconstitutional.  *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974) (failure to provide absentee voter registration to people held in jail awaiting trial outside their home county is unconstitutional).

152.   And, as the Court saw in *Gallagher*, along with the predictable effects of these policies (e.g., the votes of people unable to vote in person because of a physical disability will be worth less than the votes of able-bodied people who can), there will inevitably be *un*predictable, but equally constitutionally problematic effects:  "[a] voter's precious right to vote is just left to chance, random chance, whether he or she ends up with a post office that does its job."  2020 U.S. Dist.

LEXIS 138219, at *61.

153.   As detailed above, whether because postal workers with longer routes will simply not complete those routes under new regulations, because Post Office locations with more mail will fail to postmark *more* ballots before the deadline, or for any number of reasons, there is little question that if the Court does not act, random chance will dictate whether thousands upon thousands of absentee ballots across the country are counted.

154.   Thus, as applied, the policies and practices at issue violate the Constitution's promise of Equal Protection and the promise that all votes should be treated alike.


**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a) Issue a declaratory judgment that Defendants' actions have violated Plaintiffs rights under the Federal Constitution;

(b) Enter an injunction requiring Defendants take all steps necessary and sufficient to ensure that the USPS is adequately funded so that it can, and has no policies preventing, deliver all election mail (1) consistently with past practice, (2) in a manner that ensures absentee and other mail ballots are treated equal to in-person ballots, and (3) with sufficient staffing and overtime to handle a record level of mail voting;

(c) Enter an injunction, tailored to the facts described above and any further facts developed throughout the case, that is sufficient to (1) unwind the harm already caused by Defendants' actions and policies and (2) mitigate any harms that may flow from already accomplished harms (for example, the destruction/disposal of postal machinery);

(d) Grant Plaintiffs their attorneys' fees and costs of litigation under 28 U.S.C. § 2412 and Fed. R. Civ. P. 54(d);

(e) Grant any other and further relief that the Court may determine to be necessary and proper

Dated:  September ~~9~~22, 2020.

Respectfully submitted,

/s/

_____
J. Remy Green
Elena L. Cohen
Jessica Massimi
Jonathan Wallace, *of counsel*
COHEN&GREEN P.L.L.C.
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Ali Najmi
LAW OFFICE OF ALI NAJMI
261 Madison Avenue, 12th Floor
New York, New York 10016
T: (212) 401-6222
F: (888) 370-2397
ali@najmilaw.com

| Summary report: Litera® Change-Pro for Word 10.10.0.103 Document comparison done on 9/22/2020 4:04:10 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2020-09-09 - Amended Complaint.docx | |
| **Modified filename:** 2020-09-22 - Second Amended Complaint.docx | |
| **Changes:** | |
| Add | 3 |
| Delete | 4 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 7 |