

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*86 Chambers Street, 3rd Floor*
*New York, New York 10007*

October 8, 2020

**VIA ECF**

Hon. Victor Marrero, United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

      Re:    *Jones et al. v. United States Postal Service et al.*, No. 20 Civ. 6516 (VM)

Dear Judge Marrero:

      This Office represents the defendants in the above-referenced case. We write respectfully pursuant to the Court's October 7, 2020, Order, ECF No. 74, and in response to plaintiffs' October 6, 2020 letter motion, ECF No. 73 (the "Letter").[1] The Court should deny plaintiffs' motion because the government has complied with and will continue to comply with the Court's Order of September 25, 2020, ECF No. 57 (the "PI Order"), and because there is no basis to grant the new relief sought by plaintiffs, which has already been rejected by this Court and risks being impracticable and counterproductive. Plaintiffs' motion is not focused on Election Mail and is instead based on a fluctuation in on-time service performance scores for First-Class and Marketing Mail overall (of which Election Mail is only a small portion). Moreover, given the enormity and complexity of the Postal Service's operations, Plaintiffs have not shown and cannot show that this fluctuation was the result of any noncompliance with this Court's directives (it was not), and imposing the novel relief that Plaintiffs suggest is more likely, at this late time, to disrupt rather than expedite the delivery of Election Mail. In any event, the Court has already held that relief in this case should be "designed to remedy defects in USPS's handling of Election Mail, and not conditions relating to Postal Service operations more generally." Decision and Order at 18-19, Dkt. No. 66 (the "Overtime Order").

      **I.**    **The Postal Service Is Complying with the PI Order**

      As an initial matter, the Postal Service reiterates that its number one priority between now and Election Day is the secure and on-time delivery of the nation's Election Mail. The Postal Service is currently subject to five nationwide injunctions concerning its delivery of Election Mail, including the PI Order issued by this Court, and the Postal Service has taken numerous steps to comply with these injunctions and in support of the timely delivery of

---

[1] The information contained in this letter has been provided to this Office by the United States Postal Service, to be provided to the Court to comply with Defendants' obligations under the Court's Orders in this case.

Election Mail. *See, e.g.*, Additional Resources for Election Mail Beginning October 1, Dkt. No. 58-5 (discussing additional resources available to ensure the timely delivery of Election Mail). The Postal Service will continue to comply with the PI Order.

Although styled as a motion to enforce, plaintiffs' Letter does not argue that USPS is not complying with any particular provision of the PI Order, except for a single sentence in the Letter's penultimate paragraph. *See* Letter at 3. Instead, plaintiffs base their motion on dips in the overall on-time performance scores for First-Class Mail and Marketing Mail, of which Election Mail is only a small portion.[2] Contrary to plaintiffs' characterization, the PI Order—which was negotiated between the parties, except for one provision which was the subject of the Government's motion for clarification—does not require the Postal Service to achieve specific on-time overall performance scores. Indeed, the Court was clear in its decision on the Government's motion for clarification that "[p]laintiffs' claims and the Court's September 21, 2020 Decision and Order focused not on the Postal Service's policies and operations generally but on the extent to which USPS practices bear on its handling of Election Mail." Overtime Order at 17-18. The Court continued that "the Court devoted substantial effort to crafting default terms that precisely tracked the constitutional injuries at issue in this case—terms designed to remedy defects in USPS's handling of Election Mail, and not conditions relating to Postal Service operations more generally." *Id.* at 18-19.[3] Plaintiffs' motion essentially ignores these statements by the Court and seeks novel and unwarranted relief addressing the Postal Service's operations in general.

The only provision of the PI Order which plaintiffs' motion discusses as implicating non-compliance, *see* Letter at 3, requires the Postal Service to "make a good faith effort to fully implement the . . . steps [necessary to restore First-Class and Marketing Mail on-time delivery scores to particular levels.]" PI Order ¶ 4. The Postal Service has and will continue to make these good faith efforts. Plaintiffs' argument that the Postal Service is not in compliance with this provision overlooks the reality that the Postal Service has identified necessary steps to improve on-time delivery scores and is making good faith efforts to implement them, but that, even with the Postal Service's good faith efforts, the Postal Service faces a number of continuing challenges and sometimes does not achieve the service performance scores for which it strives. Fundamentally, this is a logistical problem—indeed, *the* logistical problem the Postal Service exists to solve—but it is not susceptible to resolution via the novel and impracticable relief that plaintiffs suggest, nor to plaintiffs' oversimplified, groundless characterization of the current

---

[2] Plaintiffs' theory of this case has grown broader and vaguer as it has progressed. Plaintiffs' complaint purported to advance a theory of intentional interference by the President with the delivery of Election Mail. *See, e.g.*, Complaint, Dkt. No. 1 ¶ 4. Plaintiffs' focus at the hearing on their motion for a preliminary injunction appeared to be mismanagement at the local level or, in the alternative, unclear directions from Postal Service Headquarters. Plaintiffs' present motion concerns the on-time scores for all First-Class and Marketing Mail across the nation. This is far afield from plaintiffs' original theory of the case and not the proper subject of constitutional claims.

[3] Moreover, as discussed in numerous submissions in this case, Election Mail is, and will be through the end of the 2020 election season, subject to a number of special and extraordinary handling measures to ensure that its expeditious delivery is prioritized and facilitated.

delivery performance as resulting from non-compliance with the Court's Order. Put another way, the Postal Service's service performance scores for First-Class and Marketing Mail for the last two weeks do not constitute a constitutional violation, but instead reflect the challenges faced by a complex nationwide organization with hundreds of thousands of employees.

For example, the delivery of mail has lately been complicated by factors beyond the Postal Service's control, including, but not limited to, the COVID-19 pandemic (which has caused continuing employee availability problems and a significant decrease in, *e.g.*, the availability of commercial flights to transport First-Class Mail by air), wildfires in the West, and hurricanes in the South. In addition, for the week of September 12 through September 18, 2020, the dip in service was partly attributable to volume build-up from the Labor Day Holiday weekend. *See* Press Release, The U.S. Postal Service Issues New Performance Report for the Week of September 12th Consistent with Performance Metrics Following a Federal Holiday, *available at* https://about.usps.com/newsroom/national-releases/2020/0924-usps-service-performance-update.htm. USPS made operational adjustments to address this, including increased staffing for locations and operations with expected high volumes, early Saturday start times for all local operations, and expanded process monitoring to ensure any performance issues were frequently communicated and elevated as necessary. For the week of September 19 through 25, 2020, the dip in service also was partly attributable to complications with the September 14, 2020, opening of the Postal Service's Great Lakes and Chicago Surface Transfer Center ("STC"). *See* Press Release, The U.S. Postal Service Issues New Service Performance Report for the Week of September 19th, *available at*, https://about.usps.com/newsroom/national-releases/2020/1001-usps-issues-new-service-performance-report.htm. Specifically, Presort First-Class Mail going through this STC contributed to a decrease in the First-Class Mail processing score by approximately 1.2 percent for the week of September 19.  To address this issue, the Postal Service deployed support teams to the STC and worked with contracting teams to increase staffing and to improve operations. These issues and the Postal Service's responses to them are not related to Election Mail specifically or to any supposed non-compliance with the preliminary injunctions in force against the Postal Service. Moreover, the Postal Service expects to report to Congress today (and to plaintiffs and this Court tomorrow), that, for the week of September 26 through October 2, 2020, the overall on-time service performance scores improved by 1.74% for First-Class Mail and by 1.14% for Marketing Mail. Accordingly, the issues raised by plaintiffs do not support further relief from this Court, or a finding that the Postal Service is not in compliance with the PI Order.

## II. Plaintiffs' Proposed Relief Is Not Connected to Election Mail and Risks Being Impracticable and Counterproductive

The relief contemplated by plaintiffs in their motion is not connected to Election Mail and has either already been rejected by this Court or is being proposed only at this late time, and risks being impracticable and counterproductive. Apart from a request for additional data addressed below, plaintiffs mention only two specific items for relief in their motion: "directing Defendants to use overtime for non-election mail until service performance improves" and Court consideration of "whether some kind of independent monitor is necessary to ensure service standards do not continue to drop." Letter at 3. The first item—using overtime for non-election mail—was the subject of the Government's motion for clarification, which the Court granted in

part, concluding that the relief pertaining to overtime in this case did not extend beyond Election Mail. *See* Overtime Order at 17-19. Nor do plaintiffs identify any basis to believe that the two-week dip in overall Postal Service performance scores discussed herein bears any relation whatever to the Postal Service's use of overtime in recent weeks or months.

The second item proposed by plaintiffs—that the Court "consider whether some kind of independent monitor is necessary to ensure service standards do not continue to drop"—is phrased in such vague terms it is difficult to address precisely. Letter at 3. But, no matter what plaintiffs envision, appointing an independent monitor or ombudsman to oversee Postal Service operations less than four weeks before the National Election would likely be impracticable and counterproductive. Setting aside that properly vetting any such individual would likely take a prohibitive amount of time, introducing yet another source of authority to direct Postal Service employees and operations, at a critical time and when the Postal Service is subject to five nationwide preliminary injunctions, risks creating confusion in the field. In addition, as phrased, plaintiffs' request for an independent monitor is not tied to Election Mail in any particular way and instead appears directed at the Postal Service's operations in general, which the Court has already held are not a proper subject of relief in this case. *See* Overtime Order at 17-19.

Although plaintiffs do not expressly request this relief in their motion, a premise of plaintiffs' motion is that the Court has or should order the Postal Service to maintain a specific, nationwide, on-time service performance score for First-Class and Marketing Mail at pre-COVID levels. The Court has not entered and should not enter such relief. As explained above, such relief would not be tailored to Election Mail and therefore would be contrary to the Court's decision on the Government's motion for clarification. *See* Overtime Order at 17-19. Moreover, ordering maintenance of a particular score would be impracticable and contrary to Federal Rule of Civil Procedure 65(d)(1). As discussed above, achieving a target on-time service performance score is a logistical challenge that—despite intensive, good-faith efforts that are underway—may be beyond the Postal Service's power to overcome in a given week. In addition, Rule 65(d)(1) requires that every injunction "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Ordering the Postal Service to obtain a specific on-time performance score would amount to requiring a result rather than an act—and a result that it may not be possible for the Postal Service to achieve given challenges and conditions that presently exist and may later arise.

The Court should also reject plaintiffs' request for additional, more "recent" or "real time" data. Letter at 3. In short, the weekly data reports that the Postal Service has been supplying in this case pursuant to the PI Order are far more complete, accurate, and reliable than shorter-term, more "real time" data would be, because more "real time" data is incomplete, subject to change, and overall, is not an accurate representative of the Postal Service's service performance. In other words, plaintiffs' request for more data, sooner, amounts to a request for worse data, more often. Providing such information thus would be an unwarranted burden on the Postal Service that would not reliably clarify Postal performance or inform operational decision-making. By contrast, the current weekly reports are more likely to be informative, helpful, and valuable to the Court and to the public.

Plaintiffs mischaracterize the weekly data reports that the Postal Service has been providing to the Court as reflecting "a multiple week delay." Letter at 3. Taking the Postal Service's most recent updates as an example (ECF Nos 68-1, 68-2), data reported for "9/19/20" reflects a week's worth of service performance data in various categories for a Saturday through Friday period (September 19, 2020 through September 25, 2020). In other words, the weekly reports provide a picture of how mailpieces in various categories performed according to their applicable service standards during that week. However, the Postal Service cannot accurately and completely report that performance data on, for example, the few days directly following the end of the reporting period. That is because the summary figures reported in these updates are, broadly speaking and without using technical language, an amalgam of hundreds of millions of data points gathered at various points within the Postal Service's collection, processing, and delivery networks. Focusing only on single-piece First-Class Mail (which would include, *e.g.*, all completed ballots being mailed by individual voters), the weekly service performance score of mailpieces in that category reflects three different components of measurement: (1) First Mile, which represents the time from acceptance of the mailpiece (*e.g.*, from a collection box or retail unit) to the first processing operation (and which is measured using a sampling methodology executed by mail carriers); (2) the mailpiece's time between its first and last processing operations (which encompasses the aggregation and sorting of mail to go to other facilities, and its delivery point sequencing in anticipation of delivery on the street); and (3) Last Mile, which tracks mailpieces from their last processing hit to delivery, and which is also measured using a complex sampling methodology conducted by mail carriers.[4]

In the days following a one-week Saturday through Friday reporting period, the Postal Service's data and reporting departments perform a number of critical functions that ultimately produce statistically reliable, complete, and accurate weekly service performance scores, including collecting, aggregating, analyzing, and aligning hundreds of millions of data points coming in from mail carriers and processing facilities across the country. Based on the Postal Service's analyses and experience, a given week's worth of service performance data does not sufficiently "settle" until several days later, which is why the Postal Service is providing its weekly service performance updates to Congress every Thursday. Reporting data sooner than that would be incomplete and unrepresentative; for example, reporting that week's data during the immediately following few days would fail to reflect, among other things, delayed mailpieces that were not delivered according to their service standard during the Saturday through Friday reporting period or very soon thereafter. Moreover, the Postal Service has observed that individual days during the week tend to exhibit unique and differential service performance patterns that would be misleading and unhelpful when taken out of a longer-term service picture; Sundays, in particular (on which mail is not delivered), tend to distort service performance scores early in the following week. For these reasons and numerous others, the weekly service performance reports that the Postal Service is currently providing to Congress and this Court at the end of each week represent the data that is the most representative and reliable—and therefore of the most value. In addition, requiring the Postal Service to produce more frequent, lower quality data reports would impose a new burden that would divert important managerial and other resources, in exchange for little benefit to the Court or the public, at a time when the

---

[4] This data gathering process has been reviewed and approved by the Postal Regulatory Commission.

relevant Postal Service employees and units are already fully occupied by ever-expanding reporting obligations and their baseline function to assist the Postal Service in fully understanding and improving its delivery operations.

For the foregoing reasons, the Court should deny plaintiffs' motion.

We thank the Court for its consideration of this submission.

Respectfully,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By: /s/ *Steven J. Kochevar*
REBECCA S. TINIO
STEVEN J. KOCHEVAR
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2774/2715
E-mail: rebecca.tinio@usdoj.gov
steven.kochevar@usdoj.gov